# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

FILED
U.S. DIST. COURT
BRUNSWICK DIV.

2005 OCT 27  A 11: 33

CLERK _____
_____ OF GA.

UNITED STATES OF AMERICA,          :          CIVIL ACTION
ex. rel. TED WHITTEN,

                                   :

        Plaintiff,

                                   :

            v.

TRIAD HOSPITALS, INC., as          :
successor to QUORUM HEALTH
GROUP, INC., QUORUM HEALTH         :
RESOURCES, INC., and QUORUM
HEALTH RESOURCES, LLC,             :

        Defendants.                :          NO. CV202-189


### O R D E R


    Plaintiff, Ted Whitten, brought suit against Defendants,

Triad Hospitals, Inc., as successor to Quorum Health Group,

Inc., Quorum Health Resources, Inc., and Quorum Health

Resources, LLC (collectively, "Quorum"),[1] seeking to recover

damages and civil penalties arising from Defendants' alleged

---

[1]    Quorum Health Resources, Inc., was reorganized into a limited liability company in 1998 and renamed Quorum Health Resources, LLC. On April 27, 2001, Quorum Health Group, Inc., and its subsidiaries, merged with Triad Hospitals, Inc.

AO 72A
(Rev. 8/82)

health care fraud against the federal government. Whitten seeks relief under the <u>qui</u> <u>tam</u> provision of the False Claims Act, codified at 31 U.S.C. § 3730(b).[2]

The case is before the Court on Quorum's motion to dismiss under Federal Rule of Civil Procedure 12(b)(1).[3] Because Whitten released his claim against Quorum for valuable consideration, Defendants' motion will be **GRANTED**.

## BACKGROUND

Between 1980 and 2001, Whitten worked for the Glynn Brunswick Memorial Hospital Authority (the "Authority") in a number of positions, including compliance officer. The Authority owns and operates Southeast Georgia Regional Medical Center, located in Brunswick, Georgia, and Camden Medical Center, located in St. Marys, Georgia.

In 1989, Quorum began providing the Authority with management services. Quorum supplied the Authority with a

---

[2]

This law allows private parties, known as relators, to file suit on behalf of the federal government in cases where fraud is alleged to have occurred.

[3]

At oral argument, the Court converted the motion to dismiss into a motion for summary judgment so that matters outside the pleadings could be considered. The parties were given twenty days to file any supplementary materials.

AO 72A
(Rev. 8/82)

Chief Executive Officer and Chief Financial Officer to manage the hospitals' day-to-day operations.  Whitten's complaint alleges that Quorum is responsible for the presentation of false claims for payment to the United States government under the Medicare, Champus, and Tricare programs.[4]

Whitten's averments of health care billing fraud fall into six categories, which he alleges took place at the hospitals from the mid-to-late 1990s through part of 2000.  Whitten asserts that Quorum is responsible for improper billing for (1) charges not permitted under Medicare Bulletin 1836, (2) durable medical equipment, (3) observation room services, (4) Medicare services provided without a physician's order, (5) cardiac rehabilitation services, and (6) mental health unit services.

On September 29, 2000, the Authority terminated its relationship with Quorum.  A few months later, Whitten left the Authority's employ.  On January 3, 2001, Whitten and the Authority entered into a severance agreement.

---

[4]     Champus is the acronym used to describe the Civilian Health and Medical Program of the Uniformed Services, a benefit program for retired armed forces personnel and dependents of active and retired military personnel.  Tricare is a managed health care program that supplements Champus.  United States v. Whiteside, 285 F.3d 1345, 1346 (11th Cir. 2002).

AO 72A
(Rev. 8/82)

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in his favor. . . ", United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991)(en banc)(internal quotation marks omitted).

In the instant motion, Quorum argues that the Court lacks subject matter jurisdiction over the case. First, Quorum asserts that Whitten's complaint is precluded under the severance agreement Whitten entered into with the Authority. Second, Quorum contends that an agreement between the Authority and the federal government prevents Whitten from asserting some

4

of his claims against it.  Third, Quorum maintains that the Court lacks jurisdiction under the public disclosure bar of the False Claims Act.  Because the Court agrees that Whitten's severance agreement bars him from serving as a relator, it need not reach Defendants' other arguments.

## DISCUSSION

The Court begins its analysis by noting that Whitten's severance agreement is interpreted under federal law.  When a release of a right to sue impacts federal rights or interests, federal common law controls the interpretation of the agreement.

> When the United States disburses its funds or pays its debts, it is exercising a constitutional function or power. . . .  The authority [to do so] had its origin in the Constitution and the statutes of the United States and was in no way dependent on the laws [of any State].  The duties imposed upon the United States and the rights acquired by it . . . find their roots in the same federal sources.  In absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards.

Clearfield Trust Co. v. United States, 318 U.S. 363, 366-67 (1943); see also United States ex. rel. Green v. Northrop Corp., 59 F.3d 953, 958-62 (9th Cir. 1994) (holding that federal common law applies to interpret a release of a qui tam

5

action under the False Claims Act); <u>Town of Newton v. Rumery</u>, 480 U.S. 386, 392 (1987).

Under federal common law, the Court looks to the intent of the parties to interpret the contract. <u>Zenith Radio Corp. v. Hazeltine Research, Inc.</u>, 401 U.S. 321, 347 (1971). "The clearest manifestation of this intent is the express terms of the written agreement." <u>Coleson v. Inspector Gen. of the Dep't of Def.</u>, 721 F. Supp. 763, 768 (E.D. Va. 1989) (pre-filing release of claim under False Claims Act whistleblower provision deemed effective). Where the terms of the contract are unambiguous, the Court will not look outside the four corners of the document to determine its meaning.

The terms of Plaintiff's severance agreement are straightforward. In exchange for more than $124,000, Whitten released the Authority, along with its officers and agents, from "any and all claims, demands, actions, and causes of action of any kind or nature, known or unknown, arising or existing until the date of this instrument." Dkt. No. 82, Ex. 2 at 1.

Yet, Whitten asserts that a separate clause of the agreement obviates the force of this provision. Whitten points to a section of the agreement that states:

6

> The parties hereto acknowledge and agree that Ted R. Whitten is contemplating initiating an action for damages or other claim or claims against Quorum Health Resources, LLC, or its proper affiliate, regarding matters arising out of his employment by Releasees and nothing herein is intended to or shall be construed to release Quorum, et al, from any such claims or liabilities.

Dkt. No. 82, Ex. 2 at 2.

Whitten contends that this clause reserved his right to bring the instant complaint. However, as Whitten conceded at oral argument, his claim as a relator is entirely derivative of the government's right to recover for fraud against it. In short, Whitten did not reserve the right to serve as a relator because the False Claims Act case does not relate to "matters arising out of his employment[.]" The claim is not dependent on Whitten's own employment at the hospitals. See, e.g., United States ex rel. Bahrani v. Conagra, Inc., 183 F. Supp. 2d 1272, 1275 n.2 (D. Colo. 2002).

Notably, the agreement indicates that when the parties wished to describe or specify False Claims Act matters, they knew how to do so. One provision states that "The undersigned agrees not to file any complaint against Glynn-Brunswick Memorial Hospital Authority . . . relating to any alleged improper billing practices . . . nor to give such information

to any other person." Dkt. No. 82, Ex. 2 at 1 (emphasis added).

The legal maxim, _expressio unius est exclusio alterius_,[5] buttresses this conclusion. The fact that the severance agreement specifically reserved any employment related claims that Whitten might have had against Quorum indicates, first, that Quorum was covered by the language releasing the "agents" of the Hospitals (otherwise, the parties would not have felt the need to carve out an exception) and, second, that non-employment related claims against Quorum were released.

Quorum was released by the severance agreement because it was the Authority's agent at the time the alleged fraud occurred, and because its employees were the Authority's officers at that time. Contrary to Plaintiff's contentions, it is immaterial that Defendants were not named specifically in the agreement. In addition to the Authority itself, the Authority contracted to release its "officers, agents, trustees, servants, and employees . . . and the heirs, executors, administrators, successors and assigns of any of

---

[5] The expression of one thing is the exclusion of another. Black's Law Dictionary 1717 (8th ed. 2004).

8

them" from liability under the terms of the agreement.  Dkt. No. 82, Ex. 2 at 1.

If Quorum had to be specifically called out in the agreement for the release to be effective, as Whitten suggests, then these words mean nothing.  The Court rejects such an interpretation.  Rather, the Authority is entitled to the benefit of its bargain.  The Authority determined that it was in its interests to protect these other persons and entities from litigation initiated by Whitten.  Whitten agreed to these terms in exchange for a severance package to which he was not otherwise entitled to as an at-will employee.

It is also immaterial that Quorum was no longer an agent of the Authority at the time the Authority entered into the severance agreement.  Without a clear manifestation of intent in the release that such a construction was intended, the Court gives the ordinary effect to the words used.  The contractual release extends to the agents of the Authority at the time the alleged fraud occurred.  Again, had Whitten understood this language to cover only the agents of the Authority at the time the release was signed, then the clause reserving his right to bring employment related claims against Quorum is superfluous and unnecessary.

Nor is the contract ineffective because Whitten was never employed by any Defendant.  If supported by the facts, Whitten might have brought any number of causes of action against Quorum relating to his employment at the hospitals, such as tortious interference with his employment relationship, defamation of character, age discrimination, retaliation based on his complaints of unlawful workplace discrimination, et cetera.  The fact that Whitten may not have had any viable employment related claims to reserve does not defeat the plain import of the words of the contract.  Whitten's suggestion at oral argument that he actually meant something other than what was stated in the agreement is inadmissible parol evidence, and the Court's function is not to improve upon the terms of agreements reached freely by the litigants before it.

There has been no assertion that Whitten was coerced into entering the agreement in any way.  The fact that Whitten made a voluntary decision to enter into the agreement supports its enforcement.  <u>Rumery</u>, 480 U.S. at 398; <u>see also</u> <u>Hemstreet v. Speigel, Inc</u>., 851 F.2d 348, 350 (Fed. Cir. 1988)("The law strongly favors settlement of disputes, and there is a compelling public interest and policy in upholding and enforcing settlement agreements voluntarily entered into.").

10

In addition to Plaintiff's arguments regarding the proper interpretation of the severance agreement, Whitten also contends that his agreement to release his right to serve as a relator is unenforceable as a contract against public policy.

In <u>Town of Newton v. Rumery</u>, the Supreme Court found that a waiver of right to sue under § 1983, in exchange for a prosecutor's decision to drop criminal charges against the accused, was enforceable.  The Court explained that such agreements are binding where they are not outweighed by the public policy interests harmed by enforcement of the agreement. 480 U.S. at 392 & n.2.  The Court specifically noted that "we hesitate to elevate more diffused public interests above [the plaintiff's] considered decision that he would benefit personally from the agreement."  <u>Id</u>. at 395.

In <u>United States ex. rel. Green v. Northrop Corp.</u>, the Ninth Circuit refused to enforce a plaintiff's release of his right to serve as a relator under the False Claims Act.  59 F.3d 953 (9th Cir. 1994).  The court determined that the policies of the False Claims Act would be undermined by enforcing such agreements because if such releases were enforceable, the government might never learn of allegations of fraud against it in the first place.  <u>Id</u>. at 962-69.

11

Applying <u>Rumery</u>, the <u>Green</u> court concluded that the interest in settling disputes, being ever present, cannot outweigh the government's otherwise significant interest in learning of fraud against it. <u>Id</u>. at 968-69.

Yet, in reaching its conclusion, the <u>Green</u> court did not consider whether a relator who has signed a release ought to be able to <u>maintain</u> a <u>qui tam</u> action in cases where the government has declined to intervene. Under the procedures of the False Claims Act, a relator begins a civil lawsuit by filing a sealed complaint with the Court. The government then reviews the averments, without disclosure to the defendant. After completing its investigation, the government decides whether it will intervene and become primarily responsible for prosecution of the case. If the government elects to participate, the relator may recover fifteen to twenty-five percent of any recovery, with the balance going to the federal treasury. 31 U.S.C.A. § 3730(d)(1) (2003). If the government does not intervene, the relator litigates the action on behalf of the federal government and, if successful, is entitled to between twenty-five and thirty percent of the eventual recovery. 31 U.S.C.A. § 3730(d)(2) (2003).

12

At least in cases where the government has declined to intervene, public policy favors the enforcement of agreements like the one entered into by Whitten and the Authority.   The public policy interest identified in Green, encouraging disclosure of allegations of fraud against the government, is served adequately by a rule that prohibits a litigant who has agreed to release his right to serve as a relator from maintaining a qui tam action if the government declines to intervene in the action.   See United States ex rel. DeCarlo v. Kiewit/AFC Enters., Inc., 937 F. Supp. 1039, 1043-47 (S.D.N.Y. 1996) (wherein the defendant suggested such an approach).[6]

Such a rule has the merit of encouraging those with relevant information concerning fraud against the government to come forward, without unduly rewarding litigants that seek to renege on their agreements.   This result is consistent with Congressional intent in amending the False Claims Act in 1986 to encourage relators to bring qui tam suits under the statute. When a court enforces a valid, uncoerced private agreement, without inordinately hampering the disclosure of harm to the

---

[6]     Another basis for reaching this result was observed by the defendant corporation in Green, where it observed that the False Claims Act was a comprehensive statutory scheme that prohibits settlements by relators after the filing of the complaint, without the government's approval. Northrop argued that Congress' failure to limit or proscribe pre-filing settlements indicates that such releases are enforceable.

13

public fisc, such a result is not in any measure inconsistent with public policy.

It may be true that a relator who has entered into a facially valid release may be less inclined to disclose fraud on the government through the filing of a <u>qui</u> <u>tam</u> action if the prevailing legal rule would dismiss his suit in the event the government decides not to intervene. <u>Id</u>. at 1047. The relator would have no guarantee that the government would agree to participate in the suit, and even if the government did intervene, the relator's recovery in the event of a successful outcome could be less than it would be if no such restriction existed at all.[7]

However, the facially valid release itself likewise inhibits the filing of <u>qui</u> <u>tam</u> actions. A layman unfamiliar with False Claims Act precedents likely would be more put off from filing suit by the express terms of the contract he signs than he would be by a rule making the involvement of the government in the suit an important consideration to whether the case could go forward.

---

[7] As explained, a relator's maximum recovery when the government intervenes is twenty-five percent of the award. In an ordinary case where the government declines to intervene, the relator's possible recovery ranges from twenty-five to thirty percent of the total award.

14

In any event, the Court does not fashion an inflexible rule barring all relators from initiating suit where he has released his right to serve as relator. The possible disincentive to notify the government of fraud against it engendered by the rule described herein is counterbalanced adequately by the fifteen to twenty-five percent recovery which the relator would obtain in the event the government decides to intervene and successfully prosecutes the case.

Whitten had no public duty to bring this <u>qui tam</u> action. While Congress wished to supplement the government's own enforcement of the False Claims Act through actions brought by private citizens, Congress did not provide private citizens with an unfettered right to proceed as relators. One limit in the statutory framework is the public disclosure bar, which precludes actions brought by litigants who learn of fraud secondhand. 31 U.S.C.A. § 3730(e)(4) (2003). Precluding Whitten from proceeding with his suit is consistent with the limits provided in the statutory scheme.

Other courts have found that relators may be barred from proceeding under the <u>qui tam</u> provision of the False Claims Act, irrespective of the government's interest in preventing fraud against it. <u>See</u>, <u>e.g.</u>, <u>United States ex rel. Paul v. Parsons,</u>

15

Brinkerhoff, Quade & Douglas, Inc., 860 F. Supp. 370, 372-75 (S.D. Tex. 1994); United States ex rel. Barajas v. Northrop Corp., 147 F.3d 905, 909-10 (9th Cir. 1998) (res judicata may apply to qui tam actions, even though relators act as private attorney generals under the law); United States ex rel. Gebert v. Transp. Admin. Servs., 260 F.3d 909, 911-912; 915-17 (8th Cir. 2001) (personal release in context of bankruptcy proceeding deemed effective).[8]

In sum, Quorum was released under the terms of Whitten's severance agreement, and public policy does not bar enforcement of the contract under the facts of this case.

## CONCLUSION

For the reasons explained above, Defendants' motion for summary judgment is **GRANTED**. See Dkt. No. 79.  The parties' motions and objection relating to their discovery disputes are **DISMISSED** as moot.  See Dkt. Nos. 96, 117, 119, 120, 122, & 151.  The Clerk is directed to enter judgment accordingly.

**SO ORDERED**, this _____ 1ητμ _____ day of October, 2005.

_____
JUDGE, UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA ,

---

[8] Moreover, Quorum could face a similar suit from a different relator, so long as the statutory requirements are satisfied.  See id. at 917.

AO 72A
(Rev. 8/82)