# *Report on* MEDICARE COMPLIANCE

*Volume 9, Number 37 • October 19, 2000*

### Billing Errors • Fraud and Abuse • False Claims • Compliance Programs

## Contents

**4** OIG: Hospital Overcharged for Outpatient Psych Care

**4** News Briefs

**5** Expect More Private-Payer Audits; States Push Anti-Fraud Measures

**6** Lie About Hospital CEO's Sex Scheme Gets Man Indicted

**6** Quick E-Mail Survey Can Reveal Compliance-Program Gaps

**7** Trover Clinic Foundation Quick Compliance Survey

**8** Basic Steps for a Case-Mix Index Review

**8** People on the Move

**See page 2 for Free Subscriber-Only E-mail News Alerts**

**Managing Editor**
Nina Youngstrom

**Executive Editor**
Michael E. Carbine

## Drops in Case-Mix Index Reflect Coding Problems, Fraud Anxiety

Some hospitals are experiencing drastic drops in their case-mix index, perhaps partly because fear of DRG upcoding accusations has prompted coders to overcompensate by undercoding.

Case-mix index declines are painful because they mean reduced reimbursement. But this development represents the classic tension between your entitlement to as much reimbursement as appropriate and fear of fraud accusations.

One hospital in Washington state has seen its percentage of DRG 79 cases billed decrease from 80% of the total DRG case mix to 10% over several years. Another hospital's DRG 79 billing rate has declined from 30% to 12%. "How can you have a declining case mix, year after year?" says consultant Ruthann Russo, director of the HP3 Research Institute. Even if your coding compliance efforts and other factors bring down the case-mix index, it should level off. "Staff is so paranoid."

To improve DRG coding accuracy generally, hospitals should figure out their hospital's specific coding and documentation weaknesses and give coders extra guidance and support in these areas (for advice on a case-mix index review, see box, p. 8).

*continued on p. 8*

## Hospital vs. Management Company: Who's Responsible If Feds Fine Hospital?

The feds are investigating the Hospital Authority of Southeast Georgia Regional Medical Center — which is managed by Quorum Health Group — for possible Medicare and TRICARE billing improprieties. If the U.S. attorney's office in Savannah winds up suing the hospital, who will be left holding the bag for any fines or penalties that could result — the hospital district or Quorum?

On the one hand, Medicare, TRICARE and other claims are submitted under the hospital's provider number. Quorum spokeswoman Shea Davis contends that Quorum is not to blame for the hospital's billing problems. "Ultimately, billing and cost reports are the responsibility of the hospital," she says.

On the other hand, Quorum supplied the hospital district with its four top executives. The management contract between Quorum and the hospital district, obtained by RMC, states that "Quorum shall establish and administer accounting procedures and controls in accordance with GAAP and shall cause to be prepared and delivered to the Board for its final approval cost reports and other materials required in connection with third party reimbursement..."

One insider says there's plenty of blame to go around. Both the hospitals and Quorum, the insider alleges, failed to fix billing problems despite repeated fiscal intermediary audits that flagged errors and a risk assessment a year ago that iterated these flaws. Whatever happens, the hospital district doesn't intend to take this lying

Published by Atlantic Information Services, Inc., Washington, DC • 1-800-521-4323 • www.AISH...



DEFENDANT'S EXHIBIT 10   5-25-07

down, hospital district board member Tim Chandler tells *RMC.* "If at some point in time fines and penalties are assessed," there may be litigation to get Quorum to cough up money to help the hospital settle any potential overpayment or false claims lawsuit, he says.

What's going on in Georgia — and in light of other developments — raises interesting compliance-management issues for health care organizations that use outside management companies, billing services and even consultants for discrete projects. And it's a reminder to carefully consider how your contracts are written in terms of liability for Medicare violations.

The publicly owned hospital district two weeks ago decided to terminate its contract with Quorum. But for 11 years, the hospital district has contracted with Quo-

**Report on Medicare Compliance** (ISSN: 1089-6872) is published 45 times a year by Atlantic Information Services, Inc., 1100 17th Street, NW, Suite 300, Washington, D.C. 20036, 202-775-9008, www.AISHealth.com.

Copyright © 2000 by Atlantic Information Services, Inc. All rights reserved. No part of this publication may be reproduced or transmitted by any means, electronic or mechanical, including photocopy, FAX or electronic delivery without the prior written permission of the publisher.

Report on Medicare Compliance is published with the understanding that the publisher is not engaged in rendering legal, accounting or other professional services. If legal advice or other expert assistance is required, the services of a competent professional person should be sought.

Managing Editor, Nina Youngstrom; Executive Editor, Michael E. Carbine; Publisher, Richard Biehl; Marketing Director, Donna Lawton; Circulation Manager, Kristin Mulcahy; Production Manager, Andrea Gudeon

Call Nina Youngstrom at 1-800-521-4323 with story ideas for future issues of RMC.

Go to www.AISHealth.com to join your colleagues at the Report on Medicare Compliance Listserv.

An updated multi-year index for past issues of RMC appears at www.AISHealth.com (click on "Newsletter Indexes").

To order Report on Medicare Compliance:

(1) Call 1-800-521-4323 (major credit cards accepted), or

(2) Order online at www.AISHealth.com (click on "AIS MarketPlace," then "Report on Medicare Compliance" and then "Buy Now"), or

(3) Staple your business card to this form and mail it to: AIS, 1100 17th St., NW, Suite 300, Wash., DC 20036.

    Payment Enclosed*  ❑ $473

    Bill Me  ❑ $498

*Make checks payable to Atlantic Information Services, Inc. D.C. residents add 5.75% sales tax.

❑ Add $145 for a searchable database of RMCs published since 1997 (see "NewsSearch" at www.AISHealth.com). Current subscribers who wish to add the searchable database capability should call 1-800-521-4323.

FOR SUBSCRIBERS ONLY: E-mail alerts are rushed to RMC subscribers when timely news breaks. To receive this free subscriber-only service, send an e-mail to "RMCALERT@aispub.com" and say "sign me up." You'll also receive a free e-mail edition of RMC on the day of publication, in addition to the print copy.

**Free Subscriber-Only E-Mail Bulletins**

This week's *RMC Alert* — broadcast on Oct. 16 by e-mail only — had fast-breaking news of how private payers are following states' leads and cracking down on fraud; and the OIG's charge against St. Vincent's Hospital for Medicare outpatient psychiatric fraud. If you're not getting these free weekly news flashes to subscribers (and free e-mail delivery of *RMC*), send an e-mail to RMCalert@aispub.com and say "sign me up."

rum to manage the Brunswick hospital and affiliated Camden Medical Center. Quorum furnishes the CEO, CFO and COO for the Brunswick hospital and the administrator for the smaller Camden hospital. Quorum and the hospital negotiate the executive compensation, but the hospital shells out the money — and the executives are Quorum employees. The hospital authority pays Quorum $27,000 a month in management fees, on top of the salaries, bonuses and benefits of the top executives. In total, the hospital district paid Quorum $1.2 million last year, Chandler says.

Quorum's services include giving the hospital district access to Quorum compliance resources. But the hospital has its own compliance team and compliance committee, and also hired an outside compliance consultant.

"We are transitioning them out," Chandler says. Sources say the hospital decided to drop Quorum partly because of the alleged billing irregularities at issue in the federal government's investigation. The U.S. attorney's office is examining whether the hospitals overbilled TRICARE. One issue: whether the hospital charged extra for durable medical equipment that is supposed to be included in the room rate. Chandler called this "an isolated" billing problem. "We don't necessarily agree with what TRICARE is saying," he says. "It's a disagreement over procedure."

But a risk assessment performed by a non-Quorum compliance consultant a year ago warned the hospital that it had problems in several areas, including Medicare billing and the TRICARE overcharges.

"The numerous audits that have been conducted by outside agencies at the [Southeast Georgia Regional Medical Center] over the last several years should provide the hospital authority board with an indication of the magnitude of the increasing risk within the organization," the risk assessment, obtained by *RMC*, stated. For example, HCFA found serious non-compliance with Medicare-as-Secondary-Payer documentation requirements. The hospital is now under 100% focused review.

Though Chandler says Quorum is losing its contract mainly because the hospital's performance on a series of

EDITORIAL ADVISORY BOARD: [illegible roster text]

parameters — including finances, customer satisfaction and physician satisfaction — was not up to par, he admits that the billing problems are also an issue.

"The buck stops with the CEO, and he is employed by Quorum. I feel that one of the reasons for having a management company is to help you work through the minefields. If it's done incorrectly, there is accountability." If the Georgia hospital has to pay fines, Chandler says you can bet it will sue Quorum to help defray the pain of the penalties.

At least one former government lawyer agrees. "The government follows the money and if it leads to the [consultants], they face liability," says attorney Gabe Imperato. "If Quorum is trying to tell you it's just the hospital's problem, they are living a little in La-La Land."

## So Much Depends on Contract Language

If the Hospital Authority of Southeast Georgia Medical Center winds up in a false claims case, who's responsible?

The reality is, a lot depends on how the management contract with Quorum was written, says former U.S. attorney Dave Queen. "A contract between a billing or management company and a [provider] can be crafted to create or eliminate liability on either side."

Queen says health care organizations often fail to "take adequate precautions," like having a lawyer with health-care expertise review the contract. In his experience, 90% of providers sign contracts with billing companies that were written by the billing company. These contracts tend to have exclusions that insulate the billing company from liability if they make errors or commit fraud and the provider gets tagged for it.

The providers typically "waive all their right to sue the billing company," Queen says. "This illustrates the importance of having your lawyer review any contract with a [third] party."

## Quorum Took Heat for Managed Hospitals

What's interesting is that Quorum has tentatively agreed to pay $95.5 million to settle two false claims cases originally filed by whistleblowers — one of which alleged that Quorum submitted inflated Medicare cost reports on behalf of hospitals that it managed.

Quorum didn't benefit financially from the extra Medicare income allegedly generated by those cost reports, notes Peter Chatfield, an attorney representing the whistleblower who sued Quorum. Yet Quorum — not the hospitals that benefited from the excessive Medicare reimbursement — is taking the hit.

The whistleblower originally named the managed hospitals individually in the lawsuit as well, but decided to drop them. Shea Davis, the Quorum spokeswoman, says Quorum decided to free the hospitals from the liability and take responsibility for the billing snafu.

Regardless, the point is that any entity involved in the alleged fraud can be pursued, Chatfield says. "The greater wrongdoer [in this particular false-claims case] was the management company, which was making decisions about how to do cost reports and reserves," Chatfield says. "The hospital executives were employed by Quorum. The decision was made that the more culpable party was Quorum." Chatfield notes that Quorum has since stopped preparing cost reports for its hospitals, and pays an outside expert instead.

Davis notes that Quorum never admitted guilt, and that "after two years of reviewing the evidence, we feel even more strongly we didn't do anything wrong." She notes that Quorum has a compliance program and offers its clients compliance templates and other services.

## The Flip Side: Consultants at Risk

What if the health care organization persists in misconduct, despite the consultant's warnings against it? "A billing consultant does not have an obligation to report known overpayments to the government made by the provider. But if the billing agent or consultant engages in actions which are complicit in either failing to report or concealing the overpayment, that will bring the consultant into harm's way," says Imperato, with Broad and Cassel.

Just look at the federal government's false claims lawsuit against KPMG in Tampa, Fla. The Justice Department has intervened in a whistleblower case against the consulting firm that alleged KPMG helped Basic American Medical Inc. and Columbia Hospital Corp. submit false claims through Medicare, Medicaid and CHAMPUS cost reports, Imperato says.

The government theory of liability is that KPMG has a "duty to report known errors resulting in unwarranted federal payments."

The HHS Inspector General's compliance-program guidance for third-party billing companies also makes a consultant's duty clear in terms of acting on the

## AIS Document Service

The following document cited in this issue is available by calling 1-800-521-4323 (202-775-9008 in D.C.) and charging the fee to a major credit card. Documents will be mailed in 1-2 business days. (Overnight service is available for one or more documents for an added $12.)

AIS Document #848: OIG Audit of Outpatient Psych Services at St. Vincent's Hospital (39 pages, $25)

Copyright © 2000 by Atlantic Information Services, Inc. All rights reserved. Reproduction by any means — including photocopy, FAX or electronic delivery — is a violation of federal copyright law punishable by fines of up to $100,000 per violation.

provider's billing problems. Billing companies, consultants et al must tell the provider it is billing incorrectly. If the provider doesn't stop, the billing company must either terminate its relationship with the provider or tell the government.

*Bottom line:* consultants should not continue to collect a piece of what they know is ill-gotten gain.

Contact Queen at (213) 683-2054, Chatfield at (202) 833-4567 and Imperato at (954) 764-7060. ❖

## OIG: Hospital Overcharged for Outpatient Psych Care

Inadequate treatment plans and internal controls were among the problems cited by the HHS Inspector General's office in a new report citing Medicare overpayments for hospital outpatient psychiatric services (for a copy of the report, see www.hhs.gov/progorg/oas/whatsnew.html or the AIS Document Service, p. 3).

The OIG says Saint Vincent's Hospital in New York City charged Medicare an estimated $2.2 million for outpatient psychiatric services in 1997 that didn't meet Medicare reimbursement criteria. That sum represents nearly three-quarters of the $3.1 million in claims the hospital submitted to Medicare in 1997.

Saint Vincent's OIG troubles didn't involve controversial partial hospitalization program services. Almost all of the claims OIG examined were for non-PHP services. The OIG is targeting Medicare claims for partial hospitalization and other outpatient psych services.

Among the errors cited by the OIG (and familiar to readers of earlier OIG reports):

◆ Saint Vincent's didn't have adequate procedures in place for preparing individualized treatment plans. Some plans didn't indicate service modality, duration or frequency. Other treatment plans were outdated.

◆ The hospital's system of internal controls for medical record documentation didn't cut it. Progress notes were sometimes insufficient or missing, the OIG says.

◆ Some services couldn't be shown to be reasonable and necessary. Some medical records didn't justify a patient's level of treatment.

To Saint Vincent's credit, the OIG's sample review of the hospital's Medicare cost report found outpatient psych costs were appropriate. Saint Vincent's countered that the Medicare intermediary's medical review policy wasn't a valid yardstick, because the intermediary's policy hadn't been adopted as a rule by HCFA. The hospital also argued that federal regulations don't re-

## NEWS BRIEFS

◆ **Here's a tip for hospitals struggling to find qualified coders in a market that has become incredibly competitive because of the emphasis on compliance and the new outpatient prospective payment system:** Start a night shift for coders. Pay coders who work during the day at other hospitals to come as freelancers to your hospital for a second shift, says compliance officer Jerry Kelley. That's the stopgap measure being used at Kelley's health system, Trover Clinic Foundation, until it can recruit more qualified coders. The beauty of this is the hospital doesn't have to spend almost $40,000 a year on another encoder, the software coders need to do their job. Instead, the two shifts of coders can use the encoder successively. Certified coders know their stuff and generally don't need much supervision, so a night shift can work — though Kelley says their coding will of course be audited.

◆ **Though riddled by fraud and under attack from HCFA and the OIG, the Medicare partial hospitalization benefit may not disappear.** Rep. Pete Stark (D-Calif) has sponsored a bill to restore the benefit so it can provide the services it was designed to provide, but without being used as a vehicle for unjust enrichment, a press release says.

◆ **Medicare is still shelling out lots of dough inappropriately to independent clinical and physician laboratories for chemistry, hematology, and urinalysis tests** — though the figure has dropped from two years ago, the HHS Inspector General's office says in a new report (see www.hhs.gov/oig). A previous audit found Medicare carriers overpaid about $50 million for these tests; the new audit found carriers overpaid $31.2 million during the 2 ½-year period that ended December 31, 1997. "Certain carriers still did not have adequate procedures and controls (including edits) to detect and prevent inappropriate payment for laboratory tests," the OIG states. "In addition to financial adjustments, we recommended that the Health Care Financing Administration (HCFA) ensure carriers implement controls adequate to preclude such overpayments. The HCFA concurred with our recommendations."