# SOUTHEAST GEORGIA HEALTH SYSTEM

### PREPARED FOR:
GLYNN - BRUNSWICK COUNTY HOSPITAL AUTHORITY

# Assessment of the Corporate Compliance Program

### PREPARED BY:
PROFESSIONAL PROVIDER SERVICES, INC.

9050 Pines Boulevard, Suite 351
Pembroke Pines, FL 33024

Exhibit

ElWhitten 86
6-27-07  NAB
BROWN&GALLO

001300

# SOUTHEAST GEORGIA HEALTH SYSTEM

## Table of Contents

I.    Background ................................................................. 1

II.   Executive Summary ........................................................ 3

III.  Findings and Recommendations ............................................. 6

    A.    Government Compliance Guidance ..................................... 6

    B.    Compliance Culture ................................................ 7

    C.    Standards of Conduct .............................................. 9

    D.    Training .......................................................... 11

    E.    Physician Education ............................................... 15

    F.    Structure and Responsibilities .................................... 16

        1.    Compliance Structure ........................................ 16

        2.    Management Support .......................................... 17

    G.    Human Resources ................................................... 21

        1.    Background checks ........................................... 21

        2.    Hotline Follow up ........................................... 22

        3.    Exit Interviews ............................................. 22

IV.   Conclusion ............................................................... 24

001301

Georgia Health System
Compliance Program Assessment
February, 2000

## I. Background

In 1991, the United States Sentencing Commission issued a series of guidelines that judges must use in sentencing corporations and other business entities that are convicted of Federal crimes. One provision of the Sentencing Guidelines provides more lenient punishment for organizations that adopt an "effective" compliance program. An effective compliance program must contain the following key elements:

1. Established compliance standards and procedures.

2. Program oversight by high-level corporate officers.

3. Vesting of discretionary authority only in persons unlikely to engage in criminal conduct.

4. Reasonable methods to measure and achieve compliance, such as hotlines and auditing systems.

5. Appropriate, consistent discipline for infractions.

6. Effective means of communicating compliance standards (training).

7. Appropriate, consistent remediation of violations.

The most compelling reason for healthcare providers to implement a compliance program is that directors and trustees of healthcare organizations may be held *personally liable* for any damages the organization suffers if a corporate compliance program that meets the Sentencing Guidelines criteria is not in place. Board members now have increasing oversight responsibility in light of the *In re Caremark* court decision.

In the Caremark International case, the court discussed the impact of the Sentencing Guidelines upon a director's fiduciary duty to be reasonably informed of the corporation's affairs. The court noted that "any rational person attempting in good faith to meet an organizational governance responsibility would be bound to take into account this development and the enhanced penalties and the opportunities for reduced sanctions that it offers."

The court stated that it would "be a mistake to conclude that corporate boards may satisfy the obligation to be reasonably informed concerning the corporation, without assuring themselves that information and reporting systems exist in the organization that are reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reached informed judgments concerning the corporation's compliance with the law and its business performance."

1

001302

Georgia Health System
Compliance Program Assessment
February, 2000

Although a director is not expected to "anticipate the problems which the corporation may face except in those circumstances *where something has occurred to make it obvious to the director that the corporation should be addressing a particular problem,*" the widespread publicity surrounding the government's unprecedented efforts to detect and eliminate fraud and abuse may require board members to inquire into their corporation's level of compliance with the rules and regulations governing their business activities. [emphasis added]

The numerous audits that have been conducted by outside agencies at the SGHS over the last several years should provide the Hospital Authority Board ("Authority") with an indication of the magnitude of the increasing risk within the organization. Given the frequency and scope of the reviews listed below, the Authority should carefully consider each recommendation suggested in this report.

(A) Medicare performed an on site audit of the hospital Medicare Secondary Payor (MSP) documentation in August, 1995. Inconsistencies were identified at that time, however, the problems continued. In 1999, the organization was put under 100% focused medical review for completion of MSP form due to an "almost 100% error rate."

(B) Medicare conducted a Focused Medical Review on Speech Therapy provided at the Brunswick facility (SGRMC) in 1995.

(C) Medicare conducted a Focused Medical Review on Physical Therapy provided at SGRMC in 1995 and in 1997.

(D) Medicare performed a focused Medical Review on Observation Room services performed at SGRMC in 1996.

(E) SGRMC entered into a settlement agreement with the Office of Inspector General in 1997 for outpatient services claims rendered in connection with an inpatient stay.

(F) Medicare performed a focused Medical Review on Duplex Scans services performed at SGRMC in 1996 and 1997.

(G) The Tricare/Champus issue which began in 1997. The SGRMC submitted claims for durable medical equipment that should have been included in the room rate.

2



001303

## II. Executive Summary

The Southeast Georgia Health System ("SGHS") began developing and implementing its compliance program in 1997. One of the benefits of a compliance program is that it provides ongoing feedback to management on day-to-day operations. However, because only cursory efforts were made to roll the program out to employees, and because the proper compliance culture was never established, compliance has not become a large part of the everyday business practices within the SGHS. Minimal training and a lack of program awareness have resulted in employee misconceptions, which has further escalated into system-wide resentment and departmental turf wars. There has been a lack of urgency for program implementation, which is evident by the amount of time that has passed since the introductory training sessions were introduced in 1998. Further, no intensive compliance training programs have been developed for the System's practicing physicians, despite the fact that they are an integral part of the entire operation.

Compliance manuals, posters, wallet cards, as well as a video, have been produced and distributed throughout the System, however, little has been done to bring to life the tenets espoused in these materials. Having the materials on the shelf without properly implementing them may create more risk than not having them since the organization may be viewed as having a greater level of "intent" in the event of a government inquiry. The rationale is that the organization knew what it was supposed to do, yet chose not to do it properly. Because several different areas of the organization have already been the focus of a review or audit by an outside organization, the risk of another audit, perhaps on a greater scale, has increased.

The SGHS compliance team consists of a part-time compliance officer and two full-time staff people. The compliance officer reports directly to the Chief Executive Officer, however, it is the members of the hospital authority, not the CEO, who may be held personally liable for any damages the organization suffers if the corporate compliance program does not meet the Sentencing Guidelines requirements. The compliance staff spends the vast majority of its time conducting compliance reviews only to have the majority of their recommendations be met with deafening silence. In order to properly implement the program, the compliance officer and his staff have to be given the proper authority and the necessary resources.

Therefore, the following recommendations are presented to the Authority:

1. The Authority should work in conjunction with the compliance department to finalize the standards of conduct for the organization. The standards should be circulated to managers and employees who must be required to sign an acknowledgment form.

3

001304

So___ __a Georgia Health System
Compliance Program Assessment
February, 2000

2. The Authority should adopt a policy mandating that each year, employees repeat the process of reading the standards of conduct and signing the acknowledgment.

3. The compliance staff should develop a compliance training and education program for employees, contractors, vendors and volunteers. The issues below should be considered when developing the introductory training sessions. .

   a. The training should include a complete review of the SGHS standards of conduct. Considered the foundation of an effective compliance program, the standards emphasize the organization's commitment to compliance with laws and regulations. Further, they refer employees to the company's existing policies and procedures for specific issues.

   b. The training should include a thorough explanation of the hotline reporting mechanism that is in place. Employees need to be made aware: that callers can remain anonymous; calls are not recorded; of who answers the hotline; the operating hours of the hotline; how to properly use the hotline; how complaints are investigated; how to properly use the SGHS chain of command to resolve issues before they become major problems.

   c. Each training session should devote a sufficient amount of time to the organization's policy of non-retaliation.

   d. The compliance training should be mandatory for all SGHS employees.

   e. The training should include a review of relevant case studies that will help employees to identify instances of non-compliance.

4. The organization should adopt a policy requiring all new SGHS employees to complete the introductory compliance training session within a specified period of time (usually thirty days).

5. Incorporate physicians into the compliance program by developing a unique training program that focuses on their needs and concerns.

6. Cultivate physician leadership for the compliance program utilizing the chief of medical staff and the physician on the compliance committee as the liaisons to the other physicians.

7. The compliance department should add at least one full-time employee. The compliance team could greatly enhance the effectiveness of the program by utilizing an employee whose focus is on detecting and preventing instances of improper conduct.

4

001305

Georgia Health System
Compliance Program Assessment
February, 2000

8. The compliance officer should be given the proper authority to do his job effectively. The organization should change the reporting structure and have the compliance officer report directly to the authority.

9. The Authority should formally adopt a formal job charter for the compliance officer that specifies the responsibilities of the position.

10. The Authority should become more actively involved in the organization's compliance efforts. The Authority should be aware of key developments and be able to answer questions regarding the effectiveness of the program.

11. The organization should increase the accountability of supervisors and managers by having them sign a periodic certification, which attests that they do not know of any compliance issues that should be addressed by the compliance officer.

12. The compliance officer must have input into the hiring and/or promotion of employees within the organization. Moreover, the compliance officer should review information in the personnel files and recommend to senior management changes in policy and procedure.

13. Key questions should be added to the exit interview process for the purpose of obtaining information about potential violations of the compliance program.

The objective of our assessment was:
1. To understand why the compliance program is ineffective.
2. To understand how and why the problems began.
3. To determine how to correct the problems.

The findings and recommendations are based on an assessment that was conducted on-site at the Brunswick facility the week of January 10, 2000. Additional documentation was reviewed and additional interviews were conducted subsequent to the on-site work being completed.

5

001306

n Georgia Health System
Compliance Program Assessment
February, 2000

## III. Findings and Recommendations

The corporate compliance program at the SGHS is underlined by conflict between the compliance department and the rest of the organization. As a result, known instances of noncompliance continue unabated, and the risk of unknown instances of noncompliance is increased. Further, it is unlikely that the compliance program would be perceived as effective by government regulators and would likely result in increased exposure to government sanctions. We believe that sporadic efforts on compliance program development, minimal or no compliance training, and the absence of continued organizational commitment to the compliance process have contributed in large part to employee resentment and an indifference toward compliance.

## A. Government Compliance Guidance

The OIG guidance for an effective compliance program states that the compliance program should effectively articulate and demonstrate the organization's commitment to the compliance process. Compliance efforts should establish a culture within the organization that promotes detection, prevention, and resolution of noncompliant issues. The guidance provides further that it is the responsibility of an organization's officers and managers to assure adequate systems are in place to facilitate ethical and legal conduct.

The guidance also acknowledges that implementing an effective compliance program requires a substantial amount of time, energy, and resources by senior management and the hospital's governing body. In this regard, the guidance contains two precautionary statements:

(a) Failure of a hospital's governing body to institute a compliance program could be a breach of fiduciary responsibility; and

(b) Hastily constructed and implemented compliance programs without effective monitoring will likely be ineffective and result in greater harm or liability than no program at all.

The OIG recognizes that implementation of a compliance program may not eliminate all fraud, abuse, and waste but a sincere effort by hospitals to be in compliance through the establishment of a compliance program reduces the risk of non compliance.

An OIG industry roundtable report published in April 1999 provided guidance on developing compliance programs and evaluating compliance effectiveness. Moreover, the document gives insight into what the government is looking for in the area of compliance program effectiveness. Government officials who participated in the roundtable said they evaluate compliance programs in sum, not in parts, and look at the day-to day compliance functions. The government also wants to see compliance in living color, not just on paper. Factors to assess effectiveness include management's passion for the program;

6

001307

san Georgia Health System
Compliance Program Assessment
February, 2000

employee and contractor buy-in of the program; open lines of communication; and a documented practice of returning Medicare overpayments.

## B. Compliance Culture

The SGHS has not achieved the desired organizational compliance culture. The current culture is characterized by an undercurrent of tension between the compliance department and the rest of the organization. Departmental staff perceives the compliance team as overly zealous, aggressive compliance police who make unreasonable demands and offer little constructive benefit to the other departments. The compliance employees, on the other hand, feel that they have not been given the support and authority necessary to properly message the program into the organizational culture.

In 1997, when the compliance program was initiated, a compliance officer was designated and a compliance committee was established. During the tenure of this group, a fifteen-minute compliance film was developed and shown to the senior managers and department directors, who, in turn, were instructed to train their staffs. Concurrent with the film, the compliance committee disseminated the "Integrity First" package, which included a wallet card with the number of a confidential hotline that could be used to report compliance concerns.

For the first eight months of 1998, very little noticeable committee activity occurred. In September 1998, the compliance officer responsibility was reassigned from the Chief Financial Officer to another hospital manager who already had full-time responsibility in other areas. Although he chaired the compliance committee from September, 1998 to July, 1999, the compliance officer had no departmental supporting staff to assist him in implementing the program. In July, 1999, the compliance department hired two full-time employees who have been very proactive. It has conducted audits of high-risk areas, provided technical assistance to the departments on compliance matters, and have submitted written recommendations to management.

The compliance department efforts, however, have not received visible support from department directors or from upper management levels of the hospitals. Department staff are complacent in their response to compliance department requests, and management has not taken measures to correct noncompliance matters that have been brought to its attention. For example:

- The compliance department identified a violation of the Stark Law for which management did not take immediate, corrective action.

- The departments were not very responsive to a request by the compliance department for information regarding durable medical equipment (DME) on consignment from vendors. Only 15 of 27 requests received a response. The consignment arrangement violates a patient's freedom of choice.

7

East Georgia Health System
Compliance Program Assessment
February, 2000

- The departments were essentially non-responsive to the compliance staff's request to discuss compliance training at the various department meetings. Only 12 of 29 managers responded.

- On December 29, 1999, the compliance department sent out a request to managers and VPs requesting a list of contracts for compliance review. Of the 41 requests sent out, only 26 received a reply.

- On August 4, 1999, after researching the denials associated with outpatient services, the compliance staff requested that an edit be entered into the system which would prohibit the billing of non-billable services as specified in Medicare Bulletin 1836. This recommendation was not immediately adopted and implemented. Rather, initiated a flurry of electronic messages and confusion as to what should be done as well as to who had the proper authority to call the shots. One employee responded with, "I need some clarification as to who is the deciding person here." That statement personifies the lack of awareness surrounding the compliance department and its responsibilities. Because the recommendation was not immediately implemented, several months passed before the charge was properly deactivated. (see Exhibit A)

The compliance program cannot be carried out in a vacuum. It must be fully integrated into the organization's standard operating procedures. The SGHS compliance responsibilities were handed to the compliance officer by the CEO, without charging him with a specific mission or without specific authority to carry out the mission as he perceived it. Likewise, the department directors neither were advised of the authority vested in the compliance office nor were they instructed on the priority that should be given to requests from the compliance department. Accordingly, some have perceived compliance department requests to be an intrusion on their authority.

Because certain high-risk areas of the SGHS have not been monitored for compliance purposes on a consistent basis, the compliance program would largely be considered ineffective by government standards and could, instead of reducing the organization's liability, *increase* the organization's exposure with the government. For example, the charge-description master (CDM), which lists prices and codes for all hospital goods and services, should be a major focus of the compliance efforts. The CDM should be reviewed no less than annually since billing codes are often added, updated or deleted. However, until QuadraMed performed a comprehensive CDM review in 1999, the last time the SGHS had the CDM reviewed was in 1996. In addition to creating a potential overpayment situation, erroneous billings, which can tip off the feds to aberrant patterns of billing, can (and usually do) result.

In addition to the known areas of noncompliance, the uninformed condition of the work force has fostered an environment where noncompliance could go undetected. For example, SGHS is currently under 100% Medicare review for completion of the

8

Medicare Secondary Payer (MSP) form. According to an independent review of this area performed by QuadraMed (see Exhibit B) there is an "almost 100% error rate in these MSP forms." Further, the report points out that the Business Office has to audit each and every claim, which has doubled its workload. In addition to creating additional work for the employees in the business office, the hospital is opening itself to an audit since the wrong MSP information usually results in the hospital collecting money that does not belong to it. Approximately 15% of the Medicare credit balances are the result of inaccurate or inappropriate MSP data. Had this problem been corrected several years ago when it was identified (1995), the current problems could have been avoided. Failure to maintain a system of identifying other payers during the registration process is viewed as a violation of the hospital's Medicare provider agreement.

The SGHS organization has the foundation and the necessary resources to develop and implement an outstanding compliance system that will prevent, detect, and correct identified instances of noncompliance. The compliance team that has been assembled has a well-balanced mix of experience, a clear understanding of the compliance program objectives, and a good chemistry in the sense that the members of the team work very well together. However, a competent and hard working compliance team is only part of the equation. If the ongoing relationship between the compliance team and the other parts of the organization does not improve drastically, the compliance program will not be able to sustain itself on a lasting basis.

The remainder of this report will pinpoint some of the problems that have led to the ineffectiveness of the SGHS compliance program. Each identified problem is accompanied by recommendations that will help to alleviate the stated problem. It is important to note that in order to be truly effective, the program must have the complete support of management and must be an integral part of every employee's daily responsibilities.

## C. Standards of Conduct

SGHS does not have formalized standards of conduct that employees are required to follow. Recently, the compliance team drafted a code of ethics that will apply to all SGHS employees. We encourage the Authority to move quickly in adopting the draft ethics policy because it addresses certain key areas that were not included in the initial policy booklet.

Essentially, the Integrity First Policy on Business Practices booklet is intended to serve as the organization's Standards (Code) of Conduct. The policy, which is easy to read and not filled with legalistic language, is meant to provide a solid foundation for the organization's compliance program. However, based on discussions with employees in the Brunswick facility, it appears the standards do not have high visibility with the work force and are not always followed in practice. For example, the policy specifies, "SGHS bills only for services rendered, and all bills must comply with billing requirements for government-sponsored programs and other payers." Yet, when Medicare Bulletin 1836,

9

001310

which was issued in the middle of March 1999, clarified that certain equipment and service items were not, and had never been, billable to the Medicare program, it took five months for the hospital to deactivate those charges in the chargemaster even though the appropriate individuals within the System were aware of the requirements of the Bulletin. Further, the System, against the advice of the compliance department, has never repaid the money it received from the Medicare program for the outpatient charges associated with the equipment specified in 1836. Management's decision not to follow the compliance team's recommendation on the overbilling situation is another contradiction to a policy contained in the booklet. Specifically, page seven indicates that, upon recommendation of the compliance officer, management "shall take timely remedial or other action as required by the circumstances." In addition to the exposure created by the Federal False Claims Act, the organization has increased whistleblower exposure since several employees know that the money was improperly billed yet not returned.

A review of the existing business code revealed that key elements appear to have been omitted or overlooked. For example, the code does not reference the organization's records retention policy. The OIG guidance for hospitals recommends, "Hospital compliance programs should provide for the implementation of a records system. This system should establish policies and procedures regarding the creation, distribution, retention, storage, retrieval and destruction of documents." Moreover, the code makes no mention of the organization's policy on confidentiality, which in some cases, can be directly linked to the records retention issue. Footnote thirty-four of the OIG guidance states that, "The creation and retention of such documents and reports may raise a variety of legal issues, such as patient privacy and confidentiality."

In addition to records retention and confidentiality, there is also no mention of quality care or patient relations. Quality of care should be one of the primary issues addressed in a hospital organization's code of ethics. The organization should consider including something along the lines of:

"We treat emergency patients whether they can pay or not. We will provide excellent care and avoid poor care or service."

It is incumbent upon the Authority to review and ultimately, approve the draft standards recently proposed by the compliance team. It is the authority's duty to oversee critical issues of the organization, and few issues are as critical as compliance. The OIG strongly encourages high-level involvement by the hospital's governing body in the development of standards of conduct. Nowhere is this more evident than in the corporate integrity agreements that essentially bear the government's "seal of approval". The First American Health Care agreement (see Exhibit C) serves as a good example. The agreement states, "The Standards of Conduct shall be formally adopted by the First American Board of Directors within 90 days of the execution of this Agreement."

In our opinion, the standards developed by the compliance team appear to be easy to understand and contain useful information. Statements such as, "we expect our leaders

10

Southeast Georgia Health System
Compliance Program Assessment
February, 2000

to set the example and to be, in every respect, a role model" and "they (leaders) must help to create a culture within SGHS which promotes the highest standards of ethics and compliance", effectively convey information about the expectations of the organization.

The draft standards suggest that disciplinary action for unethical or dishonest behavior will be more strictly enforced. Such a change in human resources management should be accompanied by employee awareness efforts to ensure that there is no mistaking that the hospital's management is sincerely seeking a culture change as it relates to ethical and compliance behavior.

RECOMMENDATION: We recommend that the Authority work in conjunction with the compliance department to finalize the standards of conduct for the organization. The Authority should give the standards the status of a policy since employees are going to be asked to certify that they will abide by it.

Once the standards are approved, they should be circulated to managers and employees of the SGHS who will read them and sign an acknowledgment form. The acknowledgment should state that the employee understands that continued employment with SGHS depends on full compliance with all System rules and policies. The Authority members should also adopt a policy mandating that each year, employees repeat the process of reading the standards and signing the acknowledgment. Moreover, the policy ought to require new employees to read the standards within a definite period of time after initiating employment with the System. Discussing the content and requirements of the document should be placed on the shoulders of department managers.

## D. Training

Training is the lifeblood of the compliance program because, often, it is only contact that employees will have with it. A significant factor contributing to the dysfunction of compliance stems from a lack of awareness and understanding among SGHS employees regarding the purpose of the compliance program. We believe this lack of comprehension is in part due to the methods used to develop compliance awareness through training.

The organization made an initial attempt to provide compliance training to its employees in 1998, however, the message imparted during the initial sessions apparently was not thoroughly understood. For example, a random and informal survey of employees in the Brunswick facility established that the purpose of the wallet card and the toll-free hotline was not clear. In fact, some employees indicated that they had never seen the wallet card before. Although the training alerted employees that compliance was a concern, there has been insufficient follow-up training to reinforce the initial efforts.

The compliance video that was shown at the initial training session, while well-scripted, was very fast-paced and touched on too many aspects of the compliance program, rather than focusing on several key points. Videotapes are not the best medium

11

son Georgia Health System
Compliance Program Assessment
February, 2000

for compliance training, although they can be a useful tool in delivering a message from the CEO.

Several things should be noted about the compliance video:

- The video mentions compliance but does not specifically define it as a process of the hospital.

- A toll-free number is introduced in the video. However, there are no specifics mentioned, such as who answers the hotline, the operating hours of the hotline, whether calls are recorded or not, how complaints are followed up, and the like.

- The video does not mention or review the hospital chain of command, which should be used as a guide in resolving complaints.

- With all the publicity about whistleblowers and retaliation, there should have been more information on the SGHS reporting mechanism and its commitment to protecting callers from retribution. The video does not devote sufficient time to the organization's non-retaliation policy.

- The video does not review any specific case-studies. Reviewing case studies of hypothetical compliance-related situations helps employees to identify the problem and figure out a solution. Further, employees learn the consequences of failing to properly address problems.

According to one employee who helped coordinate the training, the material contained in the video was taken almost exclusively from the Quorum compliance video. While Quorum's material could have served as a useful starting point for SGHS, the hospital should have tailored the video more to its unique organizational environment. Why? The feds will want proof that the organization's compliance program came to life with the same substance it had in the video. It would be difficult to fully implement (and demonstrate) compliance principles that were developed by someone outside of the individual facilities.

It is critical to maintain up-to-date documentation to support the training efforts that have been implemented. Such documentation includes sign-in sheets, copies of the training materials, handouts, training evaluations, and the like. Sign-in sheets were not used during the introductory training from 1998. Rather, a signed Integrity First Compliance Survey form is being used as documentation to support that a SGHS employee has attended the training. A signed survey will not satisfy a federal auditor that an employee has received adequate compliance training in that it does not indicate the date or type of training attended. Further, the survey is out-of-context for new employees. A new employee attending orientation would never be able to answer the first two questions effectively since both questions assume the employee has been working at the hospital for an extended period of time.

12

001313

east Georgia Health System
Compliance Program Assessment
February, 2000

The OIG has addressed the training records issue in recent compliance guidance. The guidance suggests that the organization maintain records necessary to protect the integrity of the compliance process and confirm the effectiveness of the program. The records should show that employees were adequately trained; documentation of hotline reports including action taken, and corrective measures that have been taken as a result of internal audits and self disclosures.

In addition to training employees, a critical component of compliance is the education of physicians and the members of the Authority. More than a year has passed since the initial training sessions were conducted for the employees, yet nothing has been done in the way of training for the staff physicians. It is highly unlikely that a compliance program designed for the bulk of hospital employees would have been well-received by physicians. Therefore, there should have been a program developed for the physicians that reflected their unique concerns, which could have been addressed at an appropriate level. Key vendors, volunteers, and contractors should also have attended compliance training. In many facilities, contractors are required not only to attend the training but also to sign a certification (similar to employees) pledging to adhere to the compliance principles.

RECOMMENDATION: As stated above, the compliance training that has been conducted appears to be largely ineffective. For example, other than the compliance videotape, there is nothing substantive (i.e., handouts, case studies, overheads) to help demonstrate the quality of the training program.

It has been over a year since the introductory compliance training was introduced to the SGHS employees. When too much time passes between sessions, many people throughout the organization get the impression that compliance is simply the "flavor of the month." All employees should receive at least one and a half hours of compliance training a year. The OIG guidance for hospitals specifies that, "Employees should be required to have a minimum number of educational hours per year, as appropriate, as part of their employment responsibilities." Therefore, we believe it is necessary for the organization to begin the training process from ground zero, to start all over. Because the employees in the compliance department are walking reminders of the program, they should be charged with the responsibility of developing the training materials and coordinating the sessions. This will give the compliance team the opportunity to increase its credibility within the organization, to explain its role with clarity, to directly answer compliance questions as well as to receive direct feedback from hospital employees regarding the perception of compliance.

While the compliance team should coordinate the training, it should strongly consider using other department heads and managers to help present the programs. The participation of other managers will be a powerful message to employees that the compliance program is supported at all levels of the organization. In addition, using managers as program leaders helps them to become conversant in compliance essentials. A word of caution: managers should not train employees in their own line of command

13

001314

...rn Georgia Health System
Compliance Program Assessment
February, 2000

since doing so may inhibit free discussions. Finally, having the compliance team work in a collaborative manner with the department managers should help to bridge the communication gap that currently exists.

The compliance team will have to decide how much training is needed, how often it will be needed, who should attend, and what should be covered. However, there are certain issues we believe should be considered when planning the sessions.

a. The standards of conduct should be reviewed during the training with all employees and other attendees. As the document that establishes the fundamental guidelines for day-to-day business conduct, a review of this document should be thoroughly explained. The code, in the form of a booklet, should contain a letter from the SGHS CEO explaining the importance of compliance. Employees should be asked to sign a form stating that they received a copy of the standards, understand them and agree to follow them.

b. Hospital employees should receive additional education that pertains to the compliance hotline. The employees (and others in attendance) should be made aware of the specifics of the hotline process, such as who answers the hotline, when to call and when not to call (e.g., treat it like a 911 line), whether calls are recorded or not, how complaints are investigated, and the like. (The compliance hotline is meant-to-be-user-friendly.) As part of this education, the trainers should review the chain of command and encourage employees to use it prior to calling the hotline. An emphasis on the chain of command stresses the importance of resolving problems "at the lowest level", within the walls of the organization.

c. Compliance training should be mandatory for all employees. Any material pertaining to the training such as attendance logs should be retained in the compliance department. The introductory training should cover the purpose, scope, and importance of the compliance program. Individuals who are required to attend the training should certify, in writing, that they have done so. The certification should specify the type of training and the date received.

d. Sufficient time should be spent addressing the organization's policy of non-retaliation. If employees feel that there will be retribution for calling the hotline, it will not be effective.

e. The compliance team should develop relevant case studies that will help employees to identify instances of noncompliance. Case studies help to bring the compliance concepts to life and make them relevant to the work environment.

f. The training should vary depending on the audience. Employees at different levels need to learn different versions of the compliance material, and it must be presented in a way that reflects their level of sophistication.

14

001315

of Georgia Health System
Compliance Program Assessment
February, 2000

New SGHS employees currently receive a fifteen-minute overview of compliance at orientation. Obviously, fifteen minutes is barely enough time to provide employees a thumbnail sketch of the program. In addition to providing new employees with a summation, the organization should adopt a policy that requires that all new SGHS employees complete the education and training program within a specified period of time (usually thirty days) after undertaking their employment duties.

## E. Physician Education

The actions of physicians on the medical staff will affect the hospitals' ability to achieve and maintain compliance. To minimize the risk to the organization, it is in its best interest to incorporate the physicians into the compliance program. Along with hospital employees, key vendors, contractors, and volunteers, physicians practicing in the hospital must receive compliance training. The government strongly encourages hospitals to implement a training program for the medical staff involving compliance issues that will help the hospital in its own compliance efforts.

To increase the effectiveness of the SGHS compliance program, the organization should develop a training program for the physicians that focuses on the specific needs and concerns of the doctors. This recommendation can be implemented by initially holding a series of short sessions (approximately 30 to 45 minutes each) that provide an overview of the hospital's compliance efforts. Shortening the sessions may make it easier for the physicians to find the time to attend. Further, the compliance message could be combined into the existing medical staff meetings or other functions (such as retreats) to increase the likelihood that physicians will attend.

In order to meet the challenges of physician buy-in, the organization should consider using a physician, such as the one involved with the compliance committee, to serve as an ambassador to the other doctors. Moreover, the compliance team should also speak with the chief of the medical staff for the purpose of cultivating physician leadership for the program. Given that the actions of the medical staff and those of the hospital are integrally related, the SGHS compliance program, without physician education and involvement, is doomed to fail.

Currently, the compliance efforts at SGHS are one-dimensional in that the compliance staff spends the majority of its time reviewing and auditing with little or no time left to conduct the appropriate level of compliance education. The compliance department has two full-time staff members and a compliance officer who spends a great deal of his time wrapped up in special projects which are not related to his compliance responsibilities. Should the compliance staff shift its attention to the training aspect of the program, there will be no one within the compliance department to conduct the internal reviews. Therefore, in order to achieve balance in the scales of the compliance program, it is our recommendation that the SGHS add at least one full time employee to the compliance team. The compliance department could greatly enhance the effectiveness of the program by utilizing an employee whose focus is detecting and preventing instances

15

001316

of improper conduct. This compliance 'auditor" should report directly to the compliance officer and work in conjunction with the other compliance team members to develop corrective action plans once a problem is identified.

## F. Structure and Responsibilities

### 1. Compliance Structure

While the SGHS compliance program was initiated in 1997, it does not appear that a specific structure was formulated prior to implementing the specifics of the program. An intensive planning process should have entailed addressing the who, what, and when of the organization's compliance system from the outset. There should have been an initial schedule of implementation with clearly stated compliance objectives, as well as milestones for measuring each component, with correlated resources and a monitoring mechanism. Further, boundaries should have been established between the compliance department and other operational areas of the facilities. For those instances where there were no clear-cut boundaries, there should have been be a clear understanding that managers must work together to accomplish the organization's objectives. During our assessment, we were unable to determine what compliance support services the management company is responsible for providing to the organization, since our request to review the management contract was denied. However, the management company does in fact have a compliance department that offers training to the employees in its hospitals.

An effective compliance program begins with the appointment of an effective compliance officer. The OIG suggests that the person appointed to this position be a member of senior management who has sufficient authority. In other words, to make the program work on a long-term basis, the compliance officer has to have some clout. The following tools are essential in order for a compliance officer to be operative:

- Immediate access to senior management.

- The authority to act on complaints.

- Independence. The compliance officer should report directly to the board of directors and regularly to the compliance committee.

- Proper staffing and resources.

- Visible support from management.

- Responsibilities that are clearly delineated.

With regard to a compliance officer's resources, the OIG guidance for hospitals states that, "The (compliance) officer should have sufficient funding and staff to perform his or

16

001317

heast Georgia Health System
pliance Program Assessment
February, 2000

her responsibilities fully"; however, as previously stated, the current SGHS compliance officer did not receive any full-time compliance staff to assist with the implementation of the program until nine months after assuming the compliance position. In addition to being in charge of overseeing the compliance program, the compliance officer also serves as the organization's senior vice president, meaning that he has significant responsibilities within the organization other than compliance. Therefore, over a nine-month period, the compliance efforts consisted of a "part-time" compliance officer with no staff to oversee the development and implementation of a program for two hospitals. The compliance officer's job description, which is commingled with his other responsibilities as senior vice president, contains no specifics with regard to the responsibilities and resources of the compliance position other than, "Is responsible for the implementation of a Corporate Compliance program." Upon starting the program, the compliance committee should have decided which aspects of the SGHS operations would be in the purview of the compliance officer and which aspects would be outside his scope. Such a determination is necessary since it greatly determines how he does his job. The fact that responsibilities were not clear to begin with has ultimately led to departmental turf wars, which has quickly escalated to conflict.

## 2. *Management Support*

The compliance officer currently reports to the chief executive officer. However, this reporting structure has not been effective enough to integrate the compliance program into the organization's existing operational structure. The SGHS compliance program is missing the vigorous, visible, and vocal leadership from the top that it requires in order to be considered a sustainable, long-term effective program. For example, program awareness, which is one of the primary tasks of management when the program is initiated, has been inadequate. The compliance department, which was formally established in July 1999, was not listed in the hospital department directory until six months after it had been in place. Moreover, the hospital telephone operators at the Brunswick facility are still not completely familiar with the compliance department despite the fact that it has been in place for over eight months.

An independent observation is that the compliance officer and his staff are not sufficiently supported by management. For example, as part of its internal monitoring activities, the SGHS compliance team identified an instance of noncompliance in which the patient account coordinator falsified a document. The compliance department recommended that the employee be terminated. The compliance team's recommendation of termination was further supported by the immediate supervisor of the employee in question. However, human resources advised that a final written warning was the most severe action that would be approved, and, ultimately, the compliance team members were told that the issue would be resolved between human resources and the business office. While the human resources department clearly should have been involved with the resolution of this matter, it was inappropriate to cut the compliance people out of the loop. No compliance officer can prevent or detect violations that management neglects by lack of support or reinforcement of the program. This is one example of how the SGHS

17

001318

compliance program has been compromised by the undermining of the compliance department. In order to be effective, the compliance officer has to be able to speak and have his authority supported by management. The OIG recommends that the compliance officer's responsibilities should include independently investigating and acting on matters related to compliance, including the flexibility to design and coordinate internal investigations and resulting corrective action.

The U.S. Sentencing Guidelines on corporate compliance programs specify that an effective compliance program must include "adequate discipline of individuals responsible for an offense." The majority of healthcare settlement agreements provide that the appropriate company officials, in consultation with the compliance officer, should make disciplinary decisions.

When an employee is not sufficiently disciplined for violating a hospital standard, or the law, other employees within the organization may perceive that they do not have to be fully accountable for their actions. The SGHS performance evaluation form contains a criterion linked to an employee performing "within the prescribed limits of the compliance program." However, the compliance staff members have no input into the performance and appraisal system to ensure that improper conduct is discouraged and that support for the compliance program is an essential element to performance rated as acceptable or superior. Further, this criterion is the same for all employee levels. Performance objectives should differ between the managers vs. the rank-and-file workers. Generally, managers who supervise employees should be accountable for ensuring that they and their employees, including new hires, attend compliance training. SGHS managers should also be held accountable for making certain that employees under their direct supervision have read the standards of conduct and confirm that they have done so in writing.

A true test of the effectiveness of the compliance program is management's response to a bona fide compliance issue involving a physician who brings in significant patient revenue for the organization or who is very influential. For example, in November, 1999 the compliance department performed a review of hospital-physician contracts (see Exhibit D). The purpose of the review was to determine "whether contracts between the hospital and physicians for professional services conform to Medicare regulations and federal law relating to financial relationships between physicians and hospitals." Based on the review, it was determined that:

"SGRMC's financial arrangement with Dr. Tripp does not appear to qualify for one of the above exemptions under the Stark Law. Dr. Tripp's contract specifies that he is responsible for performing his own billing and must utilize his own staff, supplies and equipment in doing so. This is consistent with how the other physician contracts are structured. Dr. Tripp, however, is the only physician utilizing a hospital employee for his transcription. In addition, he leases office space from the hospital for his billing activities for $100.00 per month including utilities and phones. The price per square foot on this lease is $1.25 which is far below fair market value. The physicians' office

18

building at CMC, for example, leases for approximately $12.00 or more per square foot."

The review resulted in a recommendation that the lease be amended to conform with federal law by setting the rental charges at fair market value. Moreover, it was recommended that the physician be charged for the use of the hospital staff that he was using for billing and transcription. No response, either written or verbal, was ever received by the compliance department. To ignore the recommendations made by the compliance team members completely undermines the authority they should have and demonstrates that the compliance program is not receiving adequate high-level support. The Authority should be aware of any significant compliance violations involving employees, senior managers, or physicians. In the case of issues surrounding physicians, Authority members should be prepared to resolve compliance disputes because they may demand a ruling from a higher governing body than senior management.

Because the government evaluates whether a program is adequately staffed and whether the proper resources have been committed to it, the SGHS probably would have fallen short of government standards.

RECOMMENDATION: In order to give the compliance officer the independence to make the compliance system work effectively, we recommend that the reporting structure be modified to reflect that the compliance officer report directly to the Authority with regular reports given to the compliance committee. The Inspector General strongly recommends that independence and objectivity be granted to the compliance officer.

The Authority should begin to develop some formal structure and guidelines to the SGHS compliance department. Initially, the Authority should formally adopt a job charter for the compliance officer from which a job description distinct from the senior vice president job description can be developed. The charter should specify the responsibilities of the compliance officer such as:

- Initially and periodically assessing the compliance risks to which SGHS is exposed to, and to ensure that the compliance program is responsive to these risks.

- Ensuring that training programs (a) convey SGHS's standards of conduct to all employees; (b) periodically refresh employee knowledge of the code and related policies; and (c) address areas of compliance risk or concern to employee populations.

- Work with human resources to ensure a work force with high ethical standards, including the establishment of minimum standards for conducting appropriate background and reference checks on potential employees.

19

001320

Southeast Georgia Health System
Compliance Program Assessment
February, 2000

Under emerging standards of liability, board members or directors may face personal liability for failing to ensure that their companies have established adequate compliance systems. Moreover, in the face of a government onslaught, the feds will evaluate the level of direction and oversight that was given to the compliance by the board. Therefore, it is our recommendation that the Authority become actively involved in the SGHS compliance program. The term 'actively involved' goes beyond receiving monthly reports from the compliance officer. Examples of direct involvement would include, but are not, by any means, limited to:

- Requiring an explanation of how the organization plans to facilitate a change in culture to reflect the renewed commitment to doing the right thing.

- Reviewing and approving key documents, such as the Southeast Georgia Health System Standards of Conduct.

- Knowing whether the essential compliance program elements are in place that would protect them from being personally liable in case a fraud claim arises.

- Knowing how the SGHS compliance program addresses the high-risk areas implicated by government investigations.

Without direction and oversight from the Authority, the compliance program will not work effectively.

If the SGHS is going to have an effective compliance program, it must increase the level of accountability for managers and supervisors. The majority of compliance issues within the organization will be known to managers and supervisors yet may still go unresolved, because managers and supervisors are the least likely employees to call the compliance hotline. For example, there have been several instances of noncompliance identified by the compliance team that were neither responded to in a timely manner nor have they been resolved. Unresolved compliance issues increase the risk for the entire organization. Moreover, identifying compliance risks but not resolving them defeats the purpose of having a compliance program. Therefore, in order to increase the accountability of the hospital system's supervisors and managers, we recommend the board have all supervisors and managers periodically sign a certification, which attests that they do not know of any compliance issues that should be addressed by the compliance officer. We suggest that the certifications be signed on a *monthly* basis. Consider that the longer a known problem exists, the more costly it is to correct it. It takes approximately ten seconds to sign a certification form; therefore, the "I don't have time" excuse should not be considered acceptable.

20

001321

*St Georgia Health System*
*Compliance Program Assessment*
*February, 2000*

## G. Human Resources

### 1. Background Checks

It is a natural response for human resources to feel threatened by the compliance team since compliance may be addressing issues that human resources believes should be handled by its own department. For example, during the assessment, a human resources employee indicated that she would prefer "compliance not be allowed to view the personnel files" for things such as the results of background checks. Rather, she expressed that if compliance wanted to know the results of a background check, it could call her and she would "let them know." Human resources should be working in a collegial manner with the compliance personnel to ensure that candidates for employment do not have a propensity to violate laws or engage in improper conduct in prospective areas of responsibility. The OIG guidance specifies clearly, "The compliance officer must have the authority to review all documents and other information that are relevant to compliance activities." Further, the OIG states that designating a compliance officer with proper authority is *critical* to the success of the program. In order to successfully implement the program, the compliance officer must have a certain degree of clout.

The government is a key customer of the compliance program. Therefore, in order to get a good idea of what the government expects from a formal compliance program, it would be wise to review the reporting requirements stated in prior healthcare settlement agreements. The settlement documents, referred to as corporate integrity agreements, are essentially government imposed corporate compliance programs. The adoption of all settlement agreements followed a significant compliance failure at the settling organization. The value to SGHS in the settlement agreements is that they serve up instruction on the practical steps of implementing a compliance program. For example, one of the significant points in the C.R. Bard compliance program (see Exhibit E) is that the compliance officer "will review information in personnel files, audit results, managers' opinions, and customer/supplier surveys."

RECOMMENDATION: The Federal Organizational Sentencing Guidelines (see Exhibit F), which set ranges of penalties that judges must impose on businesses for certain federal crimes, provide organizations with a definition of a compliance program. The guidelines also describe relevant factors that organizations must have for meaningful compliance programs. One of the relevant factors is that, "The organization must have used due care not to delegate substantial discretionary authority to individuals whom the organization knew, or should have known, through the exercise of due diligence, had a propensity to engage in illegal activities."

Based on our assessment of the SGHS compliance processes, as well as our experience in the field of compliance development, we recommend that the Authority empower the compliance officer to work in conjunction with human resources to ensure a workforce with high ethical standards, including the establishment of minimum standards for conducting appropriate background checks on potential employees.

21

S.    t George Health System
Compliance Program Assessment
February, 2000

## 2. _Hotline Follow-Up_

Some of the issues that are reported through the compliance hotline are human resources issues. It is not uncommon for a report to begin as a human resources problem only to expand into something with wider repercussions than originally indicated. When the hotline vendor faxes the complaint form to the compliance department, the compliance officer has no way of knowing what the report is about until he reviews the facts surrounding it. It should be the prerogative of the compliance officer to defer any issues that he feels could be better resolved by human resources over to that department. Further, compliance should be responsible for coordinating such investigations among the departments and to ensure that duplication of effort and overlap is avoided. The compliance department must be the starting point for all follow up efforts on hotline calls. In order to prevent the process from becoming fragmented, the framework of the program must be centralized around the compliance staff. If other departments take it upon themselves to handle compliance matters, the program stands a greater likelihood of becoming ineffective and inefficient.

It is important to note that the compliance officer and his staff should never be kept in the dark, even on matters that have been deferred to human resources for resolution. Human resources should always make the compliance officer aware of how an issue was resolved since he will be responsible for documenting his file. Since there is no formal protocol for handling such matters, the compliance department defers to human resources on an as needed basis.

RECOMMENDATION: It is our recommendation that the SGHS develop written procedures that address the investigative protocol for issues that are reported through the compliance hotline. The procedures should be agreeable to the employees in the compliance department as well as the human resources department. In addition to delineating responsibilities, a written protocol should be specific as to what resources the compliance officer or human resources will have available in order to adequately investigate a complaint. For example, the compliance officer may require assistance from the risk management department, accounting, patient business office, security, or from outside legal counsel. The compliance officer must be responsible for screening routine concerns from significant problems before launching an internal review of the problem.

## 3. _Exit Interviews_

Exit interviews with departing employees are a good source of information on Medicare violations. The exit interview process should be utilized to determine if employees have any information about violations of the compliance program. The process will help to identify employees who should have reported their suspicions but chose to ignore the reporting requirement. This strategy is often used to minimize the opportunity for an individual who, subsequent to leaving the organization, decides to file a whistleblower lawsuit. Because the interview is documented, the organization can

22

prove that an employee had the opportunity to report the misconduct. It has been our experience that exit interviews with departing employees are a good source of information on violations of Medicare, Medicaid and company policy.

It is important for the authority to understand that, in today's health care environment, the threat of a whistleblower suit being filed is greater than ever before. The government is dangling dollars in front of healthcare employees as an incentive to find out where the problems within the healthcare system are. Relators (whistleblowers) can receive 15% to 30% of the government's recovered money. What increases the risk is that anyone — an employee, a vendor, a competitor — with information can file such a suit. The SmithKline Beecham Clinical Lab settlement of $325 million began as a whistleblower suit filed against a subsidiary of the company that ultimately found its way to the parent organization.

Interviews with departing employees are currently being conducted by the SGHS human resources department. However, the exit interview form (see Exhibit G) being used does not contain any questions to assist the organization in tagging employees who may have knowledge of a compliance violation. The form requests the employee to share perceptions on basic issues about the organization's perceived weaknesses and strengths regarding areas such as rate of pay, attendance, dental insurance, medical insurance and the like.

RECOMMENDATION: If the intention of the System is to develop and implement a compliance program that will provide leverage in any future enforcement action, we recommend that the exit interview form be revised to include several key questions which should help to reduce the credibility of any potential future whistleblower suits. The key questions should include:

1. Have you engaged in conduct which you believe was either unethical or illegal?

2. Have you been asked to engage in conduct you believe was unethical or illegal?

3. Have you ever witnessed conduct by an employee, contractor or agent that you believe was unethical or illegal? If yes, by whom?

4. Have you ever removed SGHS documents (including those created by you) without returning them to the facility? If yes, do you have those documents?

5. Have you ever given hospital documents to non-hospital employees other than for business reasons?

23

001324

6. While employed by the SGHS, did you or your family member own, operate, invest in, assist or otherwise have an interest in any company or enterprise which competed with SGHS or with which the hospital had a business relationship? If yes, please explain.

Any affirmative answers should be followed up with detailed questions to identify: (a) participants in the conduct; (b) witnesses to the conduct or others with knowledge; (c) the date and place of the conduct; (d) any other information necessary to either verify or disprove the allegations. In other words, any affirmative answer should result in a request for details. When management ignores or is unaware of improper activities occurring within the organization, the organization's vulnerability to a whistleblower suit increases.

As part of the compliance monitoring responsibilities, the compliance department should randomly audit the exit interview responses that have been received. Moreover, it should be apprised of all affirmative responses.

## IV. Conclusion

This report identifies issues that must be addressed in order for the compliance program to be effective. Many of the recommendations focus on strategies such as training, standards of conduct, exit interviews, and board involvement: fundamental components of an organizational compliance program SGHS appears to have a dynamite compliance staff that is conversant on these issues and has already started planning how to integrate them into the compliance process. This initial implementation stage can take anywhere from eighteen to twenty four months. Since the compliance department has been in place less than a year, it is important for management to fully endorse the compliance effort and commit the time and resources needed to massage some of these elements into the System. Given the proper time, authority and cooperation, SGHS can develop a compliance program that meets the requirements of the Federal Sentencing Guidelines.

A significant impediment to the effectiveness of the organization's compliance program is clearly the organizational culture which does not appear to be consistent with the objectives of the program. Before any of the recommendations (i.e., training, standards of conduct, etc.) can be properly implemented, there has to be a makeover of the corporate culture as compliance becomes a major aspect of doing business.

Engaging a platoon of compliance consultants and advisors to assist with the process, will not, in our opinion, make a measurable difference in the caliber of the program as long as the climate within the organization remains the same. Further, "throwing" people at the problem will not help implement the program any faster. In fact, it may make the program more disjointed. Rather than develop a program using a plethora of independent contractors, the organization should focus on building a superior compliance team that can evaluate, educate and perpetuate the technical skills and corporate culture needed to breed integrity. The organization already has the core compliance team in place. It should be pointed out that the organization must learn to rely

24

001325

*St Georgia Health System*
*Compliance Program Assessment*
*February, 2000*

on the expertise of its compliance team. The recommendations of the compliance staff should not be validated by external sources every time someone in the organization dislikes the message being delivered.

As previously stated, we believe the organization already has the internal resources necessary to build an effective program. Before the organization spends a significant amount of money on outside vendors, we believe it should attempt to re-engineer its compliance efforts internally, beginning with the creation of a new climate that embraces compliance. The chief executive officer has already committed to making the change in culture a top priority, and to further compliance issues within the organization. The visible support from the top will be very beneficial in effective compliance program efforts.

Compliance should *become part of* the organization's operations rather than dictate them. With its emphasis on procedural rules, preventing misconduct and obeying the law, many hospital managers will mistakenly believe that their jobs are being encroached upon. Therefore, one of the biggest challenges facing the compliance department is persuading individual managers that compliance is critically important. It is vital for the compliance staff to remain sensitive to a person's perspective and position. People tend to react to change negatively and with skepticism. To make the compliance process run smoothly, the compliance staff should try to work within the existing structure as much as possible and to foster suggestions on doing things better, or at least differently.

25

001326