IN THE DISTRICT COURT OF THE UNITED STATES
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

UNITED STATES OF AMERICA,
ex rel., TED WHITTEN,
(Relator),

          Plaintiff,     CIVIL ACTION FILE

    vs.              NO. CV202-189

QUORUM HEALTH GROUP, INC.,
TRIAD HOSPITALS, INC., As
Successor to
QUORUM HEALTH GROUP, INC.,
QUORUM HEALTH RESOURCES, INC.,
and QUORUM HEALTH RESOURCES, LLC,

        Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF
TED REDDING WHITTEN

June, 26, 2007
10:15 a.m.

440 College Avenue
Athens, GA

LEE ANN BARNES, RPR

Ted Redding Whitten                                                    June 26, 2007

Page 86

then finally, senior vice-president for system development, my final position.

Q. When were you compliance officer?

A. I was named compliance officer in September of 1998, I believe it was.

Q. And for how long did you hold the position of compliance officer?

A. Until my termination date.

Q. When did you serve as acting CEO on the two occasions in which you did so?

A. Sometime -- about approximately 18 months before Bert Whitaker was hired and that was -- I don't know when.

Q. And was there another occasion in which you were acting CEO?

A. There was. I don't recall the -- the time, but it was a relatively short period of time.

Q. Was it before or after the period you described as occurring about 18 months before Mr. Whitaker came on?

A. Before.

Q. Who succeeded you as the permanent CEO after your first stint as the interim?

A. Gosh, there have been so many there.

Page 87

I really don't recall who that was.

Q. What was the position that you held immediately before becoming that interim CEO that first time?

A. Assistant administrator, I believe.

Q. For how long did you serve as chief operating officer?

A. Possibly three or four years.

Q. And do you remember which years those were?

A. No, sir, I can't, it's been so long, I can't tell you.

Q. Were you the COO while Mr. Whitaker served as CEO?

A. Yes, sir.

Q. What were your job responsibilities as COO?

A. I oversaw essentially all the clinical areas of the hospital and worked with various department managers in carrying out day-to-day duties.

Q. Did you have any responsibility for -- did you have any responsibility for patient billing?

A. No.

Page 88

Q. Did you have any responsibilities, or anyone that reported to you, regarding Medicare coding?

A. No, sir.

Q. Did -- in the course of your entire employment at the hospital, did you ever have any involvement in the preparation of a cost report?

A. No, sir.

Q. Did you ever sign a cost report?

A. No, sir.

Q. Did you advise on the filing of cost reports?

A. No, sir.

Q. Do you have any certification as a coder --

A. No, sir.

Q. -- for medical billing?

A. No, sir.

Q. Are you a certified compliance professional?

A. I'm not sure what that is.

Q. What is the nature of your postsecondary education? After high school, what degrees did you obtain?

Page 89

A. I have a degree nursing from Columbia State University.

Q. Is that an associate degree?

A. Uh-huh (affirmative).

Q. And for how -- did you maintain a nursing license in the State of Georgia?

A. I did.

Q. For how many years?

A. Until the present day.

Q. So you're still licensed as a registered nurse?

A. I am.

Q. And when were you first licensed?

A. Gosh, '79, I believe.

Q. In the course of your job descriptions, did you ever have responsibility for conducting utilization review at the hospital?

A. No, sir.

Q. Do you know what utilization review is?

A. Uh-huh (affirmative).

Q. What is it? Just so we're using the same terms, that's why I ask.

A. Well, describe it to me. I'm not

23 (Pages 86 to 89)

Ted Redding Whitten                                    June 26, 2007

Page 90

sure we are talking about the same thing.

Q. Well, please give me your understanding what you would mean by utilization review at a short-stay acute-care hospital.

A. A group of people who oversee the utilization of resources for the hospital.

Q. In the course of your responsibilities at the hospital, at any time, did you have occasion to have communications directly with the fiscal intermediary?

A. No, sir.

Q. Did you have any occasion to have direct communications with the Medicare carrier?

A. No, sir.

Q. Did -- did you have any communications with any government official regarding hospital operations while you were employed at the hospital?

A. No, sir.

Q. With respect to your training as a compliance officer, at the time that you were appointed compliance officer in September 1998, what prior training in

Page 91

compliance did you have?

A. None.

Q. Upon your appointment, did you receive subsequent training?

A. Prior to my appointment?

Q. No, sir. Subsequent. After you were appointed compliance officer.

A. Oh, I attended the Quorum compliance training and anything else that -- that I could possibly attend. I spent a great deal of time on the Internet studying compliance issues and attended a lot of compliance trainings.

As a matter of fact, I was a compliance -- Georgia Hospital Association compliance roundtable chairman and as such, we had a series of meetings to be made more aware, more informed, throughout the state.

Q. How many Quorum-sponsored compliance training sessions did you attend?

A. One.

Q. Just one?

A. One.

Q. And where was it held?

A. In Dallas, Texas.

Page 92

Q. And you don't remember attending any other Quorum-sponsored compliance training?

A. No, sir, I don't.

Q. Did other personnel from the hospital attend --

A. Yes, sir.

Q. -- compliance training sponsored by Quorum?

A. Yes.

Q. Who were the employees that you recall attending Quorum-sponsored compliance training at the hospital?

A. Lorraine Boudreaux and Jim Andersen. Now, I think their were more -- their training was more geared to their particular job title. One was a lab training and the other one was business office.

Q. What are the functions of the business office?

A. Billing, collections, fiscal.

Q. Do you have any training in accounting?

A. No, sir.

Q. Do you have any training in billing and collections of any type?

Page 93

A. No, sir.

Q. Do you recall when the hospital authority hired Quorum to manage the hospital?

A. I don't -- I don't recall it exactly, but it was probably '93-'94, something like that.

Q. If I -- was it before Bert Whitaker came onboard?

A. Yes, sir.

Q. If I suggested about 1989, would that be comporting with your recollection of when Quorum first undertook management responsibilities?

A. Well, I think when -- I think when -- I think HCA first had the management contract and then the spinoff was Quorum. So I don't recall the timing there, but it was HCA-managed for a while and then it was -- they brought in Quorum people.

Q. And do you recall who the first Quorum employees were at the hospital?

A. I think Michael Blackburn was the administrator and I think Ray Owings was the CFO.

Q. Did you ever see the contract for

Ted Redding Whitten                                                    June 26, 2007

Page 94

Quorum Management Services with the hospital?

A. Not until lately.

Q. When you say later, when do you mean?

A. When this lawsuit came out.

Q. Before or after the suit was filed?

A. After the suit was filed.

Q. Did you ever meet with anyone from Triad?

A. No, sir.

Q. When did you first learn about Triad?

A. After the suit was filed.

Q. Can you recall the names of people from Quorum with whom you met while you were employed at the hospital?

A. Sure. Gary Linc, L-I-N-C. He was like Ray Owings' boss with Quorum. Of course, Joe Beck. Chuck Owen, O-W-E-N. I think those are the three I met with.

Q. Now, did these three gentlemen -- you said Gary Linc was Ray Owings' boss, as far as you know?

A. Yes.

Q. So he was a financial person?

Page 95

A. Financial guy, yes, sir.

Q. Okay. And Joe Beck you've described as related to compliance. What was his position?

A. Quorum compliance officer.

Q. How many times did you meet with Mr. Beck?

A. Let's see, after Dallas, I brought Mr. Beck in to do some compliance training at the hospital. So that would be two times. And then at some of the Quorum compliance meetings around the state of Georgia, of course he was in attendance but I didn't meet with him individually.

Q. Okay. Those compliance meetings around the state of Georgia, were those sponsored by Quorum or by --

A. Quorum.

Q. -- another -- oh, Quorum?

A. Uh-huh (affirmative).

Q. Did -- and you attended those?

A. I attended those and others, yes, sir.

Q. Okay. I'm a little confused now because I think previously you testified that

Page 96

the only compliance training with Quorum you attended was the one time in Dallas?

A. These were compliance meetings, not training.

Q. So you're distinguishing that?

A. Yes, sir.

Q. All right. I understand. What was discussed at the Quorum compliance meetings around the state of Georgia?

A. Just various compliance issues.

Q. Was there continuing education on compliance issues discussed at that?

A. I don't know that you could characterize it at that -- as that. It was more or less a discussion.

Q. Were there certificates of attendance provided to those that came?

A. Gosh, I don't -- I don't believe so.

Q. Were other persons from the hospital also in attendance with you at these meetings --

A. No, sir.

Q. -- in Georgia?

A. No, sir. I was the only person.

Page 97

Q. So any other occasions that you can recall meeting with Mr. Beck other than what you've just described?

A. Talked to him on the phone.

Q. How often would you talk with him on the phone?

A. Probably talked with him a half dozen times.

Q. Over what period of time?

A. Over the time I was compliance officer.

Q. So from September '98 until the point of your termination, you talked with Mr. Beck about half a dozen times?

A. Approximately that, yes, sir.

Q. Okay. Had the occasion of --

MR. BLASINGAME: Excuse me. That was over the phone?

MR. LUCE: Right. Over the phone, Telephone calls.

Q. (By Mr. Luce) So -- and the purpose of these calls was what?

A. To raise his concern about issues that we had uncovered.

Q. I'm sorry. I just didn't -- to do