IN THE DISTRICT COURT OF THE UNITED STATES
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

UNITED STATES OF AMERICA,
ex rel., TED WHITTEN,
(Relator),

          Plaintiff,     CIVIL ACTION FILE
   vs.                NO. CV202-189

QUORUM HEALTH GROUP, INC.,
TRIAD HOSPITALS, INC., As
Successor to
QUORUM HEALTH GROUP, INC.,
QUORUM HEALTH RESOURCES, INC.,
and QUORUM HEALTH RESOURCES, LLC,

          Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF
TED REDDING WHITTEN

June, 26, 2007
10:15 a.m.

440 College Avenue
Athens, GA

LEE ANN BARNES, RPR

Ted Redding Whitten                                                        June 26, 2007

Page 134

day was August -- in August, then the letter had to come after John Miller.

Q. What was your status as an employee on October 17, 2000 when you signed this letter to Dr. Manning?

A. I was on medical leave.

Q. But you were already on medical leave?

A. Sir?

Q. You were already on medical leave as of October 17, 2000?

A. Well, I was taking sick days, paid time off. The medical leave had to be requested from the insurance carrier.

Q. Didn't the hospital approve your application for leave under the federal -- Family Medical Leave Act?

A. Yes, sir.

Q. When did they approve that?

A. I don't have any idea, sir.

Q. Well, let's look at your letter, rather than speculate.

Would you read aloud the first sentence.

A. "As you know, I've been out of work

Page 135

on medical leave since August 11, 2000 due to a number of medical problems I have. As a result of consultations with my physicians, I have determined that my service -- various problems will prevent me from returning to full-time employment at the hospital. After 20-plus years of service at the hospital I regret that my employment has to end in this manner."

Q. Was this a true statement as you have just read it at the time you signed this letter?

A. Yes, sir.

Q. Did anybody from the hospital force you to send this letter in?

A. No, sir.

Q. Did Dr. Manning request that you send this letter?

A. No, sir.

Q. Let me ask you to look at the paragraph that starts, "I am very troubled."

Do you see that paragraph?

A. Yes, I do.

Q. Do you have that paragraph before you?

Page 136

A. I do, yes.

Q. All right, sir. It says you're "troubled and concerned about numerous compliance allegations."

What -- was that true?

A. Yes, sir.

Q. What were the numerous compliance allegations that troubled you when you wrote this letter to Dr. Manning?

A. Well, the mental health unit had no medical director or master's prepared social worker. So I was concerned that all the bills that were going in were fraudulent in nature because they -- the hospital didn't comply with conditions of participation. That's one.

There were -- there were other issues, as we identified in our compliant.

Q. Well, I'm interested in what was troubling you at the time you signed this letter.

A. Everything was troubling me at the time I signed this.

Q. Everything?

A. There were numerous compliance violations.

Page 137

Q. Yes, sir. That's --

A. I felt --

Q. I'm sorry.

A. -- I felt -- I felt an enormous sense of concern about my legal exposure as a compliance officer, and that exposure did not end when I left the hospital because I was compliance officer there for about 18 months.

Q. And that concern is what you expressed here in the second sentence where it says, "I am concerned that I could have a role in any civil and/or criminal proceedings that may arise as a result of the investigation into or the prosecution --

A. Yes, sir.

Q. -- of these matters"?

A. Yes, sir.

Q. And these were issues of concern regarding the possible criminal or civil investigation of the hospital?

A. Yes, sir.

Q. Why did you feel you might have criminal or civil liability?

A. Because I was compliance officer and there were things -- there were charges that

Ted Redding Whitten                                    June 26, 2007

Page 138

were going on unabated.

Q. In October of 2000, you weren't working at your job as compliance officer; right?

A. Uh-uh (negative). No, sir.

Q. But you were on August 11 when you left --

A. Yes, sir.

Q. -- the hospital?

A. Yes, sir.

Q. Have you had any contact with the hospital between August and the time of this letter as to the matters that were of concern to you that you characterize as compliance allegations?

A. I don't believe I did.

Q. Now, in the next sentence, it says that, "As a result, I request that the hospital indemnify me against any losses I might incur as a result of being involved in some proceedings," and that the hospital provide legal counsel payments for you.

Is that -- that a request that you wanted to make of the hospital because of your concerns about compliance matters?

Page 139

A. Oh, yes, it was.

Q. Well, I'm going to ask you to try to recall what were the matters of concern to you here in October.

You mentioned the mental health unit. What else?

A. That's just one. Lack of physician documentation, observation area, lack of physician signatures, nurses making rounds and using a rubber stamp to -- rubber stamp physician signatures. By the way, these same concerns were identified by a Quorum consultant named Kay Nance and put in -- in her report, written report.

Q. When was that?

A. Just -- it was around Joint Commission accreditation time. I don't remember what -- what month that was. But all this stuff was happening sort of concurrently.

Q. Would that have been in 2000, that Joint Commission accreditation?

A. I believe it was, yes, sir.

Q. So Kay Nance of Quorum advised the hospital of some of the issues that you've mentioned here?

Page 140

A. Yes, sir.

Q. Who -- who got a copy of Kay Nance's report?

A. Oh, a lot of people, people that were on the Joint Commission accreditation improvement team. There was a number -- a number of individuals.

Q. Well, can you recall who the members of that commission improvement team were?

A. Warren Manley, I think Rosie Moan, maybe Ray Owings. I'm not certain about him. And many others, I just -- I can't recall.

Q. Was there a board representative on that committee?

A. No, sir.

Q. Was there other members of the compliance committee on that committee?

A. There could have been, but I don't -- I can't say that for sure.

Q. Was your wife on that committee?

A. For a short time, yes, sir.

Q. And this was a report provided by a Quorum employee at the hospital?

A. A Quorum consultant.

Q. Quorum consultant. Okay.

Page 141

Did she work with Quorum or was she with a independent company that Quorum paid?

A. I can't tell you the arrangement. She was just identified to me as a Quorum consultant. I don't know.

Q. So I'm sorry, I digressed from the list of matters that you were concerned about at the time.

What else was your concern?

A. Observation unit. Again, the lack of documentation. Just a number of issues that we've identified to you.

Q. Was the charge description manager --

A. Oh, yes that was of concern to me.

Q. Was the receipt of subpoenas a matter of concern to you at the time?

A. I don't recall -- I don't know what subpoenas you're talking about.

Q. Was there a concern about numerous focused medical reviews by the --

A. Oh, yes, sir.

Q. What is a focused medical review?

A. When a problem area is identified by the Georgia Medical Care Foundation, a peer

Ted Redding Whitten                                                                    June 26, 2007

Page 142

review organization for Georgia hospitals, they do what's called a focused medical review and they focus in on the areas that were identified as problems. And we had received numerous focused medical reviews.

Q. And is that focused medical review then conducted by a federal contractor for Medicare? Is it is that the purpose for that?

A. I think the Georgia Medical Care Foundation is that contractor.

Q. And they contract with Medicare --

A. Yes.

Q. -- to provide the review; is that correct?

A. Yes.

Q. And what were some of the issues that they were looking at?

A. The same ones I mentioned to you.

Q. Okay.

A. Lack of documentation in speech therapy, I think is the recurring one. There were six or seven of them.

Q. With a focused medical review, do you know how that affects, if any -- if at all, the stream of payments from Medicare for

Page 143

the claims that are under review?

A. I don't know the mechanism for -- the Medicare FI, fiscal intermediary, which is Blue Cross/Blue Shield, I don't know how they communicated with each other. But certainly there would be heightened exposure for the hospital if the review -- the peer organization had identified focused medical review issues, then I don't know how the communication worked from the peer review organization to the FI. But I know we were very concerned about it.

Q. Well, did you participate as the compliance officer in responses to these focused medical reviews?

A. Did I participate as compliance officer in responses -- the responses weren't supposed to be mine. They were supposed to be my colleagues'. I mean, as a department manager, you're supposed to be cognizant of the Medicare rules and regulations and to monitor your departmental compliance. So I would ask them for their cooperation and we weren't getting any. It was just like stonewall.

Page 144

Q. What -- what department had stonewalled you, for example?

A. Well, we requested responses to the Chargemaster review, for example, and we --

Q. Pardon the interruption, but I'm not asking but that. I'm asking you about focused medical review.

Was the Chargemaster a matter of the focused medical review?

A. I thought you said Chargemaster. I'm sorry.

Q. Well, I asked you that several questions. But right now just in terms of focused -- the focused medical review by the Georgia Quality Foundation that you described, what issue was raised in a focused medical review that resulted in stonewalling by a department head?

A. I'm trying to answer you.

Q. Yes, I understand. But -- well, you answer. I just -- I want to make it clear to you. I'm not suggesting that the Chargemaster was part of the focused medical review. If you think it was --

A. No --

Page 145

Q. -- then go ahead and give your answer.

A. -- no, I don't think it was at all.

Q. Then can you just answer my question about -- on a focused medical review, you said departments had stonewalled you in getting a response --

A. Yes, sir.

Q. -- and I asked you could you identify a department head who had stonewalled you in a focused medical review response?

A. Joann Lentini was the department manager for the therapy department.

Q. And you felt that she stonewalled you --

A. Well, there's just lack of response. Rosie Moan I think over -- oversaw that particular area and I got no response from her. I mean, here we had identified problems but nobody's trying to participate in a solution. It's very frustrating.

Q. Who did those folks work for?

A. Who did they work for?

Q. Yes, sir.

A. Well, they answered to -- to Bert