IN THE DISTRICT COURT OF THE UNITED STATES
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

UNITED STATES OF AMERICA,
ex rel., TED WHITTEN,
(Relator),

        Plaintiff,

                       CIVIL ACTION FILE

   vs.                  NO. CV202-189

QUORUM HEALTH GROUP, INC.,
TRIAD HOSPITALS, INC., As
Successor to
QUORUM HEALTH GROUP, INC.,
QUORUM HEALTH RESOURCES, INC.,
and QUORUM HEALTH RESOURCES, LLC,

        Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF
TED WHITTEN
VOLUME II
9:31 A.M.
June 27, 2007

440 College Avenue
Athens, Georgia   30603
Lee Ann Barnes, RPR

Ted Whitten                                                                              June 27, 2007

Page 34

paragraph 30 again.

A.   Give me just a moment.

Yes, sir.

Q.   In the middle of this paragraph, there is a sentence that starts, "At the very latest...."

Do you see that?

A.   Yes, sir.

Q.   Would you read back and the next sentence only aloud, please.

A.   "At the very latest, in March 1999, when Medicare Bulletin 18" -- excuse me -- "1836 was received, improper charges should have been immediately deactivated from the Chargemaster.

Q.   The next sentence?

A.   "However, the Quorum defendants continued to inappropriately charge for equipment, supplies, and routine services well into the year 2000."

Q.   Are those true statements?

A.   As far as I'm concerned they are, yes, sir.

Q.   How should the hospital immediately have deactivated the Chargemaster, as you've

Page 35

alleged?

A.   The way it's supposed to work is the department managers should retain responsibility for being in compliance with -- in the Chargemaster from charge -- charges in their departments.

There was really no compliance with that for a long, long time.  So the employees, departmental managers, didn't even know what a -- probably didn't even know what a Medicare bulletin was, because I don't believe they were distributed.

Q.   You don't believe that Medicare Bulletin 1836 was distributed --

A.   Oh, that one, yes, sir.  I'm talking about prior --

Q.   Okay.  Well, let's --

A.   -- Medicare bulletins.

Q.   Okay.  Well, I want to deal with your allegations here.  Your allegations here deal with Medicare Bulletin 1836.

A.   Okay.

Q.   That's all I want to talk about right now; okay?

A.   Okay.

Page 36

Q.   All right.  Because I don't want to have to repeat the whole predicate for every question.

Now, with respect to Medicare 1836, was that distributed to department heads?

A.   Yes, sir.

Q.   Okay.  My question is:  What would have been necessary to, as you have alleged, immediately deactivate the Chargemaster in accordance with Medicare Bulletin 1836?

A.   A Chargemaster review to make sure that none of the things that are mentioned in 1836 is included.

Q.   Was that done?

A.   Yeah, it was done after the fact, sir.

Q.   Well, what do you mean by "after the fact"?

A.   A Chargemaster review -- a Chargemaster audit was done by an outside audit firm to bring the Chargemaster in -- into compliance.

Q.   Was there any Chargemaster review done by the hospital personnel prior to the outside audit you've just referred to?

Page 37

A.   I -- I couldn't address that, sir. I have no idea.  We -- we were not in compliance, so obviously not.

Q.   Well, that's simply your conclusion. I'm asking you simply the fact:  Did the hospital conduct a review of the Chargemaster following receipt of Medicare Bulletin 1836 in March of 1999?

A.   The Chargemaster review was conducted by the Chargemaster committee that recommended an outside audit firm be brought in to --

Chargemaster's a massive document, a massive set of charges.  It's not easily reviewed, but -- but should be reviewed on an annual basis.

Q.   Well, your allegation, however, is that the Chargemaster should have been immediately deactivated for those items called out in Medicare Bulletin 1836, isn't it?

A.   Yes, that's exactly what I think.

Q.   Well, in that massive document, how should they have immediately revised the Chargemaster?  What should have been done?

A.   They should have reviewed the

Ted Whitten

June 27, 2007

**Page 38**

Chargemaster for charges that are inappropriate.

Q. And is it your testimony that the hospital did not do that?

A. They started the process of doing that, but it didn't take place -- it wasn't complete until I think 2000.

Q. Okay. And that's your allegation?

A. Yes, sir. It's right -- it's written right there, yes, sir.

Q. Okay. And is it your allegation that Medicare paid for inpatient services for charges that it should not have paid as a result of not immediately deactivating the Chargemaster items?

A. Yes, sir.

Q. How much did Medicare pay that it should not otherwise have paid for failure to immediately deactivate the Chargemaster in accordance with Medicare Bulletin 1836?

A. It was --

MR. GARRARD: Would you read that question back? Because I think --

MR. LUCE: You've got it right there.

**Page 39**

MR. GARRARD: Well, wait a minute.

MR. LUCE: I'll look at it, too.

MR. GARRARD: I think you -- I heard you say "Medicaid" when you may have wanted to say "Medicare." And I may have misheard you.

MR. LUCE: My transcript says "Medicare."

MR. GARRARD: Okay. I misheard you. I need to change my hearing aids.

THE WITNESS: The value the Quorum personnel put on the -- the inappropriate charges is $18.8 million per year.

Q. (By Mr. Luce) Well, that's your reading from your paragraph 30; right?

A. Yes, sir.

Q. Okay. Read the sentence where you derived that number.

A. "However, the Quorum defendants continued to charge inappropriately for -- charge for equipment, supplies, and routine services well into the year 2000. The Quorum defendants' own internal documents indicate that the gross improper charges were $18.8 million per year, with a net cash

**Page 40**

revenue value of 7.5 million annually."

Q. And do you agree with that statement?

A. Yes.

Q. Okay. What internal documents of the defendant Quorum are you referring to?

A. I believe it was an e-mail authored by Ray Owings.

Q. And to whom did Ray Owings direct that?

A. Gosh, I -- I don't recall.

Q. Well, did it go to members of the hospital, administrative staff?

A. Probably.

Q. Well, you recall the memo. You -- you've alleged that this was a Quorum internal document. What is an internal document?

A. A document generated by a Quorum employee.

Q. Okay. So any document in -- generated by a Quorum employee, you would consider to be a Quorum internal document?

A. It's -- just as I stated, it's a document generated by a Quorum employee. And I think the -- the spirit of

**Page 41**

what's said here is that by the Quorum's own admission, $18.8 million per year was inappropriately billed.

Q. Well, that's your allegation. How much -- how much do you think was received by the hospital from Medicare that should not have been received for failure to immediately deactivate the Chargemaster items specified in Medicare Bulletin 1836?

A. As I testified yesterday, Mr. Luce, I'm -- I'm not an accountant. I don't know how to determine that. I'm just -- I'm just using what Quorum told us.

Q. And I think you -- you also testified that you have no experience in doing a Chargemaster review yourself?

A. No, sir.

Q. So you don't personally know, as you sit here, whether Medicare paid $1 or a hundred million dollars more than it should have to the hospital based on Medicare Bulletin 1836, do you?

A. I'm taking Quorum at their word here, sir.

Q. Well, we're going to come back to

11 (Pages 38 to 41)

Ted Whitten

June 27, 2007

Page 42

that.

So that's the only information you have as to Medicare overpayments, is based on this allegation which you contend is supported by a Quorum internal document?

A. No, sir. Bulletin 1836 clearly states that you should not make charges for the things I have already delineated.

Q. Yes, sir. That's conduct. I'm only asking about the revenue received by the hospital in excess of what it should have been entitled to.

Do you have any other information besides that which you attributed to Quorum that says that the Medicare program overpaid the hospital because it didn't follow and immediately deactivate charges called for by Medicare Bulletin 1836?

A. Well, the hospital was under focused medical review, sir, in a number of areas. So I don't know what you're asking exactly.

Q. Was the Chargemaster under a focused medical review?

A. No, services were under focused medical review.

Page 43

Q. Including services that would be billed through the Chargemaster?

A. Yes, sir.

Q. What services were under focused medical review?

A. The observation unit, as I've already testified; the speech therapy; lack of physician documentation; all those areas that I've already testified to, sir.

Q. Okay. And just to be clear, the focused medical review is performed by whom?

A. The peer-review organization, Georgia Medical Care Foundation.

Q. And they're serving as a contractor to the Medicare program?

A. Medicare, yes, sir, for review.

Q. Pardon?

A. For their review.

Q. For their review?

A. Yes, sir.

Q. Now, going back to my earlier question, with respect to your allegation that the Chargemaster should have been immediately deactivated in certain charges, when you say "immediately," how -- what time frame are you

Page 44

talking about? How -- what does "immediately" mean to you in terms of deactivating the improper charges?

A. Whatever immediate definition is given by Medicare.

Q. Well, what is that?

A. I have no idea. I mean, I don't know that the hospital ever asked them. They --

Q. You don't know whether the hospital --

MR. BLASINGAME: Let him finish his answer.

Q. (By Mr. Luce) I'm sorry, I thought you were complete.

A. Would you ask that question again, sir?

Q. Yes, sir.

You have said here that the hospital should have immediately deactivated those items in the Chargemaster that were called out by Medicare Bulletin 1836.

A. Right.

Q. My question is: As you've alleged it here, when you say they should have done so

Page 45

immediately, how long a time did they have to do that, in accordance with your view of what was required?

A. The process should have been -- been begun immediately and it wasn't begun until sometime in 2000.

And that's -- that doesn't make -- that's not logical, just take so long to deactivate charges that you know are illegal.

Q. So there was no process begun until 2000 to deactivate the charges --

A. A process may have -- may have been begun, but it's the amount of time that it took between the receipt of Bulletin 1836 and the actual deactivation of the charges.

Q. Okay.

A. In my view, it's excessive.

Q. All right. So you don't really know what "immediately" means; you just think that they took too long?

A. "Immediately" means that it should have happened when Bulletin 1836 was received, and it was sometime later in the next year when it was actually done.

Q. Let me ask you to turn to your

Ted Whitten                                                                                      June 27, 2007

Page 46

Exhibit A of this first amended complaint at page 4 of that exhibit.

If you would look in the middle of that page, sort of between the two -- between the two three-hole punch areas there where it says, "Further, the System...."

Do you see that?

A.  Give me just a second.

Q.  Yes, sir.  Take your time.

A.  Is this --

Q.  Page 4 of Exhibit A.  It's -- you need to turn back into -- I think --

MR. LUCE:  Let's go off the record for just a second.

VIDEOGRAPHER:  Off the record.

(Thereupon, there was an interruption in the proceedings.)

VIDEOGRAPHER:  Stand by.

On record.

Q.  (By Mr. Luce)  Mr. Whitten, do you have Exhibit A, page 4, before you?

A.  I do.

Q.  All right, sir.  If you would, look in the middle of that page at the sentence that starts, "Further, the System...."

Page 47

A.  Yes, sir.

Q.  All right.  Would you read that sentence aloud, please.

A.  "Further, the System, against the advice of the compliance department, has never repaid the money it received from the Medicare program for the outpatient charges associated with the equipment specified in 1836."

Q.  Is that a true statement?

A.  It was at the time this was written.

Q.  To your knowledge, have any facts changed that would suggest this is no longer true?

A.  I -- I have no idea, sir.

Q.  Now, this refers to outpatient charges; right?

A.  Uh-huh (affirmative).

Q.  Why -- why were you focusing on outpatient charges regarding Medicare Bulletin 1836?

A.  I -- I wasn't focusing on outpatient charges; I was focusing on the global charges.

Q.  That's not what your sentence says here.  Look at your sentence again.  "...has never repaid the money it received from the

Page 48

Medicare program for the outpatient charges associated with the equipment specified in 1836."

That's your sentence; right?

A.  Yes, sir, that's what it says here.

Q.  Okay.  And it focuses on outpatient charges; right?

A.  Yes, sir.

Q.  Is that a mistake?  Should it be all charges or global charges?

A.  I'm not sure about that, sir.

Q.  Well, you told me this is a true sentence.  So what is true about the allegation that the hos- -- the System has never repaid the money received for outpatient charges for -- associated with the equipment specified in 1836?

A.  It just says what -- I mean, it means what it says.  The hospital had not repaid the -- the outpatient charges associated from the Medicare program.

Q.  So you're talking only about outpatient charges in this allegation?

A.  In that sentence I am, sir.

Q.  All right.  Well, now, the first

Page 49

part of the sentence says against the advice of the compliance department, it never repaid the money.

Was that your advice, as the head of the compliance department?

A.  It was the collective advice of the compliance department.

Q.  Well, was it your advice?

A.  Yes, sir.

Q.  And you shared that view?

A.  Yes, sir.

Q.  And you expressed the view that they should repay the outpatient charges for the items and equipment specified in Section 18 -- or Bulletin 1836?

A.  I don't recall just being concerned about outpatient charges, and I -- I think that the compliance department was concerned about all charges, whether it be inpatient or outpatient.

Q.  How much were the outpatient charges that should have been repaid, according to the advice that you gave to them, just --

A.  Again, I'm not an accountant.  I can't -- I can't point to a specific figure.

13 (Pages 46 to 49)

Ted Whitten

June 27, 2007

Page 50

Whatever the figure is is what should have been deactivate -- should have been repaid.

Q. Well, did you know that there was, in fact, overpayments associated with Medicare Bulletin 1836 charges?

A. I knew, in fact, there was noncompliance in a variety of areas. That's got to result in overpayment.

Q. Well, explain this to me. Why is it that noncompliance in a variety of areas results in an overpayment?

A. Because you're -- you're charging for things that are against Medicare policy.

Q. Does Medicare pay hospitals on the basis of charges for inpatient care?

A. No. They did for outpatient care.

Q. Okay. And how did they pay on the basis of charges for outpatient care? Whatever the hospital charges?

A. No, sir. They pay it on DRG system.

Q. They pay outpatient charges based on the DRG system?

A. No, sir.

Q. All right. You're gonna have to explain, because I don't quite understand your

Page 51

question (sic).

A. I'm --

Q. Let me see if I can help you out.

A. Okay.

Q. Does Medicare pay on the DRG system for Part A or Part B charges?

A. Part A.

Q. Part A.

And Part A, we've agreed, is inpatient care?

A. Yes, sir.

Q. For outpatient, how does Medicare pay, on DRG or some other system?

A. Some other system.

Q. Okay. What is that other system?

A. It's -- I think I need to take a break. I'm sorry.

Q. I'll -- we'll take a break just as soon as you answer that question.

MR. BLASINGAME: No. If he needs to take a break --

MR. LUCE: No --

MR. BLASINGAME: -- we'll take a break now and I will tell you --

MR. LUCE: I'm going to object.

Page 52

I've accommodated Mr. Whitten and I will continue to accommodate his needs, but I've got a question pending and I think I'm entitled to an answer.

MR. BLASINGAME: And I will -- I will represent to you that counsel will not say a word to him during the break, but --

MR. LUCE: That's not my concern.

MR. BLASINGAME: -- if he -- if he needs a break, he needs a break.

Q. (By Mr. Luce) I -- I'd like to know whether or not you'd be willing to answer the question before the break?

A. The reason I need to take a break is my blood sugar level is going down and my ability to -- to concentrate and focus to answer your questions is diminished right now.

MR. LUCE: All right. We'll take a break.

How long do you need?

THE WITNESS: Until I can get my blood sugar back up to a normal level.

MR. LUCE: I just don't know what the circumstances are. I just need an

Page 53

estimate of how long.

MR. GARRARD: He'll be back just as quick as we can. I can't tell you how long. I don't know.

MR. LUCE: All right. Well, let's just take a break, then, for the moment.

VIDEOGRAPHER: Off the record.

(Thereupon, there was an interruption in the proceedings from 10:27 a.m. to 10:55 a.m.)

VIDEOGRAPHER: Stand by. On record.

THE WITNESS: Mr. Luce, gentlemen, I apologize for the delay. I apologize.

Q. (By Mr. Luce) Well, let me just ask you, Mr. Whitten: Do you feel capable of going forward with your deposition?

A. Yes, sir.

Q. And do you feel capable of giving complete and truthful answers to the questions that I pose today?

A. Yes, sir.

Q. Okay. When we took the break, the question pending was: How does Medicare pay for outpatient services? And I'll confine that to the time period of your tenure at the

Ted Whitten                                                                June 27, 2007

Page 54

hospital. How did Medicare pay for outpatient services?

A. I honestly don't remember, sir.

Q. Well, in the context of -- do you still have Exhibit A, page 4, in front of you, sir?

A. Yes, sir, I do.

Q. All right. What was the specific advice that was given by the compliance department that you're referencing here in this statement: "The System, against the advice of the compliance department, has never repaid the money"? What was the advice?

A. To repay the -- the funds received from Medicare.

Q. When was that advice given?

A. I couldn't tell you, sir. I'd have to go back and research it to give you an exact date.

Q. Okay. Do you believe that that advice was reduced to writing?

A. I believe it was, sir.

Q. And to whom was the advice given?

A. Various members of the affected departments and their -- and their

Page 55

supervisors.

Q. And you have used the phrase here that "the System" has never repaid the money. Who is the System, with a capital S, referred to here?

A. Southeast Georgia Health System, which includes both hospitals.

Q. Okay. And by "both hospitals," you're referring to --

A. Camden Medical Center and Southeast Georgia Regional Medical Center.

Q. All right. Thank you. Now, let me ask you to turn back over to paragraph 30 of the amended complaint, where we'd been before.

A. All right, sir.

Q. All right, sir. You had previously referenced the Quorum defendants' own internal documents indicating that "the gross improper charges were 18.8 million per year, with a net cash revenue value of 7.5 million annually." You see that sentence?

A. Yes, sir.

Q. And you believe that sentence to be true?

Page 56

A. I believe it was generated by -- by Quorum, so I take them at their word that the review of the -- the charges was accurate.

Q. All right, sir. Let me ask you this, then: Taking Quorum at their word, did you undertake, as a compliance officer, any evaluation of these numbers to determine whether or not they were correct?

A. Again, I'm -- I'm not an accountant. I don't -- don't have any ability in that area.

Q. Okay. So you didn't personally undertake any such analysis of these numbers?

A. No, sir.

Q. Okay. Did you cause anyone in your department with the requisite skills to undertake such an analysis of these numbers?

A. I believe Ray Owings is responsible for the -- the data here, and he probably would have used one of the people in his employ to -- to do that for him.

Q. And Ray Owings was the chief financial officer.

A. Chief --

Q. He's a Quorum --

Page 57

A. He's their --

Q. -- employee?

A. -- CFO, yes, sir.

Q. And it's his numbers that you believe are stated here in this paragraph 30?

A. They are, I believe so, yes, sir.

Q. Now, my question goes back to what I said before: As compliance officer, did you have anyone in the compliance department with the skill to do so to evaluate these numbers for accuracy?

A. I don't believe I did, sir.

Q. Well, let me ask you what these numbers are. You said gross improper charges were 18.8 million per year. What are gross charges, as you've used it in this sentence?

A. I haven't used it in this sentence. My attorneys have crafted this document, sir. I'm trying to explain something that -- that came out of the evidence that we submitted to you.

Q. Well, let me ask you to turn to just before paragraph A -- I'm sorry -- Attachment A in that complaint.

15 (Pages 54 to 57)

Ted Whitten

June 27, 2007

Page 58

No, sir, you're a little too far back. It'll just be --

A. Oh, I see it.

Q. All right. Just before Paragraph A's tab, two pages in, you'll see a verification.

A. Yes, sir.

Q. Take a moment, put that before you. It will be in your left hand there.

A. Yes, sir.

Q. Yes, sir. Is this a verification that you signed in support of this first amended complaint?

A. It is.

Q. Okay. And does this bear a facsimile of your sworn signature?

A. It is.

Q. It says that you have "read and understand the contents of the aforegoing and that the same is true and correct to the best of your knowledge and belief."

So was the obligation here in paragraph 30 that we've been talking about regarding the defendants' documents, is that a

Page 59

true statement, to your knowledge?

A. Yes, sir.

Q. Now, what is your understanding of gross improper charges as used here, as opposed to, if this will help, net cash revenue? What's -- what's the distinction between the gross charges and the net cash revenue as you've used it in this sentence?

A. The gross charges are those that were made for the supplies and services rendered.

The net charges are estimated cash value after DRG is extracted.

Q. Okay. Now, can you explain that last statement for me a little bit, that -- the net value after DRG adjustments?

A. Well, after Medicare -- excuse me. After Medicare pays -- Medicare doesn't pay a hundred percent, as we all know; they pay a portion through a DRG System.

And the portion that they do pay would result in 7.5 -- estimated 7.5 million to the bottom line.

Q. Out of charges of 18.8 million?

A. That's my understanding.

Page 60

Q. So these -- you're suggesting that these numbers are only Medicare gross charges?

A. Yes, sir.

Q. And the net cash revenue is only Medicare net cash revenue of 7.5 million?

A. That's what I believe to be true.

Q. All right. And is it your testimony that you advised the System to refund $7.5 million to the Medicare program and they refused?

A. No. It was our advice to refund the charges that were made to Medicare in areas that -- that didn't meet criteria, didn't meet compliance criteria.

Q. Is that the 18.8 million?

A. It would be whatever charge is determined to be inappropriate.

Q. Well, in the context of this sentence, you've said that there were improper charges of $18.8 million per year to Medicare.

A. I've not said that; that's what Ray Owings said.

Q. All right, sir. And you believe that that was true, as far as you know?

A. I'm not an accountant. I don't -- I

Page 61

can't challenge it.

Q. You made the -- you made the allegation.

A. I did --

Q. Okay. All right.

A. -- using his information.

Q. All right. Well, using his information, do you understand that to mean -- well, did you see the document from which these numbers are derived?

A. I -- sure, I did.

Q. Okay. And did you take that document to the System in some way or shape and say, "We should repay $7.5 million to Medicare"?

A. Yes, sir.

Q. You did?

A. Yes, sir.

Q. Okay. When did you do that?

A. Repeatedly.

Q. Well, when did you first do it?

A. Mr. Luce, I -- I can't give you an exact date, sir. I'm sorry, I --

Q. Well, did you do it in 1999?

A. Yes, sir.

Ted Whitten                                                      June 27, 2007

Page 86

deactivated; right?

A.  That's what we believed on August 17, '99, yes, sir.

Q.  And that's what you reported to the Hospital Authority and to the Quorum employees?

A.  Yes, sir.

Q.  And, in fact, Ray Owings authorized deactivation of charges, which was confirmed by your IS department on August 13, '99; right?

A.  Yes, sir.

Q.  So it's not correct to say that Ray Owings delayed the implementation of charge deactivation until 2000, is it?

A.  Yes, sir.  I believe the information we provided will show that.

Q.  So you have information that contradicts what you reported to the board in August -- in September of 1999?

A.  Somewhere we do.  I don't recall where it is right this minute, but, yes, sir. We wouldn't have made that statement otherwise.

Q.  Well, you know, that's what you

Page 87

testified to now, but you told every leading member of the Authority and the administration that charges had been deactivated as of August 13 and August 17 at both hospitals; right?

A.  And that's what we were told had happened, yes, sir.

Q.  Okay.

A.  But as it turns out, it hadn't happened.

Q.  Okay.  Well, in -- you've also said that Ray Owings delayed the implementation of this deactivation?

A.  Well, he was in charge of deactivation.

Q.  Yes, sir, that's what you've alleged.

My question for you is:  Haven't you asserted that Ray Owings delayed the deactivation of charges that were specified in Medicare Bulletin 1836?

A.  Yes, sir.

Q.  And, in fact, he didn't delay that at all, did he?

A.  Yes, sir, I believe he did.

Page 88

Q.  How did he -- how did he delay it?

A.  Because it wasn't corrected until sometime in 2000.

Q.  Well, you -- you suggest it wasn't correct, but as of August 1999, Ray Owings had authorized all changes to be made in the Charge Description Master on information provided to him by hospital department directors, hadn't he?

A.  That's what it says, yes, sir.

Q.  And that's what he did, isn't it?

A.  It's what I believed he did when I wrote this.

Q.  And you have no information whatsoever to suggest that he in any way delayed the deactivation of charges based on information provided to him by department directors, do you?

A.  I know that the charges weren't corrected until sometime in 2000, sir.

Q.  Okay.  Well, let's -- we'll talk about that in a moment, but that's a different thing than saying that he -- that he impeded the deactivation of charges until 2000, isn't it?

Page 89

A.  Say that again, sir.  I'm sorry.

Q.  Mr. Owings, by your own report to the chairman of your board, the CEO of your hospital, had authorized deactivation of all identified charges on the information provided by department directors as of August 1999, didn't he?

A.  That's what it says, sir.

Q.  I'm asking you, not what this says. I can read that.

That's a true statement, isn't it? He had authorized the deactivation of all charges reported to him by the department directors as of August of 1999?

A.  That's what we were told.

Q.  And you had confirmation of that from your IS department?

A.  Yes, sir.

Q.  And "IS" stands for "information services"?

A.  Information system.

Q.  System?

A.  Yes, sir.

Q.  And they're the people who would actually implement computer changes to the

Ted Whitten                                                                        June 27, 2007

Page 90

Chargemaster; correct?

A. Based on what department directors' overview of their department have indicated, yes, sir.

Q. Now, let's turn back to the first page of your report.

Paragraph 4, there is an estimated unaudited amount of overbilling from March 1, 1999 through July 31, 1999; correct?

A. Yes, sir.

Q. Who performed the calculations for this?

A. I believe it was Ruby Turner, in concert with Michelle Morris and Debra Kalister. That's my recollection.

Q. Okay. And do you believe that their calculations were reliable?

A. Again, sir, I'm not an auditor. I -- I assume -- they're reliable people, so I assume that's correct.

Q. And you had no reason to question their calculations, did you?

A. No, sir.

Q. You were a compliance officer and you relied upon their calculations?

Page 91

A. That's right, yes, sir.

Q. And you relied upon them to a sufficient degree that you would report to the chairman of the Hospital Authority and to the CEO of the hospital that these are the estimated unaudited amounts of overbilling for the period '99 through -- I'm sorry -- March 1, '99 through July 1, 1999; correct?

A. Yes, sir. Yes, sir.

Q. Now, I'd like you to, if you would, please, explain to me the numbers shown in this chart here at No. 4.

A. Again -- again, sir, I'm -- I'm not an auditor.

Q. Mr. Whitten, let me -- let me help us all out here.

I understand your role to be the compliance officer as the author of this. I'm now asking you simply to explain what you meant when you reported these numbers to the chairman of the Hospital Authority and the CEO of the hospital.

A. It's numbers that I received from -- I believe it's Ruby Turner, Michelle Morris, and Debbie Kalister.

Page 92

Q. And you believe those to be reliable calculations; right?

A. At the time -- at the time we sent this memo out, yes, sir.

Q. Well, did there come a time when you didn't think these were reliable calculations?

A. No, sir. I mean, I -- this was just estimated unaudited. It was just a quick and dirty look at the -- the numbers.

Q. All right, sir. Well, with that characterization, please explain to me what you mean by the column headed "Inpatient."

A. It's the impact of -- Camden Medical Center had a very small Medicare contingent. Brunswick had a much larger Medicare contingent.

Q. So would it be fair to say these are only Medicare numbers that we're looking at?

A. Yes, sir.

Q. All right. And when it says "the amount of overbilling" here, what do we mean by overbilling?

A. Charges that shouldn't have been billed.

Q. Charges that should not have been

Page 93

billed?

A. Yes, sir.

Q. Okay. And these would be charges to Medicare that should not have been billed --

A. Yes, sir.

Q. -- according to this calculation?

A. Because Bulletin 1836 is what drove this memo.

Q. All right, sir. Thank you.

With that understanding, then, would it be fair to say that the total charges billed to Medicare for inpatient services that should not have been billed according to this calculation were $562,869.98?

A. From March 1st through July 31, '99, that's -- that's the amount that was given to us.

Q. Okay. Now, in looking at these numbers on those charges, how much was received by the hospital for inpatient services that should not have been received as a result of those charges?

A. 688,000? Is that what you wanted? Is that what you're asking, sir?

Q. No.

Ted Whitten                                                                June 27, 2007

Page 94

I'm asking you: These are the inpatient charges that you have calculated were overbilled to Medicare for the period; right?

A. Yes, sir.

Q. Of those charges, how much was the hospital overpaid by Medicare?

MR. BLASINGAME: Why don't you refer him to the next page.

MR. LUCE: Again, he got the whole memo.

Q. (By Mr. Luce) Have you read that paragraph, that next paragraph in your report?

A. Yes, sir.

Q. Okay. The fact is that on the calculated inpatient charges of $562,000, there was no impact on the Medicare inpatient revenue under Part A, was there?

A. "These charges do not reflect the actual amount received by the hospital for Medicare. The financial impact to the hospital is approximately $54,650 and is only outpatient charges reimbursed based on cost."

Q. All right. These over- -- these billings that characterize as overbillings did

Page 95

not vary the DRG compensation -- reimbursement of the hospital, did they?

A. There were outliers and other things, I'm sure, that were in there that would have varied.

Q. Why would outliers have varied?

A. Because they're -- more is billed for an outlier. It's an unusual circumstance. It requires additional compensation -- or reimbursement.

Q. Can you explain the outlier reimbursement system?

A. No, sir.

Q. You don't even know whether or not it affected outlier calculations, do you?

A. Again, I'm -- I'm not an auditor. I don't -- I can't --

Q. You don't --

A. -- speak to that.

Q. -- know?

A. No, sir.

Q. You don't know what the statewide average was for the cost-to-charge ratio in 1999, do you?

A. No, sir, I do not.

Page 96

Q. You don't know what the threshold was established by HCFA for outlier reimbursement during 1999 was, do you?

A. No, sir.

Q. You have no idea whether the hospital even got outlier payments in 1999, do you?

A. I'm not certain of that, sir.

Q. Might have gotten some, might have gotten none; you don't know?

A. I don't know.

Q. That's purely speculative as to whether or not it had an affect on outliers, isn't it?

A. Again, I'm not an auditor. You're asking me questions I'm not qualified to comment on.

Q. Well, you've alleged that Quorum secured outlier payments by fraudulent overcharging in violation of Medicare 1836. Is that true?

A. Ask that again. I'm --

MR. LUCE: Can you read the question back?

(Whereupon, the record was read by

Page 97

the reporter as follows:

Question, "Well, you've alleged that Quorum secured outlier payments by fraudulent overcharging in violation of Medicare 1836. Is that true?")

THE WITNESS: It's true that there were -- there were charges made that shouldn't have been made.

Q. (By Mr. Luce) But you have no idea whether or not there were fraudulent outlier payments secured as a result of those charges, do you?

A. I'm trying to see where it says "outlier payments."

Q. It doesn't say "outlier payments" here, does it?

A. No, sir.

Q. No. But your complaint alleges that Quorum secured fraudulent outlier payments and your answers to interrogatories also say that Quorum received fraudulent outlier payments as a result of overcharging?

A. Yes, sir.

Ted Whitten                                                                 June 27, 2007

Page 98

Q. And you've sworn to both of those documents?

A. Yes, sir.

Q. And you've sworn that they're true?

A. Yes, sir.

Q. But you have no actual knowledge of whether or not any outlier payments were even made to this hospital in 1999, do you?

A. Sir, I -- I'm not an accountant. I -- I don't know.

Q. So you should be careful before you make allegations of fraud about a matter you don't know; right?

MR. BLASINGAME: I -- I object to that question just as being purely argumentative, Mr. Luce.

Q. (By Mr. Luce) You've accused my client of fraud.

Do you have any basis to accuse Quorum of engaging in fraudulent practices that resulted in outlier payments to SGRMC?

A. Sir, they overbilled a lot and we -- we provided information to that effect.

I assumed, through the universe of charges, outlier payments would be affected.

Page 99

Q. You assumed?

A. I'm not an auditor. Yes, sir, I assumed that.

Q. You just guessed?

A. Nope, didn't guess.

Q. Well, what's the difference between an assumption and a guess if you have no auditor or accounting skills to know whether or not outlier payments were received?

A. As in the hospital, people are interdependent. I mean, just because you're an administrator, you have to rely on people to give you good information, sir.

Q. All right. And in this memorandum that you prepared for the chairman of the board and for the chief executive officer of the hospital, you concluded that the impact of the financial -- financial impact to the hospital for all the overbillings described in that column was $54,650; right?

A. That's what it says, sir.

Q. Okay. That was your report to the chairman of your board for him to rely upon in understanding the magnitude of the issue that was being dealt with; right?

Page 100

A. It's the information that I believed to be accurate on that date, sir.

Q. You were -- you were trying to tell the chairman as truthfully as you could, based on qualified information from people who were qualified to give it to you, what the impact was?

A. Yes, sir.

Q. And your conclusion was that the entirety -- the entirety -- of the charges that should not have been billed under Section -- Medicare Bulletin 1836 was $54,650; right?

MR. BLASINGAME: Object to the form of that question because that's not what he said.

Q. (By Mr. Luce) Total impact to Medicare reimbursement from these overbillings as calculated by you and your department on September 7, 1999 was $54,000 --

A. That's what it says. That's what we believed to be true on that day.

Q. Now, in response to the question by Mr. Chandler as to what has been done to prevent a recurrence, do we find your response

Page 101

in paragraph 5 to that?

A. Yes, sir.

Q. Okay. And were the steps you identify here in paragraph 5 implemented?

A. That was our recommendation.

Q. Yes, sir, that was your recommendation.

Now my question is: Were those recommendations followed?

A. Eventually.

Q. After you provided this report to the chairman of the board and the CEO and Mr. Chandler, as the compliance representative for the board, what was next done with respect to the Chargemaster issues arising under Medicare Bulletin 1836?

A. After this memo went out, what was the next thing that happened?

Q. Yes, sir.

A. The Chargemaster committee was convened and it was reemphasized over and over again that the distribution of Medicare bulletins was extremely important, had not been done in the past, and we devi- -- devised a mechanism by which distribution could take

Ted Whitten                                      June 27, 2007

Page 102

place with some surety.

Q.  Was there any further evaluation of the Chargemaster undertaking?

A.  A QuadraMed audit was done on the Chargemaster.

Q.  So by September 7, would it be fair to say that the hospital had identified the charges through the department director information, had deactivated charges at both hospitals that were to be deactivated pursuant to Medicare Bulletin 1836, and had commenced an audit through QuadraMed of the entire Chargemaster?  Is that -- is that the status at that point?

A.  I don't have a recollection of what the dates were when the Chargemaster review was done by QuadraMed, but it was done subsequent to this -- this memo.

Q.  All right, sir.  Let me show you an exhibit we're going to mark Exhibit 61.

(Exhibit-61 was marked for identification.)

Q.  (By Mr. Luce)  This is a document that was produced to us by the hospital and it ends in the Bates numbers -9204.

Page 103

Take a moment to look at this document, please.

A.  Yes, sir.

Q.  Have you completed reading that, Mr. Whitten?

A.  Yes, sir.

Q.  All right.  I'm going to ask you some questions.

First, have you ever seen this document?

A.  I don't recall having seen it.

Q.  Are you familiar with the circumstances that are described in the timeline that's set out here, in a general sense?

A.  Generally, yes, sir.

Q.  Does the information here comport with your own recollection of what went on related to Medicare Bulletin 1836?

A.  Up through the time of 8/19, yes, sir.

Q.  Do you take issue with any of the statements that are made here as to what occurred on a given date?

A.  I don't have any opinion on that.  I

Page 104

don't -- I don't know how to compare that.

Q.  Well, do you have any recollections of your own that are contrary to what is set out here?

A.  No, sir, not -- nothing that comes to mind right now.

Q.  Well, just as an example, on July 16, 1999, is that when Michelle Morris was moved into the compliance department?  Do you see --

A.  Yes --

Q.  -- that entry?

A.  -- that's what it says here.

Q.  Does that sound right to you?

A.  That sounds appropriate.

Q.  Okay.  According to this bulletin -- this memorandum, a bulletin was received on 3/18/99.

Is that the Medicare Bulletin 1836?

A.  Yes, sir, that's what I assume that to mean.

Q.  Okay.  And according to this outline, the bulletins were distributed on April 5, 1999; is that right?

A.  Yes, sir.

Page 105

Q.  This refers to, under the entry for April 5, a Chargemaster work group.

Is that the Chargemaster committee that you had referred to before?

A.  Yes, sir.

Q.  And so your recommendation in paragraph 5 of your report to Mr. Chandler that bulletins be promptly disseminated had already been implemented by the time you reported to Mr. Chandler on September 7; right?

A.  I --

Q.  Yeah, take a look at that again.

A.  What was your question again, sir?  I'm sorry.

Q.  Yeah.

My question was that you had made a recommendation to avoid a recurrence of the problem that, in part, Medicare bulletins be promptly distributed to the appropriate departments; right?

A.  Yes, sir.

Q.  Okay.  And according to this timeline, Medicare bulletins were distributed within a couple of weeks of their receipt; is

27 (Pages 102 to 105)

Ted Whitten                                                                June 27, 2007

Page 226

independent audit must be reviewed internally for accuracy in our agreements with its findings."

Who was Tom Waldon?

A. He was an auditor that Ray always engaged for some reason. I don't -- I wasn't a part of the process. I don't know. I just remember Tom Waldon was an auditor. I think he's from South Carolina somewhere.

Q. All right, sir.

Now, given your advice -- or I should say given your concurrence that a three- to four-week time frame to implement some of the QuadraMed changes would be acceptable and given the assessment of Mr. Waldon that three or four months would be needed to fully implement the QuadraMed recommendations, is it still your testimony that Mr. Owings failed to promptly implement the QuadraMed recommendations?

A. The changes weren't completed, sir, until 2000. I think that goes way beyond the weeks or the months referenced here.

Q. How much time should it have taken to implement the QuadraMed recommendations?

Page 227

A. I can't possibly answer that. Just -- we should have completed it faster than we did, in my opinion.

Q. All right. Well, we had the QuadraMed recommendations at the hospital by December of 1999; is that correct?

A. I believe that is correct.

Q. Okay. Should they have been implemented within 30 days?

A. They should have been implemented as fast as they could have been implemented.

Q. Well, how fast is that?

A. It's -- well, you have a bunch of department managers who don't know how to review a Chargemaster and Medicare expecting to hold them accountable for it.

So as fast as you can get them up to speed and -- and to review their own Chargemaster charges is how fast it should take, whatever that time is.

Q. And would you say that was a fairly massive undertaking?

A. Yes, sir.

Q. Okay.

A. That's the reason it's supposed to

Page 228

be done by all the department managers.

Q. Okay. So with all department managers focusing their time on the Charge Description Master, how long do you think, as compliance officer, it should have been taken to implement the QuadraMed recommendations?

A. A matter of months.

Q. How many months?

A. Two.

Q. Two months?

A. Yes, sir.

Q. You'd already agreed that a time frame from late January that would take longer than that would be acceptable, hadn't you?

A. On that particular day, yes, that's what it says.

Q. Oh. And today, you have a different view?

A. Well, things changed over the -- the course of the last six months of my job there. We became more and more heightened to denials that were coming in because of the issues I've raised.

So what may have been okay three or four months ago would not be okay then,

Page 229

because we -- we learned more. We've become more mature in our compliance.

Q. I showed you a whole series of focused medical reviews, documents related to those; right?

A. Yes, sir.

Q. Did any of those occur in 2000, to your recollection, while you were there?

A. They weren't a hundred percent focused medical reviews, sir.

Q. Well, how many hundred percent focused reviews were there?

A. Six or seven.

Q. And what services were involved?

A. Gosh, I -- you know, I just don't have the -- the recall to be able to go back and do that. It's in --

Q. Well, let me -- let me -- let me see if I can help to shorten this. I'm really not trying to prolong your deposition testimony here, but did any of those hundred percent focused reviews involve any of the services for which you've alleged there were fraudulent claims submitted in your complaint?

A. I don't recall, sir.

58 (Pages 226 to 229)

Ted Whitten

June 27, 2007

Page 230

Q. Okay.

A. I'd have to research that.

Q. So in your opinion, it should have taken a couple of months to implement the --

A. In my opinion.

Q. -- QuadraMed recommendations?

A. In my opinion, yes, sir. The --

Q. Did you have -- I'm sorry, I didn't mean to cut you off.

A. No, it's --

Q. Had you formed that opinion by advice provided to you by anyone else?

A. I -- I can't answer that. I don't know. There was such a massive volume of information being shared. That's just a -- you asked me my opinion just now and that's -- that's what I believe to be prudent.

Q. Okay. Okay. And, in fact, how long did it take to finally implement the QuadraMed recommendations?

A. I'd -- I'd have to again research that, but we've discussed it earlier.

Q. Yes, sir. Let me see if I can show you a document that will shorten this and move straight to the point.

Page 231

While we're looking for this, if I suggested to you that in early June, you thanked everyone for their participation in the project in completing the QuadraMed recommendations, would that be consistent with your recollection? That would be June of 2000.

A. I -- I just don't recall, sir.

Q. All right. Give me one minute and I can find that document.

I'll show you a document, see if this will refresh your recollection a bit.

(Exhibit-90 was marked for identification.)

Q. (By Mr. Luce) This is going to be 90, Exhibit 90.

In looking at this Exhibit 90, does this refresh your recollection that at CMC, the changes were made last night to discontinue charging for supplies and incorporate into the facility fees the QuadraMed recommendations?

A. That's what it says.

Q. And that was June 8, 2000; right?

A. Right.

Page 232

Q. And your response to Bert Whitaker, Michelle Morris, Debra Kalister, and Tim Chandler was, "Thanks for your help with this issue," and you forwarded that Ray Owings memo to them?

A. Yes, sir.

Q. Okay. And by June 8th, would it have also been true that those changes had been implemented at SGRMC?

A. I couldn't comment on that. I don't know.

Q. Well, let's just deal with CMC, then.

So at CMC, the charges, according to this document, had been amended according to the recommendations of the QuadraMed report by June 8 of 2000; right?

A. That's what it says, yes, sir.

Q. Okay. How many months was that, then, from the time that the QuadraMed report was received until those changes were implemented?

A. I don't remember the date of the QuadraMed.

Q. Well, it was from December to early

Page 233

June; right?

A. Yes, sir.

Q. Okay. So about six months or so?

A. Yes, sir.

Q. In your view, it should have been done in two months?

A. In my opinion. Again, I'm -- I'm not an auditor, so I don't -- and I'm not a biller, so I don't know. But I just -- I think six months is a little excessive.

Q. And that's your feeling?

A. That's my opinion.

Q. Okay. But it's not an opinion based upon ever having done a Chargemaster review?

A. No, sir. I testified to that several times.

Q. Right, right.

And you're not -- and you've testified candidly that you're not qualified to do a Chargemaster?

A. No, sir.

Q. So the truth is you have no prior experience to know how long it should take?

A. Based on all the -- the data, all the studying I did on the Internet on

Ted Whitten                                                                June 27, 2007

Page 234

compliance sites, my concern was heightened considerably about our continuing exposure, in my opinion.

Q. All right. Well, opinion aside, what fact demonstrated to you that Ray Owings was delaying the implementation of the QuadraMed recommendations for the Chargemaster?

A. Because nothing was happening.

Q. Okay. Well, something was happening, right, because --

A. Something --

Q. -- by June, they were able to implement the changes?

A. Yes, something was happening.

Q. And it was a massive undertaking to implement those changes, wouldn't you agree?

A. I would certainly agree.

Q. But a massive undertaking can be accomplished in two months, in your view?

A. If everybody's up to speed and participating. We had people that weren't even responding to our requests.

Q. Mr. Whitten, are you confusing the lack of cooperation by department directors in

Page 235

1999, as you've alleged regarding Bulletin 1836, with the lack of responsiveness that you've alleged in the spring of 2000 related to the QuadraMed recommendations? Is that possible?

A. Sir, I -- ask that again. I'm sorry.

Q. Yes, sir.

Are you confusing your complaint about lack of department head responsiveness between the implementation in 1999 of Medicare Bulletin 1836 with the implementation of the QuadraMed changes recommendations in 2000?

A. I don't think I'm confusing those.

Q. Okay. So your testimony is that department heads from March of 1999 to June of 2000 were not responsive in a timely way to meet the implement changes?

A. Yes, sir, that's exactly what I mean.

Q. Okay. And who -- who were the department heads working for?

A. Different people. Most of them worked for Warren Manley and Ray Owings.

Q. Well, those were -- they weren't

Page 236

working for either of those gentlemen, were they? They were working for their respective hospitals; right?

A. I don't understand your question, sir.

Q. Well, they were hospital employees, the department heads; right?

A. Yes.

Q. Which hospital head in particular comes -- stands out in your recollection as being unresponsive?

A. It was system-wide. There were problems spread -- spread out throughout the system.

Q. But no particular department head comes to mind?

A. No, sir. I just was surprised with the lack of response.

Q. Okay. Well, let me show you a document.

MR. LUCE: We'll mark 91 here.

(Exhibit-91 was marked for identification.)

Q. (By Mr. Luce) What's the date of this memorandum from Ms. Morris?

Page 237

A. 2/3/2000.

Q. In looking at this memorandum, does this suggest to you that the department heads had completed their worksheets provided by QuadraMed regarding the Charge Description Master changes as of February 3, 2000?

A. I'm sorry. It's late in the day. I just --

Q. It is, sir. Thank you for your patience.

Let me -- I was trying to move it along, but maybe I better just back up a step.

What is Ms. Morris saying in this memorandum, to your understanding?

A. She's recommending that all data entry be done directly from the department's -- director's worksheet one department at a time. "All recommendations affecting revenue deletions, price changes, additions could be keyed when your staff has completed their reviews. Items could be -- should be highlighted or could be highlighted to denote that entry."

Q. And she described this as a massive project --

Ted Whitten

June 27, 2007

Page 238

A. Yes, sir.

Q. -- right?

A. Yes, sir.

Q. Would it be fair to say that as of February 3, Ms. Morris had already reviewed the QuadraMed worksheets amended by the directors?

A. That's what it says, yes, sir.

Q. And the directors are the directors of the respective departments; is that correct?

A. I don't understand the distinction here.

Q. Well, they -- these would be the directors of the departments --

A. Department directors, yes.

Q. -- who had to respond to the QuadraMed recommendations; right?

A. Yes, sir.

Q. And QuadraMed circulated a worksheet for each department to fill out so that they could amend the Charge Description Master according to their recommendations; right?

A. That's my understanding, yes.

Q. And according to Ms. Morris's

Page 239

memorandum, the clear implication is that the directors had responded and provided those QuadraMed worksheets at least as of February 3, 2000?

A. That's your interpretation. I -- I don't get the -- the sense that she's received all the worksheets. The -- every -- I think this just has to do with Camden, doesn't it.

Q. It just has to do with what, sir?

A. Camden, doesn't it?

Q. Well, I don't know. Why would you reach that conclusion?

A. I thought I read it there that way. It could be systemwide; I just -- I don't know.

Q. Okay. Would you agree with me that she is not voicing any complaint about a lack of responsiveness from the directors of the departments here?

A. Not in this particular memo or this particular e-mail, but she voiced a great deal of concern about it.

Q. And she did that respect to the 1999 work on the Charge Description Master, didn't she?

Page 240

A. Yes, sir, she did.

Q. And is it your testimony that she made the same complaint in 2000 regarding the QuadraMed recommendations?

A. I can't remember, Mr. Luce. I just don't know.

Q. All right, sir. Thank you. I appreciate your patience.

MR. BLASINGAME: Mr. Luce, we've been going --

MR. LUCE: I think --

MR. BLASINGAME: -- a long time and this deposition has gone now about eight hours.

MR. LUCE: Mr. Blasingame, I'll just -- not to cut you short by rudeness, but I think I'm pretty much done. I want to check with my young colleague here.

MR. BLASINGAME: Okay.

MR. GARRARD: If he's not tired, I am.

MR. LUCE: Thank you, Mr. Whitten. That concludes my direct examination. Your counsel may have questions for you.

THE WITNESS: Thank you, sir.

Page 241

MR. GARRARD: We don't have any questions, but we do reserve signature.

Is it acceptable that she send the transcript to us and we forward it on to him?

MR. LUCE: Oh, of course.

MR. GARRARD: And I'm not sure he has to sign in front of a notary, but assuming that he does, can he sign in front of any notary, as opposed to the court reporter? Is that all right?

MR. LUCE: That's fine with me.

MR. GARRARD: Thank you.

MR. LUCE: Okay. We'll go off the record.

VIDEOGRAPHER: Off the record.

(Whereupon, the deposition was concluded at 4:48 p.m.)