Ted Redding Whitten                                                                June 26, 2007

Page 1

IN THE DISTRICT COURT OF THE UNITED STATES
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION


UNITED STATES OF AMERICA,
ex rel., TED WHITTEN,
(Relator),


                    Plaintiff,      CIVIL ACTION FILE
        vs.                         NO. CV202-189


QUORUM HEALTH GROUP, INC.,
TRIAD HOSPITALS, INC., As
Successor to
QUORUM HEALTH GROUP, INC.,
QUORUM HEALTH RESOURCES, INC.,
and QUORUM HEALTH RESOURCES, LLC,


                    Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

                    VIDEOTAPED DEPOSITION OF
                    TED REDDING WHITTEN


                    June, 26, 2007
                        10:15 a.m.


                    440 College Avenue
                        Athens, GA



                    LEE ANN BARNES, RPR

Ted Redding Whitten                                                                June 26, 2007

Page 110

A.  No, sir.

MR. LUCE:  I think this would be probably as good a time as any to take a lunch break.

MR. BLASINGAME:  Okay.

MR. LUCE:  So if that will suit you --

VIDEOGRAPHER:  Off the record. 1:01 p.m.

(Thereupon, there was an interruption in the proceedings.)

VIDEOGRAPHER:  On the record.

Q.  (By Mr. Luce)  Mr. Whitten, we're back on the record.  I want to ask you, in follow-up to some of your earlier answers, a little bit about your role as various -- holding various positions at the hospital.

You've described your role as chief operations officer for a period of time.  I wanted to ask you:  Did you have any responsibility for compliance activities during --

A.  No, sir.

Q.  -- that period?

A.  No, sir.  That was Ray Owings who

Page 111

was the former compliance officer.

Q.  And so was Ray Owings the compliance officer immediately prior --

A.  Yes, sir.

Q.  -- to your appointment in September of '98?

A.  Yes, sir.

Q.  When you became the compliance officer, was there a compliance plan at the hospital?

A.  Quorum gave us a compliance plan called Integrity First, and it was pretty much just a boilerplate plan.  The compliance plan really kind of evolved as we became more mature in our compliance knowledge and we helped develop it, the compliance staff and I developed it.

Q.  So in September of 1998 when you became compliance officer, is it fair to say, then, there was a compliance plan provided by Quorum called Integrity First that was in place?

A.  I don't recall if it was in place or just was put in place.  Seems to me that I recall that Wallace Harrell and Ray Owings

Page 112

developed or worked on the compliance plan that Quorum sent them and implemented that.

Q.  And Wallace Harrell is the --

A.  Hospital counsel.

Q.  The hospital counsel.  And he's outside counsel?

A.  No.

Q.  You saw him name --

A.  He's outside, yes.

Q.  And when you became the compliance officer -- at the time you became, was there a compliance committee at the board already?

A.  There was an inactive compliance committee.

Q.  When you say, "inactive" -- let me kind of break this down first.

Was there a committee?

A.  I believe there was a committee on paper but I don't believe they were active.

Q.  Okay.  Were there members of that committee, to your knowledge?

A.  Were there --

Q.  Were there any members of the committee?

A.  I don't know.

Page 113

Q.  Well, did -- was there a record of the compliance committee's activities that you looked at when you came on?

A.  There was after I became compliance officer.  I didn't ever have anything to refer back to.

Q.  So it's your testimony there were no minutes of a board compliance committee for the hospital prior to October of 1998?

A.  That's my -- that's my belief, yes, sir.

Q.  Okay.  Now, after you came on, was there formed a compliance committee?

A.  Was there formed a compliance committee?

Q.  Of the board.

A.  Yes, sir.  Well, it wasn't just on the board.  It was Ray Owings, Warren Manley, Wallace Harrell, Tim Chandler -- who's a board member -- and my compliance staff.

Q.  Well, were you on that committee?

A.  Uh-huh (affirmative).

Q.  That was the hospital's compliance committee, is that --

A.  Yes, sir.

29 (Pages 110 to 113)

Ted Redding Whitten                                                June 26, 2007

Page 114

Q. Okay. Was there a separate committee of the board that served also to monitor compliance activities?

A. No, sir.

Q. Who were the members of your compliance department at the time that you came on?

A. Michelle Morris and Debra Kalister.

Q. Was anyone else on that compliance department roster?

A. As we developed a more mature compliance plan, we had a personnel, like an educator, compliance educator.

Q. And so who else did you add?

A. I don't recall her name.

Q. Well, do you recall how many people?

A. I think we had a total of four.

Q. Including Michelle and --

A. Yes.

Q. -- Debra Kalister?

A. Yes.

Q. Did you think Michelle Morris was qualified to provide compliance services as part of your department?

A. Yes, sir.

Page 115

Q. Was Debra Kalister qualified to provide services --

A. Yes. She's -- very unusual background. She has a master's in finance and also is an RN, former Medicare auditor.

Q. What were Michelle Morris's qualifications?

A. Her experience working in the business office over a number of years. She also graduated from the -- I don't remember what the national compliance committee -- compliance association was, but she and Debra both attended that.

Q. The national compliance association?

A. Yes.

Q. Did you ever attend the national compliance association meetings?

A. No, sir, I didn't have time. Compliance was just one of my additional duties, and so my time away from the hospital was very limited.

Q. Well, as a percentage, how much of your professional time was spent on compliance as compared to your other responsibilities?

A. Toward the end there, probably 75

Page 116

percent of the time.

Q. Well, how about towards the beginning when you first came on?

A. I didn't -- I didn't know anything about compliance when I first came on.

Q. That tells me what you know. It doesn't tell me how much you did.

What, as a percentage of time, did you devote to your compliance officer obligations from October 1998 forward?

A. As I stated earlier, early on, just after I became the compliance officer, relatively little time because I hadn't been trained yet. But as the compliance plan matured, I spent more and more time.

Q. Who appointed you to be the compliance officer?

A. Ray Owings. Actually I believe more accurately Ray suggested that I be the compliance officer and I believe Burt Whitaker appointed me the actual officer.

Q. Burt Whitaker was then the CEO of the hospital --

A. CEO, yes.

Q. -- is that correct?

Page 117

Remind me, how often did the compliance committee, those members you listed, meet?

A. Monthly.

Q. Monthly?

A. Yes, sir.

Q. As a vice-president, did you meet with the board of the hospital?

A. I did early on and then toward the end of my tour, I was prohibited from meeting with the board.

Q. Who prohibited you from meeting with the board?

A. Bert Whitaker.

Q. When did he first tell you that you were not to meet with the board?

A. Probably the last six months I was there.

Q. So sometime from February 2000 through about August of 2000?

A. Yes, sir, something like that.

Q. Did he tell you why he didn't want you to meet with the board?

A. No, sir. He was openly hostile toward me the last months and he didn't like

Page 118

the compliance audit that was done and asked me to change it and I refused to do that and I think it was about that time he told me I couldn't meet with the board members anymore.

Q. Did you report compliance issues personally to the committee during your tenure as the compliance officer?

A. Oh, yes, sir.

Q. And so you reported those to the committee that included outside legal counsel, Wallace Harrell; is that right?

A. Yes. Yes, sir.

Q. Did Mr. Harrell provide legal advice on the compliance issues for the benefit of the hospital?

A. Occasionally. We -- to be honest with you, if you were to review the compliance -- compliance minutes, compliance committee minutes, nothing was getting done. I mean, we were reporting and reporting and reporting and nothing ever got done so I don't know really how to answer that question. I knew we had a great deal of exposure but nothing was happening.

Q. Nothing was happening?

Page 119

A. No corrective action.

Q. No compliance initiatives that --

A. No -- no corrective action.

Q. We're going to have to not to talk over one another.

A. Sir?

Q. We have to be careful not to talk over one another for our court reporter. So I'll try not interrupt you and likewise, let me finish my questions. Please go ahead and finish your answer.

A. What was the question again, sir?

Q. Well, I think you said that nothing was getting done, and I was asking whether or not there were any matters that you reported that resulted in advice by Wallace Harrell?

A. Oh, yes, sir.

Q. And was Mr. Harrell's advice accepted, to your knowledge?

A. Well, again, toward the end, the hospital engaged an Alston & Bird man, Mitch Mitchelson, and we were supposed to talk to Mr. Mitchelson to get our legal advice. And so I don't know how to answer your question. It didn't come from Wallace Harrell. It came

Page 120

from Mitch Mitchelson.

Q. Well, that was what you said at the end. But at the beginning when you became compliance officer, you said Mr. Harrell was on the committee --

A. Yes, sir.

Q. -- is that correct?

A. Yes, sir.

Q. Did Mr. Harrell provide advice on compliance issues to the hospital that were brought to the attention of committee? It's not what advice. It's just: Did he provide advice?

A. Yes, sir.

Q. Did you rely on that advice?

A. Yes, sir, again, until he was no longer the interface with the compliance department. Mitch Mitchelson became that.

Q. So then in like fashion, Mr. Mitchelson of Alston & Bird gave advice to the hospital --

A. Yes, sir.

Q. -- compliance committee?

See, this is what I mean by let me finish. You may say yes, sir and you really

Page 121

mean no, sir. I know you're trying to cooperate. I just want a clear record here.

Did the hospital act upon the advice by Mitch Mitchelson on compliance matters?

A. I -- I can't answer that because I haven't had any exposure to the hospital since I left.

Q. Well, let me be clear. I'm not going to ask you about things that happened after you left in this line of questions.

I want to know: When you were the compliance officer and Mitch Mitchelson was providing advice on compliance issues, did the hospital follow Mr. Mitchelson's advice, to your knowledge?

A. Yes, sir.

Q. Did the advice that Mr. Harrell provided from time to time require changes to the way that the hospital operated to meet compliance standards?

A. Yes, sir.

Q. And similarly, with respect to the advice that Mr. Mitchelson gave, did the hospital initiate changes based on that advice to meet the compliance recommendations of