Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

UNITED STATES OF AMERICA    )
ex rel. TED WHITTEN,        )
        Plaintiff,          )
                            )
VS.                         ) CIVIL ACTION NO.
                            ) CV202-189
TRIAD HOSPITALS, INC. as    )
Successor to QUORUM HEALTH  )
GROUP, INC., QUORUM HEALTH  )
RESOURCES, INC. and QUORUM  )
HEALTH RESOURCES, LLC,      )
        Defendant.          )


THE ORAL DEPOSITION OF
DEBRA KALISTER
JUNE 19, 2007


THE ORAL DEPOSITION OF DEBRA KALISTER, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on the 19th day of June, 2007 from 9:58 a.m. to 5:15 p.m., before JULIE VERASTEGUI, CSR in and for the State of Texas, reported by stenographic and computer-aided transcription at Inn of the Hills Resort & Conference Center, 1001 Junction Highway, Kerrville, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 66

A. 21, 22, and 23.

Q. Okay. Actually, if you can hand me that whole stack of materials so I can look at them for a minute, there's a couple other items I want to ask you about in there.

A. (Complying.)

Q. Thank you. Do you know who Sue Keller is?

A. She was an outside consultant brought in to help with the Chargemaster.

Q. Okay. And what do you mean by "Chargemaster"?

A. The Chargemaster is what the hospital uses to bill. Every -- Every item that's used in the hospital is assigned a code and a corresponding charge. And she worked for Quadramed, and they were brought in to do a review of the Chargemaster.

Q. Okay. And what is Quadramed?

A. A consulting firm that specializes in hospital billing.

Q. Okay. Do you know what PPS is?

A. That's the company that did the compliance audit. And PPS stood for --

Q. Professional Provider Services?

A. Yes.

Q. Okay. When you said they were brought in

Page 67

to do the compliance audit --

A. To do an audit of the Compliance Department.

Q. Okay. Do you know how they came to be -- how they came to be charged with that responsibility?

A. They were hired by the board.

Q. Okay. Do you know who recommended them?

A. Tim Chandler.

Q. Okay. Did you ever do any work with PPS in regards to that -- that -- that audit of the Compliance Department?

A. We -- They were auditing us, so we had extensive discussions with them. And it was just as if I went in to audit a department, that -- that was the relationship. We were the auditee, and he was the auditor.

Q. Okay. And do you -- do you know who Tony Capullo is?

A. He was the owner of PPS.

Q. Okay. With respect to the Compliance Department -- We're not -- We're not going to talk about those specifically right now.

With respect to the Compliance Department, how did -- how did issues -- can you

Page 68

describe for me, like, the flow of information, how -- how items arose and then how they were resolved?

A. Issues of a billing nature generally went through Michelle, and she might become aware of an issue because a department director called and said, "Are we doing this correctly," or --

Q. Sure.

A. And then she would work with the department director to resolve it, to -- to correct whatever the problem was. Other issues might come up, maybe, of -- of a general nature.

I was looking -- always looking for something to -- to get me away from my policies and procedures, so I did various reviews. The Observation Unit was one that -- when we started the department, that had been an ongoing problem, so we did a review there and -- and tried to put procedures in place to correct that problem.

Q. Okay. Who was -- Who was the person on the ground? Do you understand what I mean by "person on the ground"?

A. Probably, once you finish the question.

Q. Let me ask the question, and we'll try to flush it out. When you said that, you know, you

Page 69

were looking for ways to divert yourself sometimes from the policies and procedures, one of these things you mentioned was Observation.

A. Uh-huh.

Q. You have to say yes.

A. Yes. Sorry.

Q. Okay. Thank you. Did you -- I mean, were you the person on the ground who was responsible for actually doing the review of Observation?

A. I did the review.

Q. Okay. And how did you do the review? What did you do?

A. I -- I did -- The first initial one I did at Camden.

Q. Okay.

A. And I -- I pulled a sample of -- of patients who had been placed in Observation and went through their record to determine whether they met the criteria, whether it had been properly ordered by the physician and -- and basically had a worksheet summarizing everything.

Q. Okay. And you said, "initially at Camden." Did there come a time when you did a review of the Observation Unit at -- at SGRMC?

A. Yes.

18 (Pages 66 to 69)

Whitten vs Triad                                Debra Kalister                                6/19/2007

Page 70

Q. Okay. And who -- Did you -- Is it generally fair to say that you followed the same kind of procedure?

A. Yes.

Q. Okay. As -- As you did at CMC?

A. Yes.

Q. Okay. Now, once you received the results of your review of the Observation Unit at CMC, did you -- what did you do then? Did you immediately laun -- Did you immediately launch into the -- a review of SGRMC? Or did you kick that upstairs?

A. No. Once I finished Camden, we sat down, and -- and I believe I worked with Christy Foddrell so that she could put procedures in place, because she was also in charge of Case Management, I believe, at Camden --

Q. Okay.

A. -- I believe. And then I don't know what period of time elapsed before I did the -- the review at Southeast --

Q. Okay.

A. -- and basically had the same findings. So Resource Management became responsible for correcting -- monitoring and correcting the problem. And -- And they actually assigned a case manager

Page 71

to -- to that unit to review all of the -- the orders.

Q. Okay. Who was in charge of -- Who was Resource Management? Who was that person?

A. Mary Drake.

Q. Mary Drake. Okay. And when you said you performed these -- Did you ever provide the results of these -- these reviews to Mr. Whitten?

A. Yes.

Q. Okay. When would you do that?

A. It would have been right after I completed the audit.

Q. Okay. And would it have been separately as to -- to both audits? Or did you wait until you finished the CMC audit before providing results of your -- I'm using the words -- And I want to make sure -- I'm using the words "audit" and "review" interchangeably.

A. Yes.

Q. But before you used the -- the results of your reviews to Mr. Whitten, did you wait until -- Strike that. I'm asking that --

Did you wait -- Strike that.

After finishing your review at CMC, did you wait until you completed your review at

Page 72

SGRMC before providing those results to Mr. Whitten?

A. I don't believe so. I believe I gave him Camden and then SGRMC separately.

Q. Okay. Okay. Who else worked on the review with you when you -- when you did that?

A. No one.

Q. Okay. Okay. So it's fair to say that -- that your review of those items at CMC and SGRMC were a function of your own efforts?

A. Yes.

Q. And I noticed some hesitation in your voice. Let me make sure. You might have made calls to other people to ask them questions regarding specific items, but you were the person who did the reviews?

A. I did the review as a result had -- A problem had been identified.

Q. Right.

A. I did a review to quantify it.

Q. Who identified the problem to you?

A. It existed when -- when I started, and I believe it -- Resource Management was the department that was initially aware of it.

Q. Okay. Did you ever become aware of any settlements that were made with the government in

Page 73

regards to any billing issues involving the hospitals?

A. No.

Q. You had previous -- I had previously asked you what the Chargemaster was. Do you recall that?

A. Yes.

Q. Okay. How -- How did -- did -- How did the Chargemaster relate to Bulletin 1836?

A. Within the Chargemaster, there were items that fell under 1836 that -- that shouldn't have been billed separately to Medicare based on if they were part of a procedure.

Q. And that's the matter -- that's the -- When we talk about Bulletin 1836, those are the -- those are the items in that -- that Deposition Exhibit 30 that were referenced in the news articles as being investigated?

MR. GARRARD: I'm going to object to that, because she's already told you that what was being investigated was Tricare.

Q. (By Mr. Calloway) You can answer.

A. I thought the newspaper article was referring to Tricare.

Q. Okay. How was -- I think we talked about this with respect to the differences between your

Page 74

position and the position of Michelle Morris at the hospital. What was the difference between your position and -- and Ted Whitten's position?

A. Ted was the compliance officer.

Q. Okay.

A. He wasn't as hands-on as Michelle and I.

Q. Okay.

A. In terms of just the day-to-day functioning of the department, I was trying to develop a framework, and Michelle was addressing day-to-day issues. I don't -- Ted was very involved in that we were always -- we were always talking to him about Compliance issues; anything that occurred, we immediately brought it to his attention, but he had many other functions. He had many other departments that reported to him.

Q. When was the last time you spoke with Michelle Morris?

A. About a week or two after I left the hospital.

Q. So back in 2001?

A. Yes.

Q. Okay. Do you recall what you spoke about?

A. I told her I was on the beach at Jekyll Island and having a good time.

Page 75

Q. Do you know who Triad is?

A. Didn't Triad take over Quorum?

Q. I meant, do you know what it is.

A. No. No.

Q. Okay. You said, "Didn't Triad take over Quorum?" Do you know who was -- At the time that you were working at -- at SGRMC, were you aware of -- of what Triad is -- what Triad was?

A. At the time, no.

Q. I see. Okay. And you said that -- You made this reference that, "Didn't Triad take over Quorum?" When did you -- To the extent you -- you have some understanding of -- of Triad, when did you -- or how did you acquire that understanding?

A. After I moved to Texas --

Q. Yes.

A. -- which was almost two years ago, I was curious as to whatever happened to Ted's qui tam suit, so I got on the internet and Googled. And I found a reference there where Triad -- Quorum was now Triad.

Q. And why did you say, "Quorum was now Triad"?

A. Quorum no longer existed, and they either were bought out by Triad or evolved into Triad,

Page 76

however those mergers happens.

Q. Okay. You're not a lawyer, correct?

A. Correct.

Q. You never been to law school?

A. No.

Q. Okay. So that's just your understanding of what you think happened, correct?

A. Yes.

Q. Okay. You don't think you're qualified to render an opinion as to -- Well, let me ask the question a different way.

Are you aware exactly -- Are you aware of the exact facts regarding the -- any relationship between Quorum and Triad?

A. No.

Q. Okay. When you made a reference just now to you were curious about whatever happened to Mr. Whitten's qui tam lawsuit, was there something that sparked that? Or were you just sitting watching TV one day and it just occurred to you?

A. I had a box of papers that I'd moved four times. And we were moving, and I said, "I wonder if this thing's still going on, or can I get rid of this box." So I got on the internet, and I saw that his -- the case had been dismissed because, I

Page 77

believe they said, he didn't have standing. And I said, "Well, I guess I can get rid of all this."

Q. Okay. And when you said you had a box of papers, what were those papers?

A. Some of it was this, this Exhibit 30, but most of it were the policies and procedures I had written, compliance manual samples where I'd compiled the compliance manual, disks with my e-mails on them, and that was probably -- It was a copy paper box.

Q. Okay. You mean like a banker's box?

A. The size box that you have a ream of all the copy -- you know, a full box of copy paper.

Q. Okay. Okay. And by that -- And why did you have those materials?

A. Like I said, when I left, the hospital was still being investigated by the U.S. Attorney. Kit Duncan had indicated to me that I could be held liable with the Observation, and I just -- I just took a drawer from my file cabinet with all the papers that I thought might be relevant if the U.S. Attorney ever knocked on my door.

Q. Okay. And I can't recall if I -- if I asked you this before, so please forgive me if I did.

20 (Pages 74 to 77)