DOCKET NO. 05-16422-G

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

### UNITED STATES OF AMERICA, EX REL. TED WHITTEN

Plaintiff/Appellant,

v.

### TRIAD HOSPITALS, INC., AS SUCCESSOR TO QUORUM HEALTH GROUP, INC., QUORUM HEALTH RESOURCES, INC., AND QUORUM HEALTH RESOURCES, LLC

Defendants/Appellees.

On Appeal from the United States District Court
For the Southern District of Georgia
Case No. : 2:02-CV-189

---

### <u>REPLY BRIEF OF APPELLANT</u>
### <u>UNITED STATES OF AMERICA, EX REL. TED WHITTEN</u>

J. Ralph Beaird
Gary B. Blasingame
Henry G. Garrard, III
Josh B. Wages

BLASINGAME, BURCH, GARRARD & ASHLEY, P.C.
440 College Avenue
Athens, Georgia 30601
706-354-4000

Randall A. Jordan
JORDAN & MOSES

1804 Frederica Road
Suite C
St. Simons Island, Georgia 31522
Telephone: 912-638-0505
Facsimile: 912-638-0605

United States of America, ex rel. Ted Whitten v. Triad Hospitals, Inc., as successor to Quorum Health Group, Inc., Quorum Health Resources, Inc., and Quorum Health Resources, LLC

Docket No. 05-16422-G

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, Plaintiff/Appellant Ted Whitten respectfully submits his Certificate of Interested Persons and Corporate Disclosure Statement, listing in alphabetical order those persons or entities known to have an interest in the outcome of this appeal:

1. Hon. Anthony A. Alaimo, United States District Judge, Southern District of Georgia;

2. Blasingame, Burch, Garrard & Ashley, P.C., Attorneys for Appellant;

3. J. Ralph Beaird, Attorney for Appellants;

4. Gary B. Blasingame, Attorney for Appellants;

5. Dean A. Calloway, Attorney for Appellees;

6. Harry D. Dixon, Jr., Attorney for Appellees;

7. Henry G. Garrard, III, Attorney for Appellants;

8. Jones Day, Attorneys for Appellees;

9. Jordan & Moses, Attorneys for Appellant;

10. Gregory M. Luce, Attorney for Appellees;

11.    Quorum Health Group, Inc., Appellant;

12.    Quorum Health Resources, Inc., Appellant;

13.    Quorum Health Resources, LLC, Appellant;

14.    Triad Hospitals, Inc., as successor to Quorum Health Group, Inc.,

Appellant;

15.    United States of America, ex rel. Ted Whitten, Appellant;

16.    Josh B. Wages, Attorney for Appellant.

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................... i

TABLE OF AUTHORITIES ....................................................................... ii

I. ARGUMENT AND CITATION OF AUTHORITY ...................................... 1

    (A) PLAINTIFF SATISFIED THE REQUIREMENTS OF 31 U.S.C.
    §3730(b)(2) ........................................................................................... 1

    (B) DEFENDANTS ARE NOT PROTECTED BY THE
    GOVERNMENT'S SETTLEMENT AGREEMENT ENTERED WITH
    SOUTHEAST GEORGIA REGIONAL MEDICAL CENTER AND
    CAMDEN MEDICAL CENTER WHICH SETTLED ONLY SPECIFIC
    CLAIMS FOR A SPECIFIC TIME PERIOD .............................................. 5

    (C) PLAINTIFF'S COMPLAINT IS NOT "BASED UPON" ANY
    "ALLEGATION OR TRANSACTION" OF FRAUDULENT CONDUCT
    BY DEFENDANTS WHICH HAS EVER BEEN "PUBLICLY
    DISCLOSED" WITHIN THE MEANING OF THE FALSE CLAIMS
    ACT'S JURISDICTIONAL BAR ............................................................. 8

II. CONCLUSION .................................................................................... 34

# TABLE OF AUTHORITIES

## CASES CITED

Foster v. Savannah Communication, 140 Fed. Appx. 905, 2005
WL 1719221 (11th Cir.2005) ........................................................................ 1, 2

Hughes Aircraft Co. v. U.S. ex rel. Schumer, 520 U.S. 939, 117 S.Ct. 1871
(1997) ........................................................................................................ 11, 12

U.S. ex rel. Aflatooni v. Kitsap Physicians Svcs., 163 F.3d 516
(9th Cir.1998) ........................................................................ 18, 22, 23,24, 33

*U.S. ex rel. Butler v. Magellan Health Svcs., Inc., 74 F.Supp.2d 1201
(M.D.Fla.1999) ........................................................ 8, 9, 12, 18, 22, 34

*U.S. ex rel. Cooper v. Blue Cross & Blue Shield of Fla., Inc., 19 F.3d 562 (11th
Cir.1994)) ............................................................ 8, 18, 19,  21, 23, 26, 27, 34

U.S. ex rel. Fallon v. Accudyne Corp., 921 F.Supp. 611
(W.D.Wis.1995) ............................................................................................ 29

U.S. ex rel. Hochman v. Nackman, 145 F.3d 1069 (9th Cir.1998) ................ 16, 21

U.S. ex rel. Holmes v. Consumer Ins. Group, 318 F.3d 1199
(10th Cir.2003) ............................................................................................... 29

U.S. ex rel. Lamers v. City of Green Bay, 998 F.Supp. 971
(E.D.Wis.1998) ............................................................................................. 15

U.S. ex rel. Lindenthal v. Gen. Dynamics Corp., 61 F.3d 1402 (9th Cir.1995)  .. 10

U.S. ex rel. Merena v. Smithkline Beecham Corp., 114 F.Supp.2d 352
(E.D.Pa.2000) ............................................................................................... 34

U.S. ex rel. Milam v. Regents of Univ. of Cal., 912 F.Supp. 868
(D.Md.1995) ................................................................................................. 12

U.S. ex rel. Rabushka v. Crane Co., 40 F.3d 1509 (8th Cir.1995) ....................... 24

U.S. ex rel. Ramseyer v. Century Healthcare Corp., 90 F.3d 1514
(10th Cir.1996) ................................................................................. 15, 29

U.S. ex rel. Stinson v. Provident Life & Acc. Ins. Co., 721 F.Supp. 1247
(S.D.Fla.1989) ........................................................................................... 21

*U.S. ex rel. Williams v. NEC Corp., 931 F.2d 1493
(11th Cir.1991) ............................................................... 9, 13, 14, 15, 34

Wang v. FMC Corp., 975 F.2d 1412 (9th Cir.1992) .................................... 16, 21

Wercinski v. Int'l Business Machines Corp., 982 F.Supp. 449
(S.D.Tex.1997) ........................................................................................... 29

## FEDERAL STATUTES AND REGULATIONS

*31 U.S.C. § 3730 ................... 1, 2, 3, 8, 9, 10, 11, 13, 14, 15, 23, 24, 28, 33, 34

## I. ARGUMENT AND CITATION OF AUTHORITY

In their Brief, the Defendants/Appellees have raised three alternative grounds which they urge would support summary judgment in their favor, which grounds were not relied upon by the District Court below. (Appellees' Brief, pp. 37-61). Plaintiff has previously addressed the District Court's erroneous decision regarding the Release executed in connection with Plaintiff's employment severance with the Hospital Authority. This Reply Brief will address only the alternative grounds raised in the Appellees' Brief.

### (A) Plaintiff satisfied the requirements of 31 U.S.C. § 3730(b)(2).

Defendants contend that Plaintiff's failure to disclose to the U.S. Attorney's Office the employment severance Release entered between him and the Hospital Authority violated 31 U.S.C. § 3730(b)(2), and thus would warrant the dismissal of this case. (Appellees' Brief, p. 38). In support of such argument, the Defendants rely primarily on this Court's decision in Foster v. Savannah Communication, 140 Fed. Appx. 905, 2005 WL 1719221 (11th Cir.2005). This Court's ruling in Foster has no applicability to the present case, and Defendants' argument based thereon is unfounded. Contrary to the Defendants' characterization, this Court's decision in Foster did not turn on the relator's purported failure to provide any particular document or documents to the

1

Government. The *pro se* relator in <u>Foster</u> admittedly filed her False Claims Act *qui tam* action after the statute of limitations had expired, and she did not even attempt to satisfy any of the statutory procedural requirements set forth in subsections (b)(1), (b)(2), (b)(4)(A), or (b)(4)(B) of 31 U.S.C. § 3730. The relator in <u>Foster</u> provided <u>nothing</u> to the Government, and her complaint was not filed *in camera* or under seal as required by the False Claims Act. The facts in <u>Foster</u> bear no resemblance to the facts of this case, and this Court's holding in <u>Foster</u> is simply inapposite herein. The other cases cited by Defendants likewise did not involve an alleged failure to disclose a particular document or documents, and thus provide no support for their argument herein. <u>U.S. ex rel. Pilon v. Martin Marietta Corp.</u>, 60 F.3d 995 (2nd Cir.1995) (relator's failure to file complaint under seal and to serve Government was basis for dismissal); <u>White v. Apollo Group</u>, 241 F.Supp.2d 710 (W.D.Tex.2003) (as in <u>Foster</u>, *pro se* plaintiff made no attempt to comply with any of the procedural requisites of False Claims Act); <u>Erickson ex rel. U.S. v. American Institute of Biological Sciences</u>, 716 F.Supp. 908 (E.D.Va.1989) (relator's failure to file *qui tam* complaint in camera and under seal or to await court order for service on defendant warranted dismissal).

31 U.S.C. § 3730(b)(2) requires a relator to bring the action in the name of the United States Government and the relator must serve upon the Government "[a] copy of the complaint and written disclosure of substantially all material evidence and information the person possesses." Plaintiff satisfied the requirements of 31 U.S.C. § 3730(b)(2). The Release entered between Plaintiff and his former employer in connection with an employment severance agreement has no bearing whatsoever on Plaintiff's False Claims Act case against these Defendants. Indeed, as discussed below, the U.S. Attorney's Office has made it clear that it did not consider the contents of Plaintiff's severance agreement material to its investigation of the claims described in Plaintiff's Complaint.

As they did in the District Court below, the Defendants continue to accuse Plaintiff of "playing games interfering with the Government's investigation and with the administration of justice", and to call into question Mr. Whitten's "credibility as a witness". (Appellees' Brief, pp. 39-41; Dkt. No. 99, p. 5 n. 4, Dkt. No. 110, pp. 3-5). Defendants' personal attacks on the Plaintiff are a thinly-veiled attempt to divert attention from their own fraudulent conduct, which is the only issue in this False Claims Act case.

At the hearing on Defendants' second Motion to Dismiss, Assistant U.S. Attorney James Coursey addressed the issue of Plaintiff's credibility raised by

3

the Defendants, and he discussed the relevance of the Release to his investigation. Mr. Coursey explained that his "first order of business" in any False Claims Act investigation is to determine whether the relator "has credibility or not". (Dkt. No. 141, p. 88). Mr. Coursey explained that Plaintiff's interview "lasted five or six hours. It was detailed. We questioned and questioned; he answered and answered." (Dkt. No. 141, p. 88). Mr. Coursey has plainly never questioned Plaintiff's credibility. Regarding the Defendants' contention that Plaintiff "concealed" the Release from the Government (and their suggestion that the Government's investigation would have somehow been influenced by the Release), Mr. Coursey explained that the issue of why Plaintiff had left his employment with the Hospital Authority "came up at the end of that long, long day" during which Plaintiff had candidly answered every question asked of him by the United States' attorneys. (Dkt. No. 141, p. 88). Mr. Coursey explained that "[w]hy [Plaintiff] left the employment of the Hospital Authority was not of paramount importance to me at that point in time"; Mr. Coursey was concerned about learning from Plaintiff how the Government had lost money. (Dkt. No. 141, pp. 88-89). Mr. Coursey went on to state that "I've got no suggestion that [Plaintiff's counsel], or anyone else has withheld evidence from me. Had I asked for that document that day, I feel sure they would have given it to me. I simply

4

did not do it because my eyes were on the prize: How has the government lost money?" (Dkt. No. 141, p. 89). What was important to the U.S. Attorney's Office in its investigation is what is important in this False Claims Act action: the fact that the Defendants defrauded the United States out of millions of taxpayer dollars. Defendants' attempt to shift the focus away from their own conduct is to no avail.

**(B) Defendants are not protected by the Government's Settlement Agreement entered with Southeast Georgia Regional Medical Center and Camden Medical Center which settled only specific claims for a specific time period.**

In their initial Motion to Dismiss, the Defendants tried to distance themselves from the Hospitals, urging that Plaintiff's allegations of fraud herein concerned the Hospitals' conduct, not any conduct by the Defendants or their employees. (See, Dkt. No. 17, pp. 9-10; Dkt. No. 37, pp. 5-8; Dkt. No. 45, p. 5). However, Defendants now ask this Court to find that their liability for False Claims Act violations was discharged by a Government settlement with Southeast Georgia Regional Medical Center ("SEGRMC") and Camden Medical Center ("CMC") (collectively, "the Hospitals") of certain False Claims Act claims (the "Settlement Agreement"). (Dkt. No. 82, Ex. 3). Defendants' position regarding the Settlement Agreement cannot be sustained.

5

First, as Defendants acknowledge, the Settlement Agreement only releases the specific claims described in detail therein. (Appellees' Brief, p. 42; Dkt. No. 82, Ex. 3, § II, ¶ B (defining "covered conduct" to include only: Tricare/CHAMPUS durable medical equipment billing; patients placed on observation status without medical necessity documentation; and, patients' status changed to observation after admission)). Also, the Settlement Agreement only releases these specified claims for "the period from 1996 through 1999". Asst. U.S. Attorney Coursey made it clear at the hearing on Defendants' Motion to Dismiss that the Government's investigation was limited to those specific claims that were expressly defined in the Settlement Agreement. (Dkt. No. 141, p. 92-93). Mr. Coursey explained that "[w]e don't throw a blanket over the hospital and say, '[w]e're going to investigate you for fraud for all purposes.'…We can't look at everything, so we focus on this and this and this. And that's what happened in this case. We looked at the DME claims [under Tricare/CHAMPUS]. We looked at the observation claims." (Dkt. No. 141, p. 93). Mr. Coursey advised that there are no other claims (besides those specifically defined in the Settlement Agreement) that the Government has investigated or is investigating, whether against the Hospital Authority or any other party. (Dkt. No. 141, p. 92). The Settlement Agreement clearly cannot

6

serve as a release with respect to any claims other than those specifically defined as "covered conduct", or outside the particular time frame covered by the Settlement Agreement (1996-1999).

Further, the Settlement Agreement was entered between the Government and the Hospitals (Dkt. No. 82, Ex. 3), and was not intended for the benefit of any Defendant and does not inure to the benefit any Defendant.[1] At the hearing on Defendants' Motion to Dismiss, Mr. Coursey stated unequivocally, "[t]he government's investigation, until this qui tam was filed…was never against Quorum. It was always against the Hospital Authority…." (Dkt. No. 141, p. 92). The Government did not investigate the Defendants, and it was obviously unaware of their involvement in any fraud (until Plaintiff filed the present *qui tam* action). The Government certainly did not intend to settle any claims against the Defendants. Further, when the District Court asked Defendants' counsel, "[w]hat penalty, if any, has Quorum paid for its alleged wrongful conduct?", Defendants' counsel responded, "[w]ell, Your Honor, in terms of penalty to the government, none." (Dkt. No. 141, p. 38). The Defendants are not entitled to protection by the Government's Settlement Agreement with the Hospitals.

---

[1] Defendants admit they were not even aware of the Settlement Agreement until they obtained same via discovery in this case. (Dkt. No. 80, pp. 1-2, p. 9, n. 7). This fact, in and of itself, belies any assertion that Defendants were intended to be released by the Settlement Agreement.

7

**(C) Plaintiff's Complaint is not "based upon" any "allegation or transaction" of fraudulent conduct by Defendants which has ever been "publicly disclosed" within the meaning of the False Claims Act's jurisdictional bar.**

Defendants contend that the District Court lacked jurisdiction over the Plaintiff's claims based upon the jurisdictional bar set forth in 31 U.S.C. § 3730(e)(4)(A), which provides:

> "No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information."

"In the Eleventh Circuit, a constructive three part inquiry determines if jurisdiction exists: (1) have the allegations by the plaintiff been publicly disclosed; (2) if so, is the disclosed information the basis of the plaintiff's suit; (3) if yes, is the plaintiff an 'original source' of that information." U.S. ex rel. Butler v. Magellan Health Svcs., Inc., 74 F.Supp.2d 1201, 1206 (M.D.Fla.1999) (citing U.S. ex rel. Cooper v. Blue Cross & Blue Shield of Fla., Inc., 19 F.3d 562, 565, n. 4 (11th Cir.1994)). This Court has further instructed that 31 U.S.C. § 3730(e)(4)(A) "bars actions based upon information that is publicly disclosed **only** in certain enumerated instances.... [T]he methods of public disclosure set forth in section 3730(e)(4)(A) are **exclusive** of the types

8

of public disclosure that would defeat jurisdiction under that section." U.S. ex rel. Williams v. NEC Corp., 931 F.2d 1493, 1499 (11th Cir.1991) (Emphasis added). Finally, as explained in Williams, supra at 1500, "[t]he 'original source' inquiry only becomes necessary once a court makes a factual determination that the particular *qui tam* suit before it was based upon information that was publicly disclosed." See also, Butler, supra at 1207 ("[t]he original source inquiry is irrelevant unless there has been a public disclosure.").

Defendants urge that a hodgepodge of documents ranging from newspaper articles to letters and e-mails to and from hospital personnel could be found to constitute "public disclosures". (Appellees' Brief, p. 48). Defendants group the various, unrelated documents into categories in order to try and fit the documents within one of the exclusive types of "public disclosures" under § 3730(e)(4)(A). (Appellees' Brief, pp. 49-53). Then, Defendants summarily assert that the allegations of Plaintiff's Complaint are "based upon" the documents (without offering any explanation of how any of Plaintiff's claims are supposedly "based upon" any "allegation or transaction" purportedly contained in any of the documents in question). (Appellees' Brief, pp. 53-55). Defendants' analysis is fundamentally flawed. It is necessary to

9

examine each of the documents relied upon by Defendants individually to determine whether (1) any particular document was a "public disclosure" (2) of an "allegation or transaction" of fraud (3) by one of the exclusive means set forth in § 3730(e)(4)(A).  Then, it must be considered (4) whether any of Plaintiff's claims was "based upon" such publicly disclosed allegations. See, U.S. ex rel. Lindenthal v. Gen. Dynamics Corp., 61 F.3d 1402, 1409-10 (9th Cir.1995).

As shown below, there has been no "public disclosure" of any "allegations or transactions" of fraudulent conduct by the Defendants in this case by way of any document relied upon by the Defendants.  Furthermore, Plaintiff's Complaint is not "based upon" any "allegation or transaction" which has ever been disclosed to the public.

> *(1) U.S. Department of Justice ("DOJ") and Department of Defense ("DOD") investigations of improper billing of CHAMPUS/Tricare for durable medical equipment.*

Defendants contend that investigations conducted by the DOJ and DOD regarding improper billing at the Hospitals for durable medical equipment under CHAMPUS/Tricare[2] should bar several of Plaintiff's claims in this case.

---

[2] In the District Court, Defendants consistently and repeatedly referred to these investigations as "government investigations". (See, Dkt. No. 80, p. 15 ("the allegations in [Plaintiff's] Complaint have been disclosed in prior **government investigations**"); Id., p. 16 ("prior disclosures of [Plaintiff's] allegations in **government investigations**"), Id., p. 16 ("Prior **Government**

(Appellees' Brief, pp. 48-50).  Such argument fails in light of the plain language of 31 U.S.C. § 3730(e)(4)(A), and in light of the facts of record herein.

The crux of the Defendants' argument with respect to the DOJ and DOD investigations (as well as most of the other alleged "public disclosures" which Defendants are claiming herein), is that the fraud alleged in Plaintiff's Complaint was already "known by" or else was "available to" the Government. (Appellees' Brief, p. 46).[3]  Such argument ignores the plain language of the False Claims Act, as well as the very basis for the 1986 amendments thereto. As explained by the Supreme Court in Hughes Aircraft Co. v. U.S. ex rel. Schumer, 520 U.S. 939, 945-46, 117 S.Ct. 1871 (1997), the False Claims Act prior to 1986 "required a district court to dismiss a *qui tam* action…based on evidence or information the Government had when the action was brought." However, "Congress amended the [False Claims Act] in 1986…to permit *qui tam* suits based on information in the Government's possession, except where the suit was based on information that had been publicly disclosed and was not

---

**Investigations**…Disclosed Each of the Allegations in This Qui Tam Action"); Id., p. 20 ("articles reported on the **government's investigation**….")). (Emphasis added).

[3] Appellees' Brief, p. 46 ("The logic of the public disclosure bar is that there is no need to grant incentives to whistleblowers to come forward when the allegations of fraud are already…available or known to the government.").

11

brought by an original source of the information." See also, U.S. ex rel. Schumer v. Hughes Aircraft Co., 63 F.3d 1512, 1519 (1995), *vacated on other grounds by* Hughes Aircraft Co., supra ("[I]n passing the 1986 amendments, Congress specifically sought to diminish the government's ability to sit on, and possibly suppress, allegations of fraud when inaction might seem to be in the interest of the government....The 1986 amendments also reflected Congress's recognition that the government simply lacks the resources to prosecute all viable claims, even when it knows of fraudulent conduct.").

The history of the 1986 False Claims Act amendments doing away with the "government knowledge" jurisdictional bar, and enacting in its place "narrow exceptions to *qui tam* jurisdiction" was also discussed at length in Butler, supra at 1205-06. "When Congress rectified the [False Claims Act] in 1986, the jurisdictional bar was shifted from one precluding actions 'based upon evidence or information in the possession of the United States" to one precluding actions 'based upon the public disclosure of allegations or transactions [of fraud].'" Id. at 1209. See also, U.S. ex rel. Milam v. Regents of Univ. of Cal., 912 F.Supp. 868, 881 (D.Md.1995) ("Under the 1986 amendments, it is the public disclosure of information on which the case is based, rather than the government's awareness of that information, which bars

12

a *qui tam* relator's suit.")  In short, the fact that information may have been in the Government's possession, or may have theoretically been available to the Government, has no bearing on the issue of whether the information was "publicly disclosed".

As this Court has held, a "government investigation" is not one of the exclusive types of "public disclosure" listed under § 3730(e)(4)(A), and thus the DOJ and DOD investigations cannot serve to bar this action. Indistinguishable from the Defendants' argument in this case, this Court in Williams, supra at 1500, was urged to hold that a relator's *qui tam* action was barred "because it was based upon information 'publicly disclosed' **in a government 'investigation'**." (Emphasis added).  The facts in Williams showed that the relator, a U.S. Air Force attorney (the Chief of the Contracts Law Division, 5th Air Force), investigated bid-rigging by the defendant, a telecommunications contractor, and submitted a report of his findings to several of his superior officers. 931 F.2d at 1495 n. 5, n. 6.  After receiving the report, one of the relator's superiors provided the report to the Air Force's Office of Special Investigations ("OSI"), the Air Force office with the responsibility to investigation allegations of bid-rigging on Air Force contracts. Id. at 1496 n. 7.  The Air Force OSI was investigating the bid-ridding

13

allegations against the defendant when the relator filed his *qui tam* suit raising such allegations. Id. at 1496 n. 7.  This Court rejected the argument that the relator's investigation was a "public disclosure" under § 3730(e)(4)(A), observing as follows:

> "A plain reading of [§ 3730(e)(4)(A)] reveals that 'congressional, administrative, or Government Accounting Office' modifies 'report, hearing, audit, or investigation.'  Any other reading of that phrase would be illogical.  Because [the relator's] report on bidding practices was not issued by Congress, an administrative agency, or out of the Government Accounting Office, therefore, it is not a 'public disclosure' within the meaning of section 3730(e)(4)(A)." Id. at 1500.

Herein, the DOJ and DOD investigations were not conducted by Congress, an administrative agency, or by the General Accounting Office. Likewise, the subpoenas pointed to by the Defendants herein (Dkt. No. 82, Exs. 10-13) were not issued by Congress, an administrative agency or the General Accounting Office.  Under the Eleventh Circuit's reasoning in Williams, neither the DOJ nor the DOD investigations, nor the subpoenas relied on by the Defendants, are "public disclosures" within the meaning of § 3730(e)(4)(A).

Furthermore, there can be no reasonable argument that any "allegations or transactions" of fraud were disclosed to the public by way of the Government investigations in question, particularly with respect to the

14

Defendants in this case.[4]  As noted in U.S. ex rel. Lamers v. City of Green Bay, 998 F.Supp. 971, 978 (E.D.Wis.1998), the relevant inquiry is "[w]hat materials were in the public domain prior to filing?  Did the public domain materials include all the essential elements to filing this action?  If the answer to the second question is 'yes,' then the [defendant] has satisfied the public disclosure prong." 998 F.Supp. at 978.  With respect to the "government investigation" at issue in Williams, this Court instructively noted that "[e]ven if [the relator's] investigation and report would qualify as the type of 'public disclosure' described in section 3730(e)(4)(A), **neither the investigation nor the report were ever disclosed to the 'public' before [the relator's]** *qui tam* **suit was filed**." 931 F.2d at 1500 n. 11 (Emphasis added). See also, U.S. ex rel. Ramseyer v. Century Healthcare Corp., 90 F.3d 1514, 1519 (10th Cir.1996) ("[I]n order to be publicly disclosed, the allegations or transactions upon which a *qui tam* suit is based must have been made known to the public through some affirmative act of disclosure."). Likewise, herein, there is no evidence that any allegation or transaction of fraud has ever been disclosed to the public by way

---

[4] The only purported "public disclosure" to which Defendants have pointed in connection with the DOJ and DOD investigations are the subpoenas issued during the course of said investigations. (Appellees' Brief, p. 48 (chart purporting to set forth "public disclosures")). However, these subpoenas do not contain a single "allegation or transaction" of fraud, but instead merely request information.

15

of the DOJ or DOD investigations, or by the subpoenas pointed to by the Defendants.

Furthermore, even if a "government investigation" constituted a "public disclosure", which it does not, logic dictates that such investigation could not bar any fraud claims that were never investigated. Herein, the Government's investigation of fraudulent billing of Tricare/CHAMPUS for durable medical equipment cannot constitute a "public disclosure" of any **other** fraudulent conduct which is alleged in Plaintiff's Complaint (besides the durable medical equipment Tricare/CHAMPUS billing). See, U.S. ex rel. Hochman v. Nackman, 145 F.3d 1069, 1072 n. 3 (9th Cir.1998) ("Because the [Inspector General] did not investigate the special pay bonus or wasteful hiring allegations [of the relator's complaint], there is no basis for suggesting that these allegations were publicly disclosed."); Wang v. FMC Corp., 975 F.2d 1412, 1415-16 (9th Cir.1992) (relator claimed employer defrauded government in four separate projects; public disclosure by newspaper articles of fraud in one project did not bar claims relating to three other projects).

As noted above, Asst. U.S. Attorney Coursey made clear that the Government's investigation was limited to two specific claims. (Dkt. No. 141, p. 92-93). Again, Mr. Coursey explained that "[w]e don't throw a blanket over

16

the hospital and say, '[w]e're going to investigate you for fraud for all purposes.'…We can't look at everything, so we focus on this and this and this. And that's what happened in this case. We looked at the DME claims [under Tricare/CHAMPUS]. We looked at the observation claims." (Dkt. No. 141, p. 93). Mr. Coursey advised that the Government has not investigated and is not investigating any other claims against the Hospital Authority or any other party. (Dkt. No. 141, p. 92). However, even if there had been information of other fraud disclosed by way of the DOD/DOJ investigations (fraud unrelated to the Tricare/CHAMPUS durable medical equipment billing and observation unit billing), the Government clearly did not take any action to prosecute same. Again, the False Claims Act was amended in 1986 for the specific purpose of giving "*qui tam* plaintiffs…a more direct role…in acting as a check that the Government does not neglect evidence, cause unduly [sic] delay, or drop the false claims case without legitimate reason." U.S. v. CAC-Ramsay, Inc., 744 F.Supp. 1158, 1160 (S.D.Fla.1990). The court in CAC-Ramsey stated, "what appears to have happened in this case is, after seeing no effective action taken by the government, relators filed this suit. This appears to be exactly what Congress intended…." Id. at 1160. Although there is no evidence of record to suggest that the Government had knowledge of any fraudulent conduct beyond

17

that investigated (indeed, Mr. Coursey has denied any such knowledge on the part of the Government), there would be no jurisdictional bar as to claims that were never prosecuted.

Finally, neither the Government's investigation nor any of Defendants' other purported "public disclosures" disclosed any allegations of fraud *on the part of any Defendant in this action*. As observed in Cooper, supra at 566, "[t]he government often knows on a general level that fraud is taking place and that it, and the taxpayers are losing money. But it has difficulty identifying all of the actors engaged in the fraudulent activity….[The False Claims Act's] casting of a net to catch all wrongdoers is precisely where the government needs the help of its 'private attorneys general'." See, Cooper, supra at 566 and 568 n. 12 ("The allegations of widespread [Medicare] fraud made in sources in which [the defendant] was not specifically named or otherwise directly identified are insufficient to trigger the jurisdictional bar."; "The purpose of the FCA was to enlist the public's help in uncovering specifically each and every perpetrator of fraud."); Butler, supra at 1210-11 ("Since Plaintiff's state court lawsuit involves only two of the Defendants named in this lawsuit, there is no jurisdictional bar as to the unidentified Defendants."); U.S. ex rel. Aflatooni v. Kitsap Physicians Svcs., 163 F.3d 516, 523 (9th Cir.1998) (public disclosure of

18

Medicare fraud by one group of defendants did not equate to public disclosure of such fraud with respect to second group of defendants not identified in the disclosure). As recognized in Cooper, supra at 566, "[r]equiring that allegations **specific to a particular defendant** be publicly disclosed before finding the action potentially barred encourages private citizen involvement and increases the chances that every instance of specific fraud will be revealed." (Emphasis added). In this case, no allegation specific to any Defendant herein has ever been disclosed to the public, whether through the DOJ or DOD investigations or any of the other purported "public disclosures" cited by the Defendants, and Defendants cannot avoid responsibility for their own culpability by relying on such documents. Again, Mr. Coursey stated plainly that "[t]he government's investigation, until this qui tam was filed...was never against Quorum. It was always against the Hospital Authority...." (Dkt. No. 141, p. 92). Because no Defendant was ever investigated by the Government, it is impossible for Defendants to reasonably argue that there was any "public disclosure" of fraudulent conduct by the Defendants based on the Government's investigation.

> *(2) News articles reporting on Government investigations of*
> *Tricare/CHAMPUS billing for durable medical equipment.*

19

The articles published in The Brunswick News cited by the Defendants (Dkt. No. 82, Exs. 25-34) contain nothing more than generalized, non-specific information about the Government investigations into the Tricare/CHAMPUS durable medical equipment billing at the Hospitals (which are discussed at length above). With the sole possible exception of Plaintiff's claim relating to this particular issue, these news articles contain no allegation or transaction of fraud upon which Plaintiff's Complaint is based. In fact, the Brunswick News articles consistently state that Medicare billing at the hospitals – and specifically Quorum – were not subjects of the Government's investigation. Quorum's fraudulent billing of Medicare (for reusable equipment and supplies and routine services; lack of physician orders; cardiac rehabilitation; and, mental health unit) is at issue in four of the six fraudulent schemes detailed in Plaintiff's Complaint. (Dkt. No. 36, ¶¶ 30, 32(b), 32(c), 33, 35). There can be no reasonable contention that any of the news articles cited by Defendants "publicly disclosed" these Medicare fraud allegations, and it certainly cannot be shown that Plaintiff's Medicare fraud claims are "substantially similar" to anything disclosed in any of these news articles.

As discussed above with respect to the Government investigations themselves, it plainly appears that no "allegations or transactions" of fraud

20

other than the billing of durable medical under Tricare/CHAMPUS were disclosed in any of the articles discussing the investigations.  As with the investigations themselves, the articles discussing the investigations cannot serve to bar any of Plaintiff's other claims that were never the subject of the investigations (and which were never discussed in any of the articles). U.S. ex rel. Hochman, supra at 1072 n. 3; Wang v. FMC Corp., supra at 1412, 1415-16.

Moreover, the Brunswick News articles did not disclose any allegation or transaction of fraudulent conduct by the Defendants herein.  In U.S. ex rel. Stinson v. Provident Life & Acc. Ins. Co., 721 F.Supp. 1247, 1258 (S.D.Fla.1989) (hereinafter, "Provident"), the defendant relied upon publicized reports for its argument that the relator's claims were based on allegations disclosed in those reports.  The court in Provident properly rejected such argument on the basis that "[n]either [the defendant's] name, nor its alleged fraudulent conduct is disclosed in the reports.  If [the defendant's] argument were to stand, then the entire *qui tam* jurisdictional provision would be emasculated.  Publication of general, non-specific information does not necessarily lead to the discovery of specific individual fraud which is the target of the *qui tam* provisions." Id. at 1258.  Similarly, this Court in Cooper observed that because "[t]he [GAO] report does not allege that [the

21

defendant]…actually engaged in wrongdoing", "[t]his report does not constitute a 'public disclosure of allegations or transactions' that [the defendant] knowingly violated [Medicare] laws." Id. at 567. Accord, Butler, supra at 1210-11 (Relator's case not barred by his prior state court lawsuit as to defendants not named in that case); Aflatooni, supra at 523 (public disclosure in newspaper articles of Medicare "unbundling" by one group of defendants did not equate to public disclosure with respect to second group of defendants not named in articles).[5]

In the Brunswick News articles cited by the Defendants, there is no allegation that any of the Defendants herein "actually engaged in wrongdoing". There is no "alleged fraudulent conduct" by any Defendant mentioned in any of the articles, and there certainly is no "specific individual fraud" identified on the part of any Defendant. In fact, in the articles where Quorum is named, the articles specifically state that the Government's investigation was not targeting Quorum (a fact confirmed by Mr. Coursey). Under the reasoning in Provident

---

[5] Instructively, the 9th Circuit noted in Aflatooni that "[a]lthough the government obtained information about [first defendant] and its alleged conspiracy with [second defendant] through public disclosures, the government may still benefit from obtaining information about separate allegations of wrongdoing against [third defendant]…." 163 F.3d at 523. Herein, the Defendants' attempt to rely on articles relating solely to the Hospitals (and which expressly state that Quorum's conduct was not being investigated) to insulate them from their own wrongful conduct is similarly unavailing.

22

and Cooper and the other cases cited above, the fact that the articles do not allege any fraudulent conduct on the part of Quorum – and, in fact, expressly state that Quorum was not a subject of the investigation – forecloses any argument that the articles constitute "public disclosure" of the "allegations" or "transactions" of fraud by any Defendant which are the basis of Plaintiff's Complaint herein.

The Defendants point out that certain of The Brunswick Times articles and an article in the *Report on Medicare Compliance* reference a January 1990 internal risk assessment audit of the Hospitals (the "PPS audit"). (Appellees' Brief, p. 51). Again, however, none of these articles contain any "allegation" or "transaction" of specific fraudulent conduct on the part of any Defendant herein. Defendants contend that "billing improprieties addressed in the PPS Audit were publicly disclosed." (Appellees' Brief, p. 51). However, as observed in Aflatooni, supra at 524, an internal investigation is not a "public disclosure" under § 3730(e)(4)(A). Indeed, Defendants do not contend that the PPS audit itself fits within one of the exclusive means of "public disclosure" set forth in § 3730(e)(4)(A). Even assuming that the PPS audit itself contained "allegations" or "transactions" of specific fraudulent conduct, no such "allegations" or "transactions" were mentioned or otherwise disclosed in any

23

of the articles relied upon by the Defendants.  The articles merely state that the PPS audit raised concern regarding the hospitals' compliance program and unspecified "billing practices".  Beyond what was stated in the articles, the contents of the PPS internal audit was not subject to any "public disclosure" within the meaning of § 3730(e)(4)(A).

Defendants also urge that "[a]lthough the news articles did not reprint the entire PPS audit verbatim, the media reports put the public on notice of the…PPS audit." (Appellees' Brief, p. 51).  Even if a member of the public could have hypothetically obtained the PPS audit after reading about it in one of the articles, an internal risk assessment audit by a private contractor is not one of the expressly limited means of "public disclosure" which could potentially serve to bar a *qui tam* action. Aflatooni, supra at 524. See also, U.S. ex rel. Rabushka v. Crane Co., 40 F.3d 1509, 1513 n. 2 (8th Cir.1995) (besides the fact that the report did not contain "allegations or transactions" of fraud, an internal corporate report was not one of the exclusive means of "public disclosure" enumerated under False Claims Act).

*(3) Britton qui tam complaint.*

Defendants assert that the *qui tam* complaint filed in U.S. ex rel. Britton v. Glynn-Brunswick Mem. Hosp. Auth., *et al.*, operates as a prior public

24

disclosure of the allegations in Plaintiff's Complaint. (Appellees' Brief, pp. 51-52).

Initially, the <u>Britton</u> complaint was filed under seal. The seal was partially lifted by the District Court in that case, but only for the limited purpose of allowing the United States to disclose the Complaint to the Hospital Authority. (Dkt. No. 82, Ex. 37). The seal in the <u>Britton</u> matter was not fully lifted until an Order of the District Court of September 30, 2003, which was nearly a year after Plaintiff's Complaint was filed herein on November 21, 2002. In short, there was no way that Plaintiff could have known what the <u>Britton</u> Complaint alleged before Plaintiff's Complaint was filed herein. Therefore, Defendants' contention that Plaintiff's present Complaint could be found to have been "based upon" any allegations or transactions of fraud contained in the <u>Britton</u> complaint is untenable.

In addition, the Initial Response to the Defendants' Motion to Dismiss filed by the United States in the District Court below established that the <u>Britton</u> Complaint contained nothing more than generalized allegations of billing problems at SEGRMC. <u>See</u>, Dkt. No. 89, p. 5 and p. 6 ("The information about the billing irregularities [in Britton's complaint] was general at best....; "The government viewed Mr. Britton as a disgruntled former

25

employee with very generalized knowledge about the billing irregularities supposedly occurring at SEGRMC."). As this Court observed in Cooper, supra at 566, the "[t]he publication of general, non-specific information does not necessarily lead to the discovery of specific individual fraud which is the target of the *qui tam* provisions." See also, Provident, supra at 1258.

The Britton Complaint alleged that an internal, employee-conducted audit of patient records disclosed evidence of "false claims" (unnecessary lab tests and medical procedures; up-coded procedures; procedures or tests performed without appropriate authorization/physician signature; and, improper classification of "outpatients" as "inpatients"). (Dkt. No. 82, Ex. 7, ¶¶ 5-6).[6] The allegations of Plaintiff's Complaint are not "based upon" any of the generalized, non-specific allegations of "discrepancies and inadequacies" contained in the Britton Complaint. As set forth in Defendants' Brief, the term "based upon" means "substantially similar to" or sharing a substantial identity with publicly disclosed information. (Appellees' Brief, pp. 53-54). The only arguably corresponding allegation between the Britton Complaint and Plaintiff's Complaint herein is that regarding the performance of procedures without signed physician orders. (Dkt. No. 36, ¶¶ 31, 32©)). However, as set

---

[6] Britton's Complaint further states that "[a]ll of these discrepancies and inadequacies were noted for the period January 1, 1998 to November 30, 1998." (Id., ¶ 6). Plaintiff's Complaint herein is not so limited.

26

forth in the exhibits attached to Plaintiff's Complaint herein, Plaintiff's allegation is not merely that signed physician orders were not being obtained (which would be revealed upon an examination of patient records, such as that described in the Britton Complaint), but that nurses were making rounds and writing orders and then rubber stamping a physician's signature, or else that physician orders were being obtained after the procedure was performed. (Dkt. No. 36, Exs. 26, 33, 35).  An audit of patient records by untrained hospital employees, such as that described in the Britton Complaint, would not have disclosed this sort of fraud.   It cannot be found that the "physician signature" allegations of Plaintiff's Complaint are "substantially similar to" or share a substantial identity with any allegation contained in the Britton Complaint.

Finally, as discussed above with reference to each of the other "public disclosures" asserted by the Defendants, Britton's complaint was not filed against any Defendant herein, and there was no "allegation or transaction" of fraudulent conduct by any Defendant contained in the Britton Complaint. See, Cooper, 19 F.3d at 567 (Although GAO report named and criticized defendant, it "does not allege that [the defendant]…actually engaged in any wrongdoing", and thus, "does not constitute a 'public disclosure of allegations or transactions' that [the defendant] knowingly violated [Medicare].)" Unlike

27

Plaintiff's present Complaint, the <u>Britton</u> Complaint does not allege that any Defendant knowingly violated the False Claims Act. Thus, besides the fact that the <u>Britton</u> complaint was under seal when Plaintiff's Complaint was filed, it cannot be shown that Plaintiff's Complaint was "based upon" any "allegations or transactions" of fraud against any Defendant herein which were set forth in the <u>Britton</u> complaint, and Defendants' reliance on the <u>Britton</u> complaint as a "public disclosure" is misplaced.

*(4) Medicare fiscal intermediary focused medical reviews.*

Defendants contend that Medicare conducted "focused medical reviews", which they argue constitute "administrative audits" for purposes of 31 U.S.C. § 3730(e)(4)(A). (Appellees' Brief, p. 50). Defendants' chart suggests that these "focused medical reviews" (Dkt. No. 82, Ex. 14-16; 21-22) were "public disclosures" of two of the claims set forth in Plaintiff's Complaint, specifically Plaintiff's claims relating to cardiac rehabilitation (Dkt. No. 36, ¶ 33) and observation unit services (Dkt. No. 36, ¶ 31).

Initially, there is no evidence that either of these "focused medical reviews" was ever affirmatively disclosed to anyone outside of the Hospitals. Thus, these "focused medical reviews" have not been "publicly disclosed" within the meaning of the False Claims Act's jurisdictional bar. <u>See</u>, <u>U.S. ex</u>

28

rel. Holmes v. Consumer Ins. Group, 318 F.3d 1199, 1206 (10ᵗʰ Cir.2003) (government investigator's disclosure of information to defendant's current and former employees was not public); Ramseyer, supra at 1519 (Held: mere existence of or theoretical public availability of government report was not "public disclosure"); Schumer, supra at 1519 (dissemination of government audits to employees does not constitute public disclosure); Wercinski v. Int'l Business Machines Corp., 982 F.Supp. 449, 458 (S.D.Tex.1997) ("[P]ublic disclosure requires more than just public access to information. Rather, 'the allegation of fraud or the critical elements of the fraudulent transaction themselves [must be] in the public domain.'"); U.S. ex rel. Fallon v. Accudyne Corp., 921 F.Supp. 611, 625 (W.D.Wis.1995) ("The mere existence of a report, audit, or investigation containing information pertaining to fraud does not, in and of itself, constitute public disclosure."). As set forth above, the focus of the False Claims Act jurisdictional bar is not "government knowledge", or the theoretical availability of information, but rather an affirmative act of disclosure of information to the public. The most that Defendants have shown is the mere existence of these "focused medical review" letters, which does not constitute a "public disclosure" for purposes of the False Claims Act.

29

Even if the "focused medical reviews" could be found to constitute "public disclosures" within the False Claims Act's definition, however, Plaintiff's Complaint was not "based upon" any "allegations or transactions" of fraud arguably contained in the "focused medical reviews".

(a) Cardiac rehabilitation "focused medical review".

The August 19, 1996 letter discussing a "focused medical review" of cardiac rehab cited by the Defendants (Dkt. No. 82, Ex. 21) indicates that Medicare had "identif[ied] a pattern of incorrect billing" at SEGRMC with respect to cardiac rehab. This letter provides that SEGRMC was given 30 days from the date of the letter to submit a "corrective action plan", and an additional 90 days to implement such plan. The letter states that after implementation is complete and correction of the billing problems demonstrated, the facility would remain on "focused medical review" for one quarter after which the facility would be "removed from review". Failure to submit such "corrective action plan" would have resulted in "an onsite audit and/or referral to [the] Medicare Fraud Unit for further action."

Even assuming solely for the purposes of argument that any "allegations or transactions" of fraud could have been "publicly disclosed" by virtue of the letter in question, Plaintiff's claims do not share a substantial identity with

30

anything disclosed in this letter. (Dkt. No. 80, p. 28). The letter merely indicates that several cardiac rehab claims by SEGRMC were denied because either (1) information was not provided needed to make a decision on the claim, (2) cardiac rehab "exceeds Fred/Duration", or (3) "Services not documented". Even assuming, *arguendo*, that these undefined bases for claims denials could be construed as "allegations or transactions" of fraud, there can be no argument that Plaintiff's Complaint is "substantially similar" to same. Plaintiff's allegation is that cardiac rehab was being billed in violation of Medicare's billing requirements because neither SEGRMC nor CMC had a physician supervisor in the cardiac rehab unit, even though this practice was in violation of Medicare regulations which had been disseminated in both bulletin and manual form, and which had been in place since 1988. (Dkt. No. 36, Ex. 41). The "focused medical review" letter does not mention or reference any physician supervisor requirement. In other words, a member of the public reading the "focused medical review" letter would have no knowledge as to whether or not the Hospitals were meeting Medicare's physician supervision requirement for cardiac rehab. Rather, this information would be exclusively within the knowledge of someone inside the hospital who was familiar with Medicare's staffing requirements, and who had knowledge regarding whether

31

the hospital was complying with such requirements, i.e., someone like the Plaintiff.

Furthermore, the cardiac rehab "focused medical review" shows on its face that it was only for a specific, limited time period: four months (from the date of the letter, August 19, 1996) to adopt and implement a "corrective action plan", followed by one quarter of billing review by Medicare. Thus, this "focused medical review" period ended some time prior to mid-1997. Plaintiff's evidence demonstrates that the cardiac rehab billing fraud alleged in Plaintiff's Complaint was committed well after the hospitals were removed from this "focused medical review". (Dkt. No. 36, Exs. 37, 39, 41). It is specious to suggest that a prior "public disclosure" concerning past fraudulent conduct could serve as a bar to subsequent, unrelated fraud merely because such fraud occurred in the same facility or department.

(b) <u>Observation room "focused medical review"</u>.

The documents discussing a "focused medical review" of observation room billing (Dkt. No. 82, Exs. 14-16) contain no information which would even arguably constitute "allegations or transactions" of specific fraudulent conduct upon which Plaintiff's Complaint is based. The first document (Dkt. No. 82, Ex. 14) merely states that Medicare was conducting a focused medical

32

review with respect to the observation unit, and that documentation for specific claims would be requested. The second document (Dkt. No. 82, Ex. 15) states that the problem under "focused medical review" was that patients were being kept in the observation unit for more than 48 hours, which is a violation of Medicare regulations. The third document (Dkt. No. 82, Ex. 16) is an e-mail to Plaintiff discussing the results of an internal audit by a private firm (Quadramed) hired by the hospitals, and has nothing to do with any Medicare "focused medical review".[7] The first document does not disclose what was being reviewed, and the second document shows that what was under review was billing for Medicare for patients who were being kept too long in the observation unit. Thus, Plaintiff's allegations of fraud in his Complaint concerning observation unit billing, which relate to bills being submitted to Medicare without physician signatures or without meeting medical necessity criteria, could not have been "based upon" anything contained in any of the documents cited by the Defendants.

As shown above, none of the documents relied upon by the Defendants constitutes a "public disclosure" within the meaning of § 3730(e)(4)(A) such as would serve to bar this *qui tam* action. As set forth above, because there has

---

[7] Again, an internal investigation or audit is not a "public disclosure" under § 3730(e)(4)(A). Aflatooni, supra at 524.

33

been no "public disclosure", the "[t]he original source inquiry is irrelevant."

Butler, supra at 1207.[8]

## II. CONCLUSION

For the reasons discussed in Plaintiff's initial Brief, the District Court

erred in holding that the Release entered between Plaintiff and his employer

barred this False Claims Act case, and as set forth above, the alternative bases

for dismissal and/or summary judgment urged by the Defendants are likewise

> Attorneys for Plaintiff/Appellant
> BLASINGAME, BURCH,
> GARRARD & ASHLEY, P.C.

---

[8]Plaintiff certainly had "direct and independent" knowledge of the information upon which his Complaint is based. Cooper, supra at 568; Butler, supra at 1211. Indeed, as a whistleblowing insider employee, Plaintiff is what numerous cases have referred to as the "paradigmatic 'original source'". See, e.g., U.S. ex rel. Merena v. Smithkline Beecham Corp., 114 F.Supp.2d 352 (E.D.Pa.2000) ("[Relator] was...the paradigmatic 'original source,' a 'whistleblowing insider' employee.") Although Plaintiff did not provide information to the Government before he filed his Complaint under seal, Plaintiff satisfied the requirements of 31 U.S.C. § 3730(b)(2), the purpose of which is to allow the Government to investigate the claims and determine whether it desires to intervene while the Complaint remains under seal. Plaintiff submits that to construe § 3730(e)(4)(B) as requiring the relator to provide information to the Government before the complaint is filed under seal renders the statute internally inconsistent, and is contrary to the overall purpose and intent of the 1986 False Claims Act amendments, which were intended to "expand the *qui tam* provisions to encourage more private enforcement suits." Williams, supra at 1497. In any event, as set forth above, whether or not Plaintiff qualifies as an "original source" is irrelevant in this case because there has been no "public disclosure" which could serve to bar this action.

34

BY:   /s/ Josh B. Wages
       J. RALPH BEAIRD
       GEORGIA BAR NO. 043800

       GARY B. BLASINGAME
       GEORGIA BAR NO. 062900

       HENRY G. GARRARD, III
       GEORGIA BAR NO. 286300

440 College Avenue North
P.O. Box 832       JOSH B. WAGES
Athens, Georgia 30603       GEORGIA BAR NO. 730098
(706) 354-4000

       JORDAN & MOSES
1804 Frederica Road, Ste. C   RANDALL A. JORDAN
St. Simons Island, GA 31522   GEORGIA BAR NO. 404975

35

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

I hereby certify that:

1. This Reply Brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because this Reply Brief contains 6,993 words, excluding the parts of the Brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

2. This Brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this Brief has been prepared in a proportionally spaced typeface using WordPerfect in 14-point Times New Roman.

/s/ Josh B. Wages
Josh B. Wages
Attorney for Plaintiff/Appellant
United States of America
ex rel., Ted Whitten

Dated: February 21, 2006

## CERTIFICATE OF SERVICE

This is to certify that I have this day served counsel of record in

the foregoing matter with a copy of this REPLY BRIEF OF

APPELLANT UNITED STATES OF AMERICA, EX REL. TED

WHITTEN, via U.S. mail addressed as follows:

James L. Coursey, Jr.
Assistant U.S. Attorney
U.S. Department of Justice
100 Bull Street
P.O. Box 8999
Savannah, Georgia 31412

Harry D. Dixon, Jr.
304 East Bay Street
Savannah, Georgia 31401

Dean A. Calloway
Jones Day
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309-3063

Gregory M. Luce
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113

This 21st day of February, 2006.

/s/ Josh B. Wages