~0542013.txt

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

UNITED STATES OF AMERICA,                  :   Case No. CV202-189
ex. rel. TED WHITTEN,                       :
                 Plaintiff,                 :
vs.                                         :
TRIAD HOSPITALS, INC., as successor         :   Brunswick, Georgia
to QUORUM HEALTH GROUP, INC.,               :   September 10, 2004
                                            :   9:00 a.m.
                 Defendant.                 :

ORAL ARGUMENT ON MOTION TO DISMISS
BEFORE THE HONORABLE ANTHONY A. ALAIMO
United States District Judge

Reported By:                    Norma Hatfield
                                Official Court Reporter
                                801 Gloucester Street, Rm. 216
                                Post Office Box 1316
                                Brunswick, Georgia 31521-1316
                                (912) 262-9989  FAX (912) 262-9100
                                norma@thebest.net

APPEARANCES:

For the Plaintiff:              HENRY G. GARRARD, III, ESQUIRE
                                GARY B. BLASINGAME, ESQUIRE
                                J. RALPH BEAIRD, ESQUIRE
                                JOSH WAGES, ESQUIRE
                                Blasingame, Burch, Garrard,
                                  Bryant & Ashley
                                Post Office Box 832
                                Athens, Georgia  30603
                                (706) 354-4000
                                            Page 1

~0542013.txt

For the Defendant:             GREGORY M. LUCE, ESQUIRE
                                Jones Day
                                51 Louisiana Avenue NW
                                Washington D.C.  20001-2113
                                (202) 879-3939

                                DEAN A. CALLOWAY, ESQUIRE
                                Jones Day
                                1420 Peachtree Street NE
                                Suite 800
                                Atlanta, Georgia 30309-3053
                                (404) 521-3939

                                HARRY D. DIXON, ESQUIRE
                                Oliver Maner & Gray
                                Post Office Box 10186
                                Savannah, Georgia 31412
                                (912) 236-3311

P R O C E E D I N G S
(Call to Order at 9:00 a.m.)
THE COURT: Good morning. I will sound the case of Ted Whitten against Triad Hospitals, as successor to Quorum Health Group, Inc.

MR. GARRARD: Your Honor, I'm Henry Garrard on behalf of the plaintiffs. We're here in response to the motion of the Defendants.

MR. DIXON: Your Honor, I am Donnie Dixon. This is Greg Luce and Dean Calloway.

MR. LUCE: Good morning, your Honor.

THE COURT: Who is going to be lead counsel for the Defendant?

MR. DIXON: Mr. Luce.

THE COURT: All right. You may proceed.

MR. LUCE: Thank you, your Honor.

Your Honor, again my name is Greg Luce. I'm a lawyer from Washington D. C. on behalf of Triad and Quorum. We have received, the end of last week, an amendment to the Relator's complaint. We have indicated we don't have an opposition to the act of seeking leave to amend that complaint. We, obviously, continue to oppose the complaint.

But I thought it might be, in the interest of expediency, appropriate that I would, from time to time refer both to the original complaint, against which we filed our motion, as well as to those elements of the amended complaint which seem to be pertinent to this morning's discussion.

But to be clear, if we still have to amend our motion, I will do that now orally, and we will file our papers.

THE COURT: Fine.

MR. LUCE: Thank you, your Honor.
Page 2

~0542013.txt

Your Honor, at the outset, there are a couple of points I'd like to make simply to frame what I think will be the key part of our arguments. And I will certainly not be repeating or reading from our briefs.

But this is a relatively complicated fact set presented by the Plaintiff here. I thought it might be helpful to first talk about the parties.

In our initial papers, we have moved to dismiss, in part, because they simply have not named the right parties for the right acts that are alleged here. The Defendant, Triad, originally named, is a hospital ownership and management company.

In 2001, Triad acquired and merged into its operations Quorum Health Group. Quorum Health Group had a separate unrelated corporation. Quorum Health Group had a separate corporate entity called Quorum Health Resources, QHR, it's sometimes referred to.

Quorum Health Resources, or QHR, served as a management company. They contract to provide executives to hospitals, as the hospitals mentioned in this case, for a fee. And typically, they provide, as they did, as alleged here and as was, in fact, the case, a CEO, chief executive officer and, typically, a finance officer, usually serving as the chief financial officer for the hospital.

The importance of this, I think, is that, first, Triad, during the period, which most of what we can glean from the complaint, are the allegations made by the Plaintiff, had no relationship to Quorum at all. And there are no facts asserted against Triad.

The only thing that's asserted against Triad as a defendant is the fairly bold legal conclusion that they are responsible and liable for any acts of both Quorum Health Group as well as Quorum Health Group's separate corporate subsidiary, Quorum Health Care Resources.

But what is undisputable and is, in fact, plainly incorporated in the pleadings by the Plaintiff, which we are, of course, limited to, is that Quorum Health Resources is the party with whom these two hospitals here in this part of the state had a contract. And these two hospitals are the Southeast Georgia Regional Medical Center and Camden -- are both the hospitals for which Quorum, through Quorum Health Resources, provided management services.

So one of the first points that we make is, simply, Triad has nothing to do with this case, and it does not have successor liability on any more than was charged here. And there's no allegation that it's a sham or it doesn't observe the corporate formalities. There are no facts alleged against Triad.

With respect to the nature of this case as a False Claims Act case -- that's most of what I do, Your Honor, is False Claims Act defense work. I don't think I've ever seen a case -- and I haven't seen a reported case -- in which the Relator, here the whistleblower or the would be whistleblower, Mr. Whitten, sues the agent but not the principal.

Even the Plaintiff alleges that Quorum was the agent of the hospital. And that's true. It's true as a fact; it's true as a matter of law. The scope and sweep of that agency is not quite clearly parsed. But what is clear is that they were the agent.

But important to the Court's consideration, I
Page 3

believe, Your Honor, is that Quorum Health Resources, the management company that provided the two hospital executives, is not a Medicare provider, does not submit bills to the Medicare program or any other governmental program. And they don't bill and act on behalf of the hospital as a billing agent. They are a management agent.

And there's nothing in the Plaintiff's fairly voluminous exhibits that suggest otherwise; in fact, to the contrary. Many of the documents that the Plaintiff relies on most make clear that the people in charge of billing and operations and ultimate accountability for setting charges by the hospital or creating something called the Charge Description Master or Charge Master. All of that lies at the foot of the Hospital Authority.

Most of the Plaintiff's complaint is largely gleaned from what is sometimes called in the business, a compliance review or compliance report. And in this instance, they later attached one as Exhibit 4.

And I would, to illustrate the point, identify for the Court that this document, which was identified as an Assessment of the Corporate Compliance Program -- that is, a review of the corporate compliance officers' operations and the hospitals' adherence to the rules of the road. If you will -- is prepared not for Quorum, not for Triad, not for Quorum Health Resources.

It's prepared for Southeast Georgia Health System, the entity for which Quorum provided two executives under its management contract. And that is a report to their board who is in charge of setting policies and procedures.

So once again, I would point out that what we have here is a suit against the agent. The principal is not named. The principal, if false bills were submitted -- which we, of course, say were not -- is the one that received the money from the Medicare program wrongly. So a recovery here, even as asserted by this Plaintiff, would be a test in damages in part as to whether or not Quorum Health Resources ever received Medicare funds for which it should now pay back according to a fine and penalty. It received none.

So it is not the party responsible, even if the Plaintiff were correct in terms of there having been a false claim submitted. So the identity of the parties is more than a technicality here. Triad, Quorum, and Quorum Health Resources do not seek dismissal simply because of nomenclature but because they are not the responsible party, if any party is responsible under these allegations.

They are not only not the Medicaid provider, but the Plaintiff has made clear that he has no claims -- that is, no bills submitted to Medicare or any other government program -- that he can identify were false.

This circuit's law is very clear. The Clausen decision from the Eleventh Circuit has been followed in three other circuits. Even though it's a fairly recent decision, it seems to be the law of the land. Most recently, in the First Circuit, the Karvelas court followed it. These are all in our brief.

It is not a wayward case. It is a well-reasoned ruling, and it is very clear that the standard here is not met. I will speak a little bit more about that in a moment before I answer any questions the Court may have.
Page 4

-0542013.txt

But a couple of points about the Rule 9(b) and 12(b)(6). First, all the authority makes clear is that there must be established a claim that is false in a material respect that seeks payment from the federal fisc. And "false" has to be more than just a billing error. It has to be something that is known to be or reasonably should be; that is, one submits a claim with reckless disregard for its truth or falsity. A mere billing error will not suffice.

Another element of a False Claims Act case that I would ask the Court to carefully consider is the fact that while the Plaintiff brings this case in his name, he does so on behalf of the government. In order to do that, Mr. Whitten had to submit a statement of his case to the United States Attorney's Office, technically to the Attorney General. And they have had an opportunity to evaluate that claim.

Now their decision in this case was that this was not a claim worth their effort to pursue. Now while I am sure that counsel for the Plaintiff would point out that that doesn't mean that they don't get to proceed. Of course, they do. That's the nature of the law.

The Karvelas court, at least in the First Circuit, said that that's something of which the Court should take note; that at least one might conclude that the government has found that this is not a case that merits the expenditure of resources by the government.

Another element of that is that, in fact, the government is aware of a number of the claims that are being asserted here by Mr. Whitten and chose either not to act on them or felt that they were resolved. Those are spelled out, again, in the exhibits that were attached by Mr. Whitten.

In fact, he refers to the fact that there was a government investigation of one of the claims that he's pursuing that apparently resulted in no action being taken. So these are not new or novel issues that Mr. Whitten is raising here, and the government was apparently aware of it.

The Relator has suggested there are six broad schemes that resulted in false claims being submitted by Quorum to the federal government for payment under the Medicare program. I'll look at those in some detail in a moment, if that's -- and it's a little laborious, and I apologize for that, Your Honor. But that's the nature, because really, the details here are very important.

And what is most important and most clear from the original complaint and its exhibits and the amended complaint and its efforts to restate and cure the concerns that we raised in our initial motion is that this Plaintiff has no details about these claims.

No claim is shown to have been submitted to the government by anyone, including the hospital. No claim is shown to have been submitted to the government that was false and was paid by the government based on that falsity.

What we have is simply an allegation from Mr. Whitten largely gleaned from his role as a compliance officer during some part of this period for these hospitals, that there were billing issues and regulatory issues that were under consideration. Of course, they were. That's how hospitals operate. That's what they should do.

But the terminology in the case does become

Page 5

-0542013.txt

important. I think it might be better, Your Honor, to look at that terminology in the context of the schemes that are alleged, if I may.

Your Honor, in the first scheme that has been raised by the Relator -- and I'm quoting now from the original complaint. The Relator alleges that, quote, Quorum knowingly submitted false claims and routine services through the charges made on the hospital's Charge Master.

Your Honor, the first statement is obviously wrong because Quorum doesn't submit bills. The hospital submits bills. Quorum didn't submit a bill. They didn't operate the billing company for the hospital. They didn't operate -- other than as their executive position, of course --

THE COURT: Tell me what they were doing.
MR. LUCE: The Quorum --
THE COURT: What was their function?
MR. LUCE: Their function was to provide, under the management agreement, a CEO and financial officer.
THE COURT: To do what?
MR. LUCE: To operate the day-to-day business affairs of the hospital.
THE COURT: All right.
MR. LUCE: So they were clearly there. And again, Your Honor, I'm not trying to be overly technical. I'm simply saying that the bill to the Medicare program doesn't come from Quorum. It comes from the hospital.

Now the CEO is ultimately responsible under the contract for administering the policies and charge practices of the hospital as established by its board. It says so in the contract. It makes sense as a matter of management, of course. And that is, in fact, what was done.

But these are matters in which there are only two Quorum employees at the hospital who are, essentially, loan servants. So they administer. But Quorum, as an entity, doesn't submit a bill.

So again, I note, sort of, the empty chair. Where is the hospital who actually submits the bill? The administrator, Quorum, don't actually do that, of course. They are employees who are not Quorum employees.

The importance here though, Your Honor, is not -- just that Quorum didn't submit the bill, but that a submission of a bill is not the same thing as the Charge Master or Charge Description Master, as it is sometimes called.

That is a list -- and we refer to it in our brief from other courts' descriptions as sort of the master price list. It is a list of five to seven thousand, perhaps, items and services and pieces of equipment that a hospital would have to account for in the course of providing care to a patient.

And in this instance, all that's alleged is that there should have been changes made in this Charge Description Master to comport with what the Plaintiff alleges were requirements of the Medicare program.

Now the Clausen case teaches that there has to be more than simply a description of a scheme. There has to be a way of showing the who, what, when, where, and how the

Page 6

-0542013.txt

fraud occurred to meet a 9(b) standard or to meet a 12(b)(6) standard for a claim.

The fact that a Charge Description Master, even excepting the allegations that there were not changes made and they were not made timely enough, does not equate to a bill because the Medicare program doesn't pay off a price list. It's not like a menu that they get a bill at the end of the patient's receipt for all these items based on this price list. That's not how Medicare pays.

So whether or not a change was or wasn't made on a Charge Description Master and whether or not that was a false claim requires consideration of at least the following: Was it a Medicare patient? Were they charged? That is, did Medicare get a bill from the hospital for their care? And did that bill contain any elements of a statement of services that should not have been billed because of a Charge Master change that didn't occur?

The Plaintiff has shown no case in which a claim was submitted to Medicare that involved or had any of the items on the Charge Master that he says should have been included. So we lack specificity in the entirety.

Second, not all hospital bills to Medicare involve all items on the Charge Master, of course. The patient that comes in for an appendectomy will have a different set of charges and services than a patient that comes in for a coronary bypass.

So to simply say that there were not changes made timely enough, which is the allegation, does not suggest that there were any bills sent that were false. We have no way of responding to this.

And what the Plaintiffs clearly seek is simply, "Well, we've said enough. There was a scheme, and we want to get discovery." That's not the law in the fraud and abuse allegation that gets them to discovery, Your Honor.

And in the case that we've cited out of the Fifth Circuit in the Epic Healthcare case, the Fifth Circuit panel observed that the lack of specificity in a broad sweeping allegations would simply be a ticket to discovery for every plaintiff. They have to produce an actual claim before they get to the point where they can say, "That claim was false."

And it is important, Your Honor, to note that this Charge Description Master -- which is sort of their centerpiece because it arises in at least scheme one and scheme three, as best I can tell -- is not something in which they have identified any claim that contained an item from that Charge Description Master that was paid by Medicare and was known to be false.

Not only have they not produced that claim in any respect, the claim being the sine qua non, according to Clausen in this circuit, of a False Claim Act allegation.

But it wouldn't be true anyway because Medicare doesn't pay according to this price list, as I said earlier.

They pay according to something called Diagnosis Related Groups. And there's a series of costs and charges that are associated with any Medicare inpatient stay. When we cited the cases, that summarizes this fairly complex matter.

But in the end, it's not really that complicated. Medicare says, "For certain kinds of conditions and procedures, we're only going to pay 'X'. If you can get that patient out and take less resources to provide that

Page 7

-0542013.txt

care and save some money, you get to keep it. But if it costs more, we're not going to pay you for it." And in very basic fundamentals, that's how it works.

So the Charge Description Master, while it might have some impact in terms of how the total charges are aggregated, Medicare doesn't pay charges. They pay according to a predetermined formula called the Prospective Payment System under whatever is the Diagnosis Related Group.

So errors in a Charge Description Master do not automatically result in a Medicare bill being overstated or overpaid. It's just one of the many tools in the accounting and the cost accounting of the hospital.

That's why, Your Honor, I think the terminology is so important. Charges are not the same as reimbursement under Medicare.

The second scheme that has been related, Your Honor, has to do with the notion that, once again, Quorum Health Group -- is the allegation -- charged for diagnostic tests and treatments in the observation area. That is the area before a patient is admitted. Perhaps they have come through the emergency department and they need some further evaluation before a determination is made as to what kind of care they might need, if any.

They say it didn't need the medical necessity criteria set out in Medicare requirements. Two points on this scheme that we've made in the brief, but I would like to emphasize here, Your Honor.

First, the allegation in the original complaint was that what apparently was happening -- that's the complaint at Exhibit A, page 16. It's not an allegation that it did happen. What apparently was happening.

There is, again, no claim identified. There is simply a set of Medicare informal rules that are usually found in a set of manuals and provisions. They're not sort of the substantive legal rules that apply, but they are still the guidelines for billing. And they're saying that wasn't followed.

The documents that the Plaintiff has produced --

his own exhibits, 29, for instance -- shows that the hospital, because they're the ones doing the billing, held the bills until they could determine this. They had a significant accumulation of these bills, which they held until they could get better guidance from others, outside resources and outside legal counsel, and their own what they call Health Information Management System.

His document, "Observation Hours," I believe still referring to the same issue, continues to be verified with HIM prior to billing -- hospital -- they call it either health or Hospital Information Management, HIM.

So they are looking to do this. It says, "Change in observation discharge sign-out procedure should eliminate manual verification." What does that mean? That means before they even sent a bill for observation charges, somebody was checking it to make sure that all of the requirements were met before it went.

That's the allegation. That's this Plaintiff's document. It says, "We held the bill." If we billed it after holding and we billed it wrong after checking the requirements, it still might have been wrong or Medicare might have denied it. There are a lot of people that make

Page 8

-0542013.txt

their living pursuing denials of Medicare claims. But it sure doesn't make it false. And it certainly doesn't suggest any reckless disregard for the rules of the road.

The Plaintiff's own allegations and documents that he's provided here show that the hospital was following a prudent course in submitting its claims. And by the way, there's no showing that either of the Quorum employees were involved in it or obstructed any efforts to make a proper bill accounting or otherwise were involved.

The third scheme is, again, related to the Charge Master, Your Honor. Once again, it says that Medicare and then Tri-Care and CHAMPUS, which is the -- CHAMPUS was the former provision for Tri-Care for military support -- military health care support for their extended families.

It says, "... falsely billed for procedures because physician orders were not obtained prior to the procedure." Now there is to be a physician order. It is to be documented in the record, and patients are not admitted to hospitals, and Medicare won't pay for patient's services in hospitals if there isn't a physician order.

The timing on this is very much an open issue. Hospitals, all the time, take patients in -- not just these hospitals -- on the admission from the doctor that says, 'Go to the hospital and admit to my service." And the doctor's nurse calls over and says, "Hey, Mr. Jones is coming over. He's going to need a gall bladder operation. I'm going to admit him, and I'll be over later with all the rest of my work."

There has to be a history and physical. There's all kinds of things that go on here. That's what the allegation here is, that none of that happened. But there are no facts shown here.

Instead, Mr. Whitten, in his role of compliance o...cer, was observing. And he saved, apparently, all of his e-mails and, I guess, did a computer dump when he left to show that these matters weren't always assiduously followed in their timing.

Your Honor, that doesn't mean that these were fraudulent claims. It means that the hospital is looking at how it admitted the patients and whether it submitted claims for that, but we don't have a claim -- we don't have a claim showing that Mr. Jones, going over for a gall bladder, didn't have a proper physician order. And Medicare, as the Plaintiff's exhibit show, was looking at this and at that other observation issue before.

They talk about Focus Medical reviews where the Medicare program is looking at these bills. That may have influenced the U. S. Attorney's Office in deciding not to take this case.

In any event, how the Charge Master relates to this and how the physician's orders were or were not met, all, according to the Plaintiff, turn on Medicare Bulletin 1836. But how that resulted in a false claim -- the government would not have paid but for some falsity of a material medical matter -- is unexplained.

So when we talk about 9(b) and we talk about (b)(6) and we pound on the need for specificity, it isn't just an exercise that defendants' lawyers go through. We can't defend against a claim that we don't understand. And

Page 9

that's part of the purpose of 9(b). It has to be clarified so the defendant can marshal a defense.

Scheme four involves cardiac rehab services performed without the presence of a supervising physician. This is an area that, frankly, we have some familiarity with. In our practice, it is an area where Medicare sort of changed the rules as to who had to be present and whether or not it had to be a physician who dealt with cardiac care or whether or not another physician could be there, whether they could be in the same hall or had to be in the same room.

The bottom line is, again, the exhibits that are provided by the -- Exhibits 38, 39, and 41 -- by the Plaintiff show that this was a matter that was under consideration; that how cardiac rehab was going to be treated was not within the Medicare regulations identified in the Coverage Issues Manual; and that the hospital physician was not going to be deemed sufficient to meet the regulation.

So the correspondence between Mr. Whitten and Ms. Norris at the hospital -- there's no showing, again, that Q&A is involved in this.

Mr. Whitten, as the compliance officer, had reporting obligations to the CEO, but also to the board. The board received, as we saw in his Exhibit 4, reports on compliance. And ultimately, it was the board's hospital that submitted the bill.

How this relates, in any precision, to some falsity, false claims, some fraud by my client is, again, unarticulated.

Scheme five involves outpatient hemodialysis services. This one is truly, I think, the most baffling for us, at least for me, of all. This is the only case in which the Relator could identify a claim actually submitted to Medicare.

To his credit -- at least to his counsel's credit -- they also show that that was a bill that was re-billed, was corrected, was withdrawn because it didn't meet the criteria. So the one claim form submitted to Medicare that the Plaintiff could produced showed that it was billed, recognized it had a billing error by the hospital, and withdrawn.

This happens on a routine basis. That's what's supposed to happen. If you make a mistake, you correct it. It sure doesn't amount to fraud. In fact, to the opposite. It shows that the hospital had a program to evaluate the quality of its claims and their accuracy.

So again, we don't understand this one. It shows -- the one example he gave for allegedly billing wrong, in fact, shows we billed appropriately and found an error -- when I say "appropriately," I mean billed in the ordinary course -- found an error, and retracted the claim.

The last scheme is scheme six, Your Honor. And here they say that mental health services were billed when -- they initially allege that they were billed when, quote, there may have been no qualified medical director, close quote, to supervise the service, or there may not have been staffing by a masters in social work.

They have now, as best I can tell, attempted to correct that by asserting it as an absolute fact. I don't know what additional information has come to Mr. Whitten's

Page 10

attention on that. But in any event, as we pointed out, whether or not there were or there were not sufficient supervisory personnel to meet what are called conditions of participation is not necessarily material to whether or not Medicare would have paid the bill.

There are a number of cases -- and we cited to them -- going back to Anton v. Hopper and to Clausen itself here in this circuit to say a mere regulatory violation, without more, is insufficient to support a false claim -- and a mere regulatory matter that may not even relate to condition of payment. This is a condition of how the program is supposed to operate, not whether or not Medicare will or will not pay for it.

That kind of allegation fails to meet the test for alleging fraud.

Your Honor, I think that, in sum, we think that the failure to produce any claims, with the one exception of the one that they did identify and we found we had billed incorrectly and withdrew -- by the way, I should add, we withdrew it before this suit. It's wasn't a matter of in response to any litigation.

The failure to produce that, the fact that the government found it a case not to merit its own individual pursuit in it, and the fact that they followed did look at a number of these things, according to their Exhibit 4 -- and they recite that on page 2 of that report that was made to the hospital's board.

Medicare performed an on-site audit in August of '95. They provided a Focused Medical Review in '95 and again in '97, another one on the observation room services in '96. These are not matters that were in secrecy. These are not matters that were ignored by the hospital. The board commissioned the compliance report and was trying to make sure they were operating in accordance with that.

Most of the language -- most of the accusatory tone found in the complaint and incorporated into the brief is drawn from compliance documents solicited by the hospital -- not by Quorum -- but by the hospital to make sure it was meeting its obligations. This is not a dismissal of those, disregard for matters. It isn't a dismissal of those.

What we don't have is a sense of fraud. We don't have the who, or the how, or the when. And we certainly don't have any clear claim actually submitted that was false.

Mr. Whitten pleads that he be given the opportunity to show this through discovery, that there should be a relaxed standard, although they say they meet the strictest standards of the eleventh circuit, because the information is not in his possession. It's in ours.

Not true. We don't have this information. This information belongs to the hospital, and we are no longer their managing agent. The hospital has the information. They submitted the bills.

But even more importantly and cogently for your consideration I think, Your Honor, for our motion is the fact that all of the information about these claims is in the possession of the federal government. And every claim for every Medicare patient is found at what is now CMS, Centers for Medicare and Medicaid Services.

In the Fifth Circuit, in the Epic case, the Fifth

Page 11

circuit panel said that where a plaintiff pleads on information and belief that there is fraud and says that they should be permitted to do so under 9(b) because they lack the information, all of it being in the possession of the defendant, that is not true where the same information is in the possession of the government.

And that is true here. It is not true that Triad or are Quorum or Quorum Health Resources has this information. Mr. Whitten was at the hospital, but he was not in a position -- like the Moorehouse case they cited, an unpublished pro curium decision that followed Clausen -- to know, "Oh, yeah, I saw Joe falsify this bill, put a wrong code on it, ignore the requirements for accuracy."

None of that is found here. Mr. Whitten wasn't in that position, according to the job description he has provided.

There is no reason to relax the standard here. They haven't proven -- I'm sorry -- they haven't alleged facts which, if true, would prove fraud. They certainly haven't made out a False Claims Act case under 12(b)(6).

We would ask that it be dismissed both as originally filed and as amended, Your Honor. Thank you.

THE COURT: All right.

MR. GARRARD: Thank you, Your Honor.

Your Honor this is a, as the Court knows, 12(b)(6) motion, not a motion for summary judgment. And as such, the burden is on the movant to show that there is no conceivable set of facts under which we can recover.

As we have alleged issues in this case, in both the original complaint and in the motion to amend and the amended complaint we filed with that which, as I understand it, Mr. Luce has no objection to the amended complaint.

MR. LUCE: I have no objection to the filing of it.

MR. GARRARD: The filing of the amended complaint.

MR. LUCE: I have no problem with that.

MR. GARRARD: We may object to the issues in there but not to the filing of it.

We have set forth with specificity the schemes and the facts. Within our complaint, we set forth a detailed factual summary and with that voluminous exhibits.

What's important to focus on here is Quorum. And in our amended complaint, Your Honor, in deference to their issues they raised, we have alleged that Quorum Health Group has, as a solely owned subsidiary, Quorum Health Resources. Triad merged with Quorum Health Group and took within itself Quorum Health Group and Quorum Health Resources. They did that, I believe, in 2001.

In the motion that we filed, interestingly enough, we attached to the motion to amend certain things we simply pulled off the internet as they relate to Triad. And I won't try to quote those except to try to tell the Court generally.

Triad in those internet blurbs calls itself "the company." And within things that are put on the Internet by Triad, it says, "The company provides consulting and management services through its Quorum Health Resource Unit." Not only that, Triad shows that it has taken officers from Quorum and Quorum Health Resources, made them also officers of Triad, and commingled their people.

Those are evidentiary matters, Your Honor, and I

Page 12

--0542013.txt

don't think this Court, in a 12(b)(6) motion, can make determinations as to the exact relationships, can make made the allegations that they have comingled. They are the alter ego, and they are those things that would allow a court to consider what the relationships are.

I might also add that Triad is a Delaware corporation, as are Quorum Health Group. And under Delaware corporate law, when they merge, Triad becomes responsible for the liabilities of the underlying corporations with which they merge.

Georgia has considered, as Your Honor knows, in

#0029

the Kissim, K-I-S-S-U-M, versus Humana case, issues about corporate liability. Our Supreme Court, in 1997, held that even if evidence is insufficient to pierce the corporate veil, the parent corporation may still be liable for acts or omissions of wholly-owned subsidiary corporations on the theories of apparent or ostensible agency or joint venture.

In our allegations, we have set that up. That case is reported at 267 Ga. 419.

In looking at the legal issues, and then I want to get to the factual issues, Your Honor, in Clausen, which Mr. Luce relies upon coming out of the Eleventh Circuit. Clausen stands for this proposition. And it is that in order for a relator, such as Mr. Whitten, to get past a 12(b) motion coupled with the Rule 9 requirements, what Mr. Whitten must do is to show an indicia of reliability to support the allegations of an actual false claim.

I would submit to the Court that neither Clausen or Hill, which we cite in our briefs, or the other cases stand for the proposition that the only way a relator can proceed is to show the actual bill. This Court in the Darien case faced a similar issue dealing with -- I think it was mail fraud. But then the need to look at Rule 9 in conjunction with Rule 8, which is our notice pleading rule, you've got to put the two together.

I think this Court recognized there that is a

#0030

complex set of facts that you've got to put them both together and that it's not necessary -- and I think the cases support this -- that Mr. Whitten produce the actual bills.

It is necessary that Mr. Whitten show enough indicia of reliability of the allegations of false claims to survive the motion. We think we have done that in terms of the who, the what, the when, and the where.

We know that Mr. Whitaker was the CEO provided by Quorum to this hospital. We know that Mr. Owings was the CFO, chief financial officer, provided by Quorum to the hospital.

We know from the contract, as we have alleged in the amended complaint and alleged in part in the original complaint, that when Quorum signed on, they signed on with the responsibilities to do the billing for the hospital.

They signed on to produce the cost reports which are done at the end of the year for the hospital. Sure, they submit them to the board. But common sense tells anybody that when you have hired a CEO and a chief financial officer from a company such as Quorum, they are running the hospital. The members of the board are not sitting out there doing the billing. They're not sitting out there running the hospital.

And throughout the documents we have produced in

Page 13

#0031

our factual statement that we have made a part of our complaint, we've set out how Mr. Owings and Mr. Whitaker have been involved in this case. When the Court reviews this case for motion purposes, we think that we stand without the relaxed standard, having produced the indicia of reliability necessary.

We also think that if one looks at the facts of this case with terms of the knowledge, where is the knowledge? Perhaps the facts are with the hospital. The hospital is not a party in this case. We don't think the hospital has liability in this case.

We think that this was a scheme put forward by the Quorum representatives, the CEO and the CFO. And I'll show facts to the Court in a moment about that.

But they put this forward. As they, as Mr. Owings and Mr. Whitaker, as their employees and their agents that they produced to the hospital to become agents of the hospital, they have the knowledge. Not only do they have the knowledge, they were intricately involved, as the evidence shows.

But additionally, in terms of the relaxed standard, if it is a scheme that occurs over time, if there are acts that are occurring over time, that also justifies the Court in allowing us to have a relaxed standard in terms of an evaluation of what we must plead.

#0032

Irrespective of that, we have pled, with particularity, the acts that they had engaged in. And I would like to go through that just a little bit with the Court. And as Mr. Luce says, this is a little bit laborious, but I feel the need to do that.

I want to start, Your Honor, with the audit, a portion of the audit, which is our Exhibit 4 to our statement of facts. In the audit, it is important to note that on page 2 of the audit, they state the Tri-Care/CHAMPUS issues which began in 1997. Southeast Georgia Regional Medical Center submitted claims for durable medical equipment that should have been included in the room rate.

Why do I bring that to the Court's attention? Because one of the fundamental aspects of our claim is that the Quorum representatives, as the CEO and the CFO, continued to submit bills that included charges for things they were not allowed to charge for, which is the key on False Claims Act charges.

Now what the government paid on the submissions of the false claims is what they acknowledge when the Quorum people are there. They have already had their hand slapped for doing what we allege they continued to do after Bulletin 1836 came in.

In the footnotes of Mr. Luce's original brief, they acknowledge that they operate under -- that the CHAMPUS

#0033

and medicare programs function essentially the same.

The next exhibit which is for your consideration is Exhibit 48. It is Bulletin 1836. It was produced and sent to the hospital and to its executives as of March 15, 1999, and it reminds the hospital that it can't bill for these durable goods, reusable equipment and services that they are billing for.

So what happens after that? This is not new information. It's not a new rule. But without a doubt, they've got this in 1999. The hospital has it. The

Page 14

executives have it. Mr. Owings has it. And Mr. Whitaker has it.

There is a time that comes about when they want to say, "This is the hospital's fault. The hospital did it." But we don't think it is. We think it is the Quorum people that were doing this.

One of the members of the board is Tim Chandler. Mr. Chandler was on the compliance committee and worked with Mr. Whitaker. One of the exhibits is a letter from Mr. Chandler written to Mr. Whitten.

Interestingly, Mr. Chandler says -- and it's dated August 31, 1999. And remember, that Bulletin 1836 came out to them on March 15, 1999.

It was recently brought to my attention in a meeting with you, Bert Whitaker, Wallace

#0034

Harrell and Ray Owings, that the Southeast Georgia Regional Medical Center may have inadvertently over-billed Medicare. In an effort to insure that our hospital is in compliance with all governmental rules and regulations, I request a report from you outlining the following:

One of the things is: Provide an estimated amount of the over-billing, if any.

Then it goes on to say this to the hospital executives:

I have attached a section of OIG Compliance Program Guidance for Hospitals relating to reporting. It states, "To qualify for the 'not less than double damages' provision of the False Claims Act, the report must be provided to the Government within thirty days after the date when the hospital first obtained the information." I feel that it is important to make a determination within the required thirty days. I am not suggesting that this hospital has engaged in fraudulent activities but if over-billing occurred and if restitution is due, we should act immediately.

#0035

Well, what happens? The next thing that happens -- and we refer to this, Your Honor, in our statement of facts at page 10. There is a letter from a lady named Stephanie Sinopoli who was an assistant comptroller at the hospital. She submitted to BlueCross BlueShield, the fiscal intermediary for the hospital, the cost report for fiscal year ending 9/30/99.

I inadvertently did not attach that to the exhibits. And if I may mark a copy and if I may submit that to the Court?

What is interesting here, Your Honor, is the last full paragraph where Ms. Sinopoli says:

There may possibly be some non-billable supply charges included in our revenues that were for items we deactivated a few months after a medicare notice was received --

What's she's referring to is Bulletin 1836 that was sent -- to deactivate these charges. The charges have now been eliminated from our Charge Master.

As we will show to the Court and our exhibits

Page 15

show, that's not correct. If you look at the first page of that document, Your Honor, Ms. Sinopoli sent this letter to Ray Owings, the chief financial officer, saying:

Attached is the letter I plan to send

#0036

with the cost report. Let me know if you think any changes need to be made.

Here is the letter going to the CFO of the hospital. There is their involvement.

But then what happens? If you look at Exhibit 13 written 12/9/99. What has now happened is an audit by a company called QuadraMed who was brought into the picture in July of 1999.

MR. LUCE: Pardon me. That's not the same document I have. I beg your pardon for the interruption.

MR. GARRARD: What?

MR. LUCE: Exhibit 13?

MR. GARRARD: I haven't --

MR. LUCE: I was trying to follow you.

MR. GARRARD: This is Exhibit 13. Is that what you have?

(Discussion between counsel).

MR. GARRARD: I have it marked as Exhibit 13. It was attached to our factual statement as -- it is mis-identified as Exhibit 13. I will find where it is.

It's an e-mail from Michelle Morris to Dan Cohen and copied to Ray Owings, the chief financial officer. It is addressing the fact that QuadraMed has done an audit of the Charge Master. In that, she says:

All accounts must be corrected

#0037

regardless of the change in reimbursement. We are required to submit billing which has been coded completely and accurately. Please make the appropriate corrections and notify Jim Anderson. His staff will submit corrected claims.

I have attached a myriad of e-mails that were sent back and forth in regards to NDDC abstract problem. I continue to be VERY concerned about this matter. It is apparent that we have a system problem and despite the education that has been provided, we continue to submit billing that contains incorrect/incomplete M/M coding.

Given the QuadraMed report and the potential magnitude of this problem, we must request immediate corrective action from NDDC.

I may have it as Exhibit 16.

MR. LUCE: I found it.

MR. GARRARD: So this is December of '99. Now we've got an audit saying, "This thing is wrong, and you're doing it wrong." And Ms. Morris is begging them do it correctly and referring to incorrect billing.

#0038

In Exhibit Number 9, Your Honor, I refer to a response, not necessarily to that precise e-mail, but from Mr. Owings as CFO, dated January 24, 2000, to Ted Whitten and Bert Whitaker is copied.

The first sentence:

The QuadraMed audit has recommended that

Page 16

~0542013.txt

numerous supply items be deleted from our Charge Master. About midway down, this comment, in January of 2002: To accomplish this, we will perform an analysis of revenue that is currently generated, then make a recommendation as to how to capture this in other departments, which is consistent with the method used in the past, indicating it's not correct and saying, "Let's correct this thing, but let's figure out how to keep money flowing some other way before we make the corrections and before we stop doing what we shouldn't be doing," billing for these durable goods, et cetera.

They were told in 1997 that they can't do that, and again by Bulletin 1836 that they can't do that. This is not merely a billing error situation.

Then I refer the Court to Exhibit 6. And this is an e-mail of 2/1/2000 to Ted Whitten from Michelle Morris.

I am very concerned about the lack of communication regarding the implementation plan for the QuadraMed Charge Master recommendations. On average, I received four calls every week from department directors seeking information about the project status. Because I coordinated the data accumulation and dissemination, directors believe that I am also responsible for the implementation or the lack thereof.

Many of the changes recommended should be addressed immediately. Erroneous CPT codes and item descriptions have not been corrected and can lead to allegations of false claims and abusive billing. This, I believe, is also in Exhibit 13.

Then we have Exhibit 19, another interesting e-mail. And this e-mail is dated 2/3/2000. It's from Ray Owings, CFO and to certain people, including Bert Whitaker. I spoke to Tom Walden today -- I believe him to be an outside accountant. -- regarding a time frame to complete the recommendations from QuadraMed. It was his opinion that our main -- it was his opinion that our main goal is to show an effort to correct the items --

not to get it done, not to have already taken care of things that they knew about since at least March of '99. It's now, "we want to look like we're doing something."

Then in Exhibit 14, your Honor, it's a series of e-mails. And the first one is from Michelle Morris to Ted Whitten and it copies Mr. Whitaker, the CEO, and is dated 2/16/2000.

Two of the memos created by Alan Younger and attached to his correspondence dated 2/15/2000 indicate that nursing staff knowingly misapplied charges to a patient record. He states the accounts used did not belong to the patients who received the services. If his research and statements are correct, we have a false Claim issue. How

Page 17

---

will this be addressed?

Then there is a response that says, in sending this on to Mr. Whitaker: This example, along with the Focused Medical Review issue in Rehab, points out the need not only for a change in the system compliance culture but also for the necessity of coupling education with accountability and an enforced disciplinary policy. Until employees and department directors understand that they are directly accountable for their actions, we will continue to be reactionary in responding to issues of FMR and false claims --

which is Focus Medical Review.

Exhibit Number 18 is another in the chain of evidence that we have submitted. And this is a letter from Michelle Morris to Ray Owings, and it's an interesting letter. It says:

[Dear] Ray,

Per your request, I am forwarding to you Medicare Bulletin No. 1836 dated March 15, 1999 and Donna Davis' letter dated December 15, 1999. I have also enclosed a copy of Sue Keller's memorandum dated February 8, 2000. You have, of course, seen these items before and we have discussed this issue on other occasions.

I believe that it is clear with respect to non-billable supplies and equipment, the only thing that can be re-allocated to billable services is the costs associated with those non-billable items (i.e., not the charges or revenues associated with those non-billable items).

She goes on to talk, again, about what Bulletin 1836 requires.

.... A word of caution here, do not simply take the gross charges for all items and make the total new patient price. To be compliant, non-chargeable items must be eliminated from the itemization (and the Charge Master). The total procedure is often much higher than reasonably based on individual charges and their cumulative markups.

She's saying you can't just say, "we've lost this," or "we're going to lose this, so know we have to up the charges."

I will refer the Court to Exhibit 28. And this is a series of e-mails instructive of the culture that has been created at Southeast Georgia Regional Medical Center by Mr. Owings and Mr. Whitaker.

And going in reverse order of the e-mails, one to Michelle, which is Michelle Morris, from Deborah Warden, dated 3/10/2000. The subject is QuadraMed deletions, talking about the Charge Master.

who is responsible for ensuring that the items recommended for deletion from the Charge Master gets done? I was reviewing my

Page 18

---

Charge Master this A.M. for something else and all that stuff is still there. Am I supposed to put in a CDM request? Who does Michelle Morris send this to? Ray Owings.

Ray, The attached mail came to me today. I am fielding inquiries daily. Can you provide the System Management staff with a project update? I will be happy to assist if you can provide me with the information you would like to disseminate.

What does Ray Owings say? Come by when you can and I will update you. Thanks.

And then Michelle Morris: I'm going over to see him. I will let you know.

That's just an example of the culture that has been created by the executives that have been hired to manage this hospital.

Then the next e-mail -- this is an e-mail, your Honor, that came from Mr. Owings, and he is sending this to Sue Keller, a QuadraMed auditor:

THE COURT: What number is that?

MR. GARRARD: I'm sorry. Exhibit Number 10.

What is interesting is that Mr. Owings says, "we are here. This is what we owe. Now this is what we're going to do."

The following represents the method we intend to use to resolve the deletion of the supplies identified in your Charge Master audit:

Remember the Sinopoli letter I gave to the Court a moment ago? It said, "we have already deleted all of this stuff." The gross charges annually for the items to be deleted is 18 million.

The net revenue (cash) generated by this is seven million, five hundred. It is our intent to increase our charges in room rates, O.R. time charges and E.R. room charges by an amount that will result in net revenue (cash) of an amount equal to the seven-five. We will delete all of the supply charge items from Charge Master at the same time.

They haven't deleted them yet. An analysis has been done to determine the gross revenue in each of these areas (rooms,

O.R. and E.R.) to equate the net amount and how much of the supply revenue is the result of each of these three areas. Please review this and give me your agreement to the method. Please call me with any questions or concerns.

What Mr. Owings has done is said, "Okay, we're going to counter these things. We should have deleted to the tune of seven five, and by upping this other thing" -- and this is even after receiving e-mails that say you can't just take the gross charges and flop them back somewhere else.

The letter that we referred to earlier from Donna

Page 19

---

Davis is Exhibit Number 8. And remember, Michelle Morris has said to Mr. Owings, "You had all this stuff before." What is interesting about that letter is it is dated, your Honor, December 15, 1999.

And what is interesting about that letter is really in the preceding letter from Mr. Jim Anderson where he says, "This confirms our conversation about this issue." And what he's essentially saying in his confirmation of the conversation is, "You have said the intermediary would have nothing to do with this. Ms. Davis, do not get angry."

In Exhibit 8, she says: The comments in your letter do not accurately reflect our position as stated to you in our call of November 5, 1999. Medicare Bulletin 1836 addressed our findings from recent review of medical records from various hospitals and the billing of reusable equipment, monitors and routine nursing (staff) services. The list contained in Bulletin 1836 is not all inclusive, and is merely a point of reference.

Then she goes on to say: For the findings of our review to result in a Medicare Bulletin to all providers, we obviously consider the inappropriate billing of these items of significant impact. So it's not just a slight little issue that's going on.

Another e-mail that responds to Mr. Luce's position is -- and this is just about the Hospital Authority. Interesting enough, insofar as the QuadraMed audit having been done, they're saying that all of these things that ought to be deleted were done with the Hospital Authority's knowledge, when, apparently, it was not.

There is an e-mail from Tim Chandler that I mentioned earlier that asks on 3/10/2000: Please provide a copy of the executive summary of the QuadraMed audit to all the Authority members ASAP. Please reply back to confirm that they have been sent and by what method.

So the Hospital Authority members not even, apparently, had that audit up to that point in time.

THE COURT: What number is that?

MR. GARRARD: I'm sorry, your Honor. That's Exhibit 21.

Then insofar as the changes to the Charge Master are concerned, I don't have in front of me the e-mail that refers exactly to Southeast Georgia, but my recollection is that it shows that finally the charges were finished or done at Southeast Georgia in May.

And then there is an e-mail, which is Exhibit 13, your Honor, talking about Camden Medical Center, which is also involved in this. It's dated 6/8/2000. It says: The changes at Camden Medical Center that were made last night to discontinue charging for supplies and incorporate into the facility fees. This completes the changes resulting from the Charge Master audit.

This is fifteen months, your Honor, after they

Page 20

-0542013.txt

have received Bulletin 1836. And I can't count the number
#0048
of months -- since 1997 when they knew about it. This is
another example of how long they went about keeping from
doing what is correct.

Now I want to refer back, Judge, also to the audit that Mr. Luce referred to, which is Exhibit Number 4. This audit that was done was an assessment of the Corporate Compliance Program. Now what does that mean?

That means there was an issue of what is this hospital, under their management, doing to comply with the rules and regulations?

Ted Whitten's job that had been given to him by Mr. Whitaker, as the CEO, was to become the compliance officer. Ted Whitten reported directly to Mr. Whitaker. He wasn't allowed to report directly to the board. He reported directly to Mr. Whitaker.

In the audit, one of the things that the auditor took them to task for is that that shouldn't be the case. He shouldn't be reporting to the CEO. We also shouldn't be reporting to the board.

But in this audit, when one reads it, it is clear that the auditors are saying that the compliance program is a sham. It is not a program that is doing what ought to be done.

They go through and they talk on page 2 about the number of Focused Medical Reviews. What Focused Medical
#0049
Reviews are is that somebody thinks something wrong is going on here or may be wrong. They put them under a microscope.

One of the interesting things that's also cited in that audit is they say:

Medicare performed an on site audit of the hospital Medicare Secondary Payer documentation in August, 1995. Inconsistencies were identified at that time, however, the problems continued. In 1999, the organization was put under 100 percent focused medical review for completion of medicare Secondary Payer form due to "almost 100 percent error rate."

What does that mean? The Medicare Secondary Payer form means that the hospital is supposed to look and see if there's a primary source for funds before Medicare is billed, if somebody has got commercial insurance, for example.

And they're saying even though it was brought to their attention in 1995, in 1999, it's still about a hundred percent error.

The point of this is to show that the culture of compliance is non-existent. And whose responsibility is that? That's the CEO and the CFO, as provided by Quorum.

The interesting point made the executive summary
#0050
of that is that the auditor says, you know, "Having some documents and saying, 'we've got a compliance program,' that's not enough. You've got to execute it.

In fact, just having stuff on the shelf and the administration of the hospital not enforcing these things is perhaps worse than not having it at all because you're ignoring that and you're showing your intent.

On page 7 of that document, the auditor says:
The Southeast Georgia Hospital System
Page 21

-0542013.txt

has not achieved the desired organizational compliance culture.

And it says:
The compliance department efforts ... have not received visible support from department directors or from upper management levels of the hospital.

And they gave as an example:
The compliance department identified a violation of the Stark Law for which management did not take immediate corrective action.

The Stark Law is the law that says you cannot let an individual physician, for example, utilize space in the hospital without paying for it. And they haven't done anything about it.
#0051
And it talks about non-responsiveness of the departments. There's one particular place I want to point the Court to.

It says on page 8:
Because ... high-risk of Southeast Georgia Hospital System have not been monitored for compliance purposes on a consistent basis, the compliance program would largely be considered ineffective by government standards and could, instead of reducing the organization's liability, increase the organization's exposure with the government. For example, the Charge Description Master, which lists prices and codes for all hospital goods and services, should be a major focus of the compliance efforts. The CDM should be reviewed no less than annually since billing codes are often added, updated or deleted. However, until Quadramed performed a comprehensive CDM in 1999, the last time the Southeast Georgia Hospital System had the CDM reviewed was in 1996.

Keep in mind, as we have alleged in the complaint, Quorum came in as manager of this hospital in 1989.
#0052
In addition to creating a potential overpayment situation, erroneous billing, which would tip off the feds to aberrant patterns of billing can (and usually do) result.

And then last I want to point the Court to in terms of this document is starting on page 9 and going to page 10. The audit says:

Yet, when Medicare Bulletin 1836, which was issued in the middle of March 1999, clarified that certain equipment and service items were not, and had never been, billable to the medicare program, it took five months for the hospital to deactivate those charges ...

In fact, the auditor is wrong. They haven't deactivated them yet.
... to deactivate those charges in the Charge Master even though the appropriate individuals within the system --
and that includes Mr. Whitaker and Mr. Owings
Page 22

-0542013.txt

-- were aware of the requirements of the bulletin. Further, the System, against the advice of the compliance department, has never repaid the money it received from the medicare program for the outpatient charges
#0053
associated with equipment specified in 1836. Management's decision not to follow the compliance team's recommendation on the overbilling situation is another contradiction to a policy contained in the booklet. Specifically, page seven indicates that, upon recommendation of the compliance officer, management "shall take timely remedial or other action as required by the circumstances." In addition to the exposure created by the federal False Claims Act, the organization has increased whistleblower exposure since several employees know that the money was improperly billed yet not returned.

Now this was an audit produced in February of 2000.

Now I want to point Your Honor to one more document at this moment. It's Exhibit Number 26 created by Michelle Morris, document 26. And it's dated 8/1/2000. And it makes several interesting comments. It talks about corporate culture. Quorum is still managing the hospital at this point in time.

Corporate Culture. Compliance is not a priority with administration.
#0054
And then she says, quote:
These issues will be a priority when HCFA comes in (end quote) to quote a higher ranking administrator. Other hospitals do it this way, et cetera. Employees can't be expected to take compliance seriously when their directors do not.

Then she says:
Lack of Closure. Too many issues drag on with no resolution; demonstrates the lack of an effective compliance program. Examples:
Dr. Tripp --
This was talking about the Stark Law problem.
-- the length of time to resolve the non-billable supply issue --
That's talking about the 1836 issue.
-- the mental health issue, et cetera.
Mr. Luce referred to that earlier where they were billing for mental health services when they didn't have the requisite people involved in that to be allowed to bill.

And she mentions Current Compliance Issues. One of which is Mental Health Unit.
The question of disclosure to the FI --
the financial intermediary --
-- has not been resolved for prior cost
#0055
reporting periods.
Meaning, they billed when shouldn't have billed, but they haven't resolved what they're going to do about it.

Remember, Mr. Chandler's reminder, "when you know about some of these things, you've got thirty days to tell
Page 23

-0542013.txt

the people.
She says:
In addition, there is some question as to how far back this goes; the unit may have been without a qualified department director in addition to a master social worker as far back as 1994.

Then she talks about -- and this is in August of 2000 -- Physician Orders.
The issue of physician orders prior to the performance of a test continues unresolved and has led to a dramatic increase in the number of tests billed to the financial intermediary with a non-reimbursable V-code attached. We continue to perform services without requisite orders despite the April Medical Executive Committee vote to discontinue the practice.

The Quorum folks are letting them still do that.
Then number 12, Medical Focused Medical Reviews.
#0056
The hospital is under Focused Medical Review for several areas: MSP, Rehab --
Then there is a blank. I don't know what was taken out.
-- and has a history of repeated Focused Medical Reviews which fail to show improvement. Failure to improve will subject the hospital to referral to Medicare Fraud and Abuse.

And then she talks about Outpatient Dialysis Certification.
Lack of the outpatient dialysis certification is being pursued by COO --
which I believe to be the chief operating officer.
-- however physicians continue to admit patients for one-day stays after shunt revisions for hemodialysis. This will cause problems for the hospital with the PRO in regards to the one-day stay review.

They're not allowed to bill for dialysis. They weren't certificated to do it on outpatient stays.

Now, Your Honor, what I have referred to is kind of a portion of the document that we have provided, and we have attached all of the documents, with the exception of the exhibit that we identified earlier, to our statement of our facts. They are part of our complaint. We have
#0057
incorporated that into our complaint.
My point is that we have shown a great deal of facts. We have shown where they were billing inappropriately. And that's the issue. The issue is: were bills submitted that shouldn't be submitted? This is not: were they paid? This is: were they submitted?

The Quorum people had the responsibility of preparing the billings by their contract. The Quorum people had the responsibility of submitting to the board the cost reports. Do the members of the board go out there and do the cost reports themselves? Of course not.

The reason you hire a Quorum is to run the hospital. And that's what they were doing. They, through Mr. Whitaker and Mr. Owings, created a culture in that hospital of non-compliance. That's the "who."

In terms of one of the "whens," one of the "whens"
Page 24

-0542013.txt

is, at a minimum, from March 1999 until June 2000. And I've shown that to the Court through the various e-mails.

Other of the "whens" start with the Mental Health unit much earlier than that, perhaps 1994.

Other of the "whens" deal in terms of Cardiac Rehab. It's clear when you look at all the e-mails we put in pertaining to Cardiac Rehab that the folks they've ask about that, the financial intermediaries, have said, "Anybody, if you'd look at the rules, would know you can't

#0058

use an emergency room doctor to staff Cardiac Rehab."

That's what they were wanting to say they could do. The rules say you can't do that. And if you don't have cardiac staff with a doctor, you can't bill for it. And the implication in these documents is they are billing for it. I think it's clear.

The Mental Health unit -- they're billing for the Mental Health unit. There are documents in here that talk about -- and one I do want to point out to the Court if I can find it real quick.

It is document number 42, Your Honor, dated 11/15/99. It says:

I think the issue goes beyond whether or not to void claims that are unpaid. If Mental Health unit has been out of compliance with the Medicare Conditions Participation, what should we do with all claims submitted during this period? We need to determine the date MHU was first out of compliance ...

There is also the issue of whether we can claim MHU on the cost report. Once we determine the first date the unit was non-compliant, we should void all claims submitted after that and only claim reimbursement for the period the unit was

#0059

meeting [compliance].

There is another e-mail in there that says they were out of compliance in 1994. This e-mail is dated 11/15/99.

So these are not, Your Honor, just pie in the sky schemes, as the Defendant would lead the Court to believe. These are facts that we have shown the Court that show the indicia of reliability as required by Clausen, as required by Hill, as required by other cases that are cited in the briefs.

And then the last thing I would say, Your Honor, without asking my friends back here if I missed something, is that on the issue of whether it's just the hospital, which seems to be the point they're trying to make, I cite the Court to a Ninth Circuit decision, United States versus Mackby, M-A-C-K-B-Y, 261 F.3d 821, specifically --

THE COURT: Say that cite again.

MR. GARRARD: I'm sorry. 261 F.3d 821, United States versus Mackby, M-A-C-K-B-Y.

In that opinion of the court, the court, interestingly, says:

The FCA, False Claims Act, "reaches any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether the

#0060

person had direct contractual relations with

Page 25

the government."

That answers directly the question of the responsibility of Quorum in this case.

And then in response, Your Honor, to the issue that, "well, these were just billing mistakes here. We're just making billing mistakes." I think the matters that I have pointed out to the Court, and the others that I have not specifically mentioned that are in our statement of facts and exhibits show this is much more than an issue of billing mistake.

And the Eleventh Circuit in the case of U. S. versus Calhoon, C-A-L-H-O-O-N, 97 F.3d 518 says: while it is true that a provider may submit claims for costs it knows to be presumptively non-reimbursable, it must do so openly and honestly, describing them accurately while challenging the presumption in seeking reimbursement.

My point in raising this is, if you look back at the Sinopoli letter that I introduced a little while ago, it shows they are misleading the government right there in a letter that had to be approved by the CFO of the company, Mr. Owings. They're misleading by saying, "We've changed all this stuff. There may be a few things in here, but

#0061

we've changed all this stuff." That's as misleading as it can be, Your Honor.

And just one other item that I would -- never mind. Your Honor, thank you. I think that's all I need to say.

MR. LUCE: Your Honor, thank you, and thank you for your patience in hearing from each of us on this. I will try not to wax on it too long.

A couple of points. I think that counsel has effectively demonstrated that Triad had nothing to do with this. All these claims end before Triad purchased Quorum. Triad is a publicly traded company. You don't have to go to the Internet to find out who they are, what they are, and how they're organized. Quorum, as is a matter of public record, is an independent separate corporation. Yes, its stock is held by the majority in Triad, but it's a separate corporation. The corporate separateness principles still prevail in Georgia and everywhere else, including Delaware.

The facts that are alleged here, and even in the amended complaint, as best I can tell, are on 9/29/2000. Triad acquired Quorum in April of 2001.

Counsel's selective and somewhat non-chronological reading illustrates I think at least this, Your Honor. There are no claims. No claims are identified.

#0062

None of the issues are identified here, which counsel finds to be reeking with fraud. None of these are even findings by the government. They're not even findings by outside consultants on those matters.

What we do find, though, is an abundant involvement by the hospital board. Exhibit 4 is a report to the hospital board. And if I remember correctly, it was done in 1999.

MR. GARRARD: 2000.

MR. LUCE: 2000. Thank you, counsel.

It is a report that also identifies a significant lack of coordination and communication within the compliance

Page 26

office where -- I have lost track of how many jobs, but at one point Mr. Whitten was involved.

But, if anything, what it would show is that the board and the management of the hospital, the directors of the board -- who are, by the way, the people mentioned in many of the e-mails, not the management, but the directors of the hospital -- that they have some issues here. They have some issues here.

I think it would be foolish to suggest otherwise. Nor do I. The question is whether or not those issues amount to fraud.

The Quadramed audit, Your Honor -- Quadramed is a consulting firm. They do matters that relate to the Charge

#0063

Master. That seems to be, again, the centerpiece of what they're talking about.

Exhibit Number 8, at least as it was ordered in the documents we received from the Plaintiff, relates to this 1836 Charge Master. And I think that counsel simply doesn't fully appreciate -- and it's a sad commentary on my life that I do understand Charge Description Masters at this point -- that this is not something that you come in, you punch in a few codes, and you change.

Every item, every service, every unit of the hospital, there's a code for. There's an accounting code. There's a revenue code that matches it.

What Medicare has said -- and that's borne out by these documents -- is that "You can't break those things out into separate things and charge us when you aggregate your bill for respective payment. Instead, we want you to have them by the area.

So it doesn't mean you can't charge for them. It means you can only charge for them in a certain way. That's what 1836 was about. It's an accounting convention.

And to illustrate this point, Your Honor, this is a letter from HCFA, which now, of course, is called CMS because it's necessary to change government names so we can all be confused.

But the letter to Mr. Anderson -- who, by the way

#0064

is not a Quorum employee. Mr. Anderson is the hospital's employee. He's the director of the business office. He's the guy that is and should be in charge of billing and the details of that, the chief financial officer and certainly not a CEO and certainly not a board.

But his communication with HCFA -- he receives a letter that says:

I am in receipt of your letter dated November 15, 1999 regarding Medicare Bulletin 1836 and the billing of outpatient supplies and equipment.

Then he -- I'm not going to read the entirety of it, but it says here in pertinent part:

The list contained in both Bulletin 1836 -- the new monitor here -- is not all inclusive and merely a point of reference.

This is the key.

Any reusable equipment and monitors or routine staff services --

That's what they're talking about in all of these allegations, reusable types of equipment.

-- are to be rolled into the cost for the

Page 27

treatment area in which services are rendered (i.e., the E.R., the O.R., the R.R., recovery

#0065

room, et cetera) and are not separately billable at the claims level.

It's a manner of submitting the bill. It's not that they're not reimbursable. They're just not reimbursable in the format that prior to Bulletin 1836 said they should be.

There are a lot of debates about this, lots of fights back and forth in the industry. But the fact that they were still on the Charge Description Master doesn't mean they were billed to Medicare. That's the whole point of my argument this morning.

The fact that they had to change over a period of months doesn't mean that they were committing fraud. In fact, the same e-mail suggests that they were holding claims, which I think, also, is mighty important.

The sequence of e-mails is often confusing. And I think that -- in fact, if I have followed counsel's arguments correctly, the efforts to try to tie into the management by Quorum's representatives some scheme which is simply not supported, even by everything that counsel has said, is not a matter that would support an allegation that there was fraud.

Just to find, just for a moment, Your Honor, pardon me, this particular document that I think counsel has focused on quite a bit. It was marked as Exhibit 10 in the

#0066

exhibits we received. Counsel read this as -- as I heard it, and perhaps I misheard it -- as an inquiry that was related -- that was correspondence with this person on the outside that was trying to provide oversight on these matters.

So this is Sue Keller. Sue Keller had actually responded to an inquiry from Mr. Owings, not that Mr. Owings responded to Sue Keller and said, "Here's how we're going to do it." You can tell that, counsel, if you look at the times of the e-mail.

The inquiry was first made by Mr. Owings on March 10 at 11:23 a.m. That's when it says it was sent. And Ms. Keller responded on March 10 at 3:28 p.m. And the inquiry, which they read and give a very inappropriate intent to, is exactly what they were supposed to do.

Remember that Exhibit 10 said, "You're supposed to roll up these different reusable costs into the unit, the E.R. or O.R., wherever it is, and not charge for them separately at the claims level. That's what they said.

So that doesn't mean you get them. What it means is what happens to your revenue when you still have to charge but you have to list differently, you have to account for it differently.

So Mr. Owings simply writes to Keller getting advice -- which, by the way, seems to be prudent, not part

#0067

of a conspiracy -- from a qualified advisor. And it says: The following represents the method we intend to use to resolve the deletion of your supplies identified in the Charge Master audit.

Then it says that the gross charges to be deleted are eighteen million, eight hundred thousand, and that the net revenue generated is seven and a half million.

Page 28

~0542013.txt

So in other words, charges are not what you get paid, and they're trying to deal with this. These are outpatient charges. I'm sorry to confuse it, but charges relative to outpatient as opposed to inpatient for respective payment.

So it says they have been charging 18.8 million. They've been getting back seven and a half million. They intend to increase charges in room rates, O.R. time, and E.R. rooms. That's what the agency said. It said, "You can't charge separately for these items. They have to be included in the costs and charges of those units. So that's what they're doing.

Charges by that amount will result in a "net revenue of an amount equal to seven and a half million."

So they're recharging. They're going to make the same amount of money, but they're doing it the way that Medicare says they have to state their bill.

We will delete all the supply charge items from the Charge Master at the same time.

Well, that's critical. Otherwise, they would have a series of misbills, different bills. They would lead themselves to this Focused Medical Review which happens for all kinds of reasons. It doesn't mean they suspect fraud. It also can mean you don't meet their parameters. They have lots of tests that they apply.

An analysis has been done to determine the gross revenue of each of these areas (rooms, O.R., E.R. --

exactly what the government said they were supposed to do. -- to equate the net amount and how much of the supply revenue is the result of each of these three areas.

To which, the response was made by Ms. Keller in the example of another client, not this hospital but another client and how they got to that same result.

Now, Your Honor, this is complicated stuff. It's easily confused. But for purposes of this motion, for a 9(b) or a 12(b)(6), all we have here is a series of communications that allege that we may have a problem, or identify that the government is aware of the problem and we're working through it and making the adjustments.

Now counsel didn't go through each of the charges.

I'm sort of struck with what they plead. And what they pled was, in one case, that for the hemodialysis, that we had submitted false claims. Well, the only claim they show, we corrected.

They have suggested that our Charge Description Master were not correct and prompt and shouldn't have resulted in billings the way they should have. They've shown no bills that show any of the items weren't there.

And they have shown a history of efforts to resolve a very complicated matter. It may not have been fast enough for Mr. Whitten. But Mr. Whitten didn't have to do it. The people have to deal with thousands of lines of computer code, and getting computers to read what the rules are is part of what's there.

So an innocent statement showing an effort to try to get this done, "If we trip an audit," "if we get it," is now cast as "All we have to do is do this." That's an unfair inference, but it's certainly not a strong inference of fraud which is required.

Page 29

---

~0542013.txt

So at the end of the day, have they met Clausen? Well, Your Honor, I think Clausen kind of speaks for itself. It says, in part:
... Rule 9(b)'s directive that [quote] the circumstance constituting fraud or mistake shall be stated with particularly [end quote]

does not permit a False Claims Act plaintiff merely to describe the private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government.

That's where the rubber meets the road in a False Claims Act case. Were the rule otherwise, not only would we be incapable of defending against claims, most of which, from I've heard this morning, are founded on the wrong premise, but also they've been allowed to smear two fine men who have nothing but the acceptance by this community.

If this board felt they were so insulated from responsibility that Compliance Report Number 4 here said that these CEOs were not engaging in their job, then they were on notice.

So to say that they're not responsible, to say that two men entirely in these two major hospitals with a board of community members on it -- who are being told everything, by the way -- were somehow engaged in a scheme to fraud the government is irresponsible.

This is the first time we've seen that, that these individuals have been named. And I'm a little upset about it because there's just no basis for it.

I think that the other thing that's worth noting here is that the motion that compliance and the findings of people could implicate fraud or could involve a False Claims Act, that's what this industry is about. They are very much attuned to that. This is a securities industry, hopefully, these days, and about the need to adhere to the rules.

So the fact that people are looking at it, reporting on it, raising the issues, and trying to address them -- and a record of addressing these issues as shown here -- if the hospital were my client, I would be making exactly the same argument to you today.

There is nothing here but a history of trying to meet the rules. But at the end of the day, Mr. Whitten cannot accuse Quorum, and certainly not Triad, of submitting a false bill to Medicare or in any way suggesting that they were knowingly assisting in the submission of a false claim.

If they knowing assisted in the submission of a false claim, then the hospital submitted a false claim.

The last point on this. They have alleged false statements were also made. I haven't gone into that much because you have to have a false claim to which the false statement is made to secure its payment in order for that to be actionable. I don't see the false statements alleged at all.

So, Your Honor, in sum, Triad is out. They weren't around. Bare legal assertion that one of corporate subsidiaries committed an act is not enough.

And the timing doesn't work for the plaintiff here. Quorum Health Resources, which is a subsidiary of

Page 30

---

~0542013.txt

Quorum Health Care Group, did have the contract, did provide two qualified executives who reported to this board of this hospital, but never submitted a claim to Medicare themselves.

Yes, they had day-to-day business management operations, and they were doing them. They had compliance issues going on. They had people responding to them. They engaged the compliance report. They engaged Quadramed. So they are just as responsible for bringing the people giving the advice as doing it.

To suggest they didn't act timely enough, we haven't even shown that a bill was submitted that wasn't consistent with what the Charge Master was to do or that it had any effect on the payment.

Finally, Your Honor, we believe that this is not a case that the plaintiff, lacking the information to show that a false claim is submitted, should get free discovery to prove up a theory that is merely premeiged together from a series of e-mail exchanges by people in good faith trying to do the right thing.

Thank you very much, Your Honor.

THE COURT: All right, gentlemen. The case was very well argued on both sides.

MR. GARRARD: Thank you, Your Honor.

THE COURT: We will get an order down shortly.

(Recess at 10:36 a.m.)

CERTIFICATION

I certify that the foregoing is a true and correct transcript of the stenographic record of the above-mentioned matter.

_____        _____
Norma Hatfield, Court Reporter              Date

Page 31