Ted Whitten

June 27, 2007

IN THE DISTRICT COURT OF THE UNITED STATES
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION


UNITED STATES OF AMERICA,
ex rel., TED WHITTEN,
(Relator),

          Plaintiff,

                              CIVIL ACTION FILE
     vs.                      NO. CV202-189


QUORUM HEALTH GROUP, INC.,
TRIAD HOSPITALS, INC., As
Successor to
QUORUM HEALTH GROUP, INC.,
QUORUM HEALTH RESOURCES, INC.,
and QUORUM HEALTH RESOURCES, LLC,
          Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~




          VIDEOTAPED DEPOSITION OF
               TED WHITTEN
                VOLUME II
                9:31 A.M.
              June 27, 2007

            440 College Avenue
          Athens, Georgia  30603
          Lee Ann Barnes, RPR

Ted Whitten                                                    June 27, 2007

Page 194

observation status, but not necessarily about pre- or postoperative --

A. Right.

Q. -- determinations?

A. Yes, sir.

Q. The second one says, "Patient record lacked documentation of physician order."

That's exactly the kind of error that you --

A. Yes, sir.

Q. -- alleged, isn't it?

A. Yes, sir.

Q. Number three, it says, "Patient record lacked adequate support for number of units billed."

Is that an allegation that you've made in your complaint?

A. I don't know what that means, to be honest with you.

Q. I'll show you a document that we've marked as Exhibit 80.

(Exhibit-80 was marked for identification.)

Q. (By Mr. Luce) Do you recognize this document, Mr. Whitten?

Page 195

A. No, sir.

Q. Does this refer to a focused medical review of observation room services?

A. It -- it indicates that, yes, sir.

MR. LUCE: This is going to be Exhibit 81.

(Exhibit-81 was marked for identification.)

Q. (By Mr. Luce) Have you ever seen this document, sir?

A. No, sir.

Q. Were you aware that there was a fiscal intermediary for Champus claims by the hospital?

MR. BLASINGAME: Would you say that question again?

MR. LUCE: Yeah.

Q. (By Mr. Luce) Were you aware that there was a fiscal intermediary for Champus claims?

A. Yes, sir.

Q. All right. What is Champus, to your understanding?

A. Military insurance system.

Q. Was that the same system that was

Page 196

later called TriCare?

A. Is that the same --

Q. That was --

A. -- system --

Q. That was later renamed TriCare --

A. Yes.

Q. -- for military dependents?

A. Yes, sir.

Q. And it's your testimony you've not seen this letter before?

A. No, sir.

Q. I'm going to show you a document marked 82.

(Exhibit-82 was marked for identification.)

Q. (By Mr. Luce) Have you ever seen this document before, Mr. Whitten?

A. No, sir.

Q. Does this, to your understanding, show that it's a Medicare review of cardiac rehabilitation services?

A. That's what it appears to be, sir.

Did I get your copy, Mr. Luce?

Q. Possibly so. It's at least one that I marked.

Page 197

A. Is this the one we just looked at?

Q. Yes, sir, that's the one we just looked at. We're going to -- we were just trying to get our sequence here straight.

A. Oh, okay.

Q. The next one I'm going to show you is Exhibit 83.

(Exhibit-83 was marked for identification.)

Q. (By Mr. Luce) Have you ever seen this document before, Mr. Whitten?

A. No, sir.

MR. LUCE: We'll mark this one as 84, please.

(Exhibit-84 was marked for identification.)

Q. (By Mr. Luce) Have you ever seen this document before, Mr. Whitten?

A. No, sir.

(Exhibit-85 was marked for identification.)

Q. (By Mr. Luce) This is a letter that's dated October 27, 1999.

If you look in the lower right corner, Mr. Whitten, it appears that there was

Ted Whitten                                                                June 27, 2007

Page 198

a handwritten "cc" --

A. Yes, sir.

Q. -- "to Ted."

A. Yes, sir.

Q. Do you recall seeing this document before?

A. I don't recall.

Q. I beg your pardon?

A. I don't recall. I'm sorry.

Q. It's possible that you did get the copy as noted here?

A. It's possible, but it doesn't look familiar to me.

Q. Okay. Does this talk about a review by Medicare of observation room charges before they exceed 48 hours?

A. Yes, sir.

Q. Is that one of the allegations in your complaint, that observation room services were charged when they should have not been?

A. Yes, sir.

(Exhibit-86 was marked for identification.)

Q. (By Mr. Luce) Mr. Whitten, I'm going to show you a document I'm going to mark

Page 199

86.

MR. GARRARD: Let me raise a question here.

MR. LUCE: Pardon?

MR. GARRARD: I believe -- and I do not agree with him -- but I believe that the hospital is attempting to claim privilege on this document. I don't think it is. I don't agree with their assertion, but I think this is one they have attempted to assert it on.

MR. LUCE: Well, it's identified in your complaint.

MR. GARRARD: I understand that. I gave him a copy of it.

MR. BLASINGAME: It was also produced in your production.

MR. GARRARD: It was also produced to us by your clients --

MR. LUCE: Right.

MR. GARRARD: -- but in the latest thing from Mr. Mitchelson --

MR. LUCE: Why don't we go off -- excuse me. I didn't mean to interrupt you.

Page 200

MR. GARRARD: I was going to say the latest thing from Mr. Mitchelson, I think he attempts to claim privilege on it.

MR. LUCE: Let's go off the record for just a moment.

MR. GARRARD: Sure.

(Thereupon, there was an interruption in the proceedings from 3:40 p.m. to 3:43 p.m.)

(Beginning of confidential portion of transcript.)

VIDEOGRAPHER: On the record.

MR. LUCE: Out of an abundance of caution in case there should be a privilege over this document or if there was a privilege, whether or not it's been waived remains an open question.

All counsel of record are agreed that this exhibit, 86, and the deposition transcript as relates to it shall remain within the confidentiality order previously entered by this Court several years ago and pending any further disposition by the Court as to its status as a privileged or non-privileged

Page 201

communication or a communication where the privilege, once obtained, has been waived.

Is that agreed, Counsel?

MR. GARRARD: Yes.

MR. LUCE: Okay.

Q. (By Mr. Luce) Well, Mr. Whitten, if that hasn't thoroughly confused you --

A. I have no clue what y'all were just talking about.

Q. Well, I'll -- I'm going to ask you only a few questions about this, but I would like to first ask you: Is this a document with which you're familiar?

A. Yes, sir.

Q. And it was attached as an exhibit to your complaint in this case, wasn't it?

A. Yes, sir.

Q. This purports to be, at least in part, an assessment of the corporate compliance program at Southeast Georgia Health System; is that correct?

A. Yes, sir.

Q. Did you participate in the retaining of Professional Provider Services, Inc., who

Ted Whitten                                                                    June 27, 2007

Page 202

authored this report?

A. Did I participate in --

Q. In the decision to retain them to provide this review.

A. No, sir. I didn't even know that they were.

Q. Okay. Did you meet with representatives of Professional Provider Services?

A. Yes, sir. Yes, sir.

Q. Okay. When did you meet with them?

A. I'm not sure when this was conducted.

Q. Well, take a moment just to familiarize yourself again with the -- with the report.

And you might start at the executive summary over on page 3. That might be the easiest place to start.

A. Yes, sir.

Q. In looking at this executive summary, does it remind you of when you might have met with representatives from Provider Professional Services -- or Professional Provider Services?

Page 203

A. I think -- I'm not sure of the date of this -- this report.

Q. It's -- February 2000 seems to be the --

A. February 2000.

Q. -- legend at the top of the pages.

A. I'm guessing that the -- the audit took four to six weeks to accomplish, in segments. It wasn't -- it wasn't done all at one time. So I guess I would have met with them along that time frame.

Q. Have you any recollection of the individual or individuals from the report's author that you met with?

A. Do I remember them?

Q. Who -- yes, sir.

A. Yes, sir. Tony Capullo and Gerald Dunham.

Q. And again, who hired them, to your knowledge?

A. My recollection is Mr. Whitaker hired them.

Q. And Mr. Whitaker hired them as -- in his capacity as chief executive officer of the hospital?

Page 204

A. Yes, sir.

Q. I'm only going to ask you a few questions about this, but do you recall who received a copy of this report?

A. The compliance department. I -- I'm not sure how many copies we received.

But I believe the Authority members received it. I'm not sure, sir. I -- I believe that to be the case, though.

Q. So it was you, it was members of your compliance department that would have received copies of this?

A. Yes, sir, along -- the Authority members, I assume, got copies.

Q. Well, would --

A. Mr. Whitaker --

Q. Excuse me. I'm sorry.

A. And Mr. Whitaker, of course, received a copy, Ray Owings.

Q. And you received a copy?

A. Yes, sir.

Q. And did Michelle Morris receive a copy?

A. I don't know, sir.

Q. Okay. How about would Debra

Page 205

Kalister have received a copy of this?

A. I'm not sure. I imagine they did.

Q. Do you know whether any members of your compliance department were interviewed by the authors of this report?

A. I don't recall that, sir.

Q. Did the authors of this report audit Medicare claims in the preparation of it?

A. I -- I don't think so. I don't think they had the -- I don't know, sir. I don't know.

Q. Do you know whether or not the authors of this report reviewed the Charge Description Master?

A. I'd have to read the report, but I assume they did.

Q. Well, would they have participated as members or advisers to the Chargemaster committee?

A. I don't believe so, sir.

Q. Did you discuss this report with Mr. Chandler?

A. Did I discuss it with him?

Q. Yes, sir.

A. Yes, sir. He received it as an

Ted Whitten                                                                June 27, 2007

Page 206

Authority member.

Q. All right. And when did you discuss it with Mr. Chandler?

A. I couldn't -- I couldn't begin to tell you. I guess soon after it was received.

Q. Did that discussion occur at an Authority board meeting or was it outside of that context?

A. It didn't occur in an Authority board meeting, because I wasn't allowed to go to the board meetings at that time.

So I guess it would have been as a compliance -- compliance representative.

Q. Was -- do you recall whether that meeting occurred as part of the compliance committee or was it just a meeting that you had with Mr. Chandler?

A. I don't -- I don't recall the compliance committee getting a copy of this. I don't think we did.

Q. Okay. So it wouldn't have been in a compliance committee meeting, then?

A. I don't -- that's what I'm trying to say, yes, sir.

Q. Okay. And do you recall whether

Page 207

there was legal counsel present when you talked with Mr. Chandler about this report?

A. No, sir.

Q. No, you don't recall, or no, there wasn't legal counsel present?

A. I don't recall, no, sir.

Again, I wasn't in the board meeting where the attorney would have been, so I -- I just couldn't really address that.

Q. Okay. Were you familiar with either of the authors of this report --

A. No, sir.

Q. -- prior to their commencement of work?

A. No, sir.

Q. You said you remembered meeting with them.

Do you -- do you remember how much time you spent meeting with them?

A. Not a heck of a lot. Just answering their questions.

Q. Well, that's what you've done for me today, too, and some people might say that was a lifetime, others might say it was just a few hours.

Page 208

But in terms of sort of that kind of question and answer, about how long? Was it a day? Was it an afternoon? A morning? Can you recall?

A. Probably during the course of the day.

Q. Was there any kind of follow-up meeting that you had with either of the authors here?

A. No, sir.

Q. What was your last contact with the authors of this report?

A. I guess the day they reported this -- gave -- they gave this report to the board members.

Q. Okay.

A. I just saw them. I -- I wasn't really in the meeting, but...

Q. Have you spoken with either of the authors of this report since February of 2000?

A. I have.

Q. When did you speak with them?

A. Gosh, probably months ago.

Q. Under what circumstances did you meet with them?

Page 209

A. To ask them some questions that I wanted some clarification on, and that's all.

Q. What were the questions that you asked?

A. If they would serve as my -- I don't know the term -- if they would be willing to testify if needed.

Q. To testify in this litigation?

A. Yes, sir.

Q. Did you ask them to serve as an expert consultant to you in this litigation?

A. I don't -- no, sir, I didn't do that.

Q. Well --

A. And I don't know what the definition is of that.

Q. Okay.

A. I just simply asked if they would -- would serve as witnesses.

Q. And what did they say?

A. Mr. Capullo said no, that he could not because of the job, and Mr. Dunham I believe said he will -- or would if asked.

Q. Does Mr. Dunham still work for Professional Provider Services, Inc.?