Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

UNITED STATES OF AMERICA )
ex rel. TED WHITTEN, )
      Plaintiff, )
 )
VS. ) CIVIL ACTION NO.
 ) CV202-189
TRIAD HOSPITALS, INC. as )
Successor to QUORUM HEALTH )
GROUP, INC., QUORUM HEALTH )
RESOURCES, INC. and QUORUM )
HEALTH RESOURCES, LLC, )
      Defendant. )

THE ORAL DEPOSITION OF
DEBRA KALISTER
JUNE 19, 2007

      THE ORAL DEPOSITION OF DEBRA KALISTER, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on the 19th day of June, 2007 from 9:58 a.m. to 5:15 p.m., before JULIE VERASTEGUI, CSR in and for the State of Texas, reported by stenographic and computer-aided transcription at Inn of the Hills Resort & Conference Center, 1001 Junction Highway, Kerrville, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Whitten vs Triad                                    Debra Kalister                                    6/19/2007

Page 26

title, but his division was called Resource Management. And within that was Compliance, Case Management, Quality Assurance. And -- And the idea was that it would become a system-wide -- that all these departments would become system-wide so that Camden wouldn't need their own in-house staff for all of these case management.

So that was -- The idea was that system develop -- I forget what it was called -- System development. So initially Camden had a compliance officer, and actually they had their own Compliance Committee, but we -- we tended to function at both places. We would go to their Compliance Committee meetings. If they had a billing issue, they would usually call Michelle and get her expertise.

Q. Okay. Do you know the person at Camden who was the -- I mean, who was on their compliance -- who were -- who were their compliance officers or their compliance directors?

A. I -- I can't remember her name. It was the director of nursing.

Q. Okay.

A. It was also the compliance -- I believe she was called the compliance officer.

Page 27

Q. But she was definitely the director of nursing?

A. Yes.

Q. Are there any other hospitals in the -- that were operating in the Glynn Brunswick system at the time?

A. No. They had some clinics, but no other hospitals.

Q. What's King's Bay?

A. King's Bay is a submarine base in St. Mary's, but I don't think they had a clinic there.

Q. Okay. Was there a -- a clinic at St. Mary's?

A. Just the hospital.

Q. I just -- just remembering --

A. They had one in Darien.

Q. Okay.

A. They had one in Nahunta.

Q. Uh-huh.

A. I don't -- They had one on St. Simmon's Island. And that's the three clinics and two hospitals.

Q. Okay. Now, you had mentioned something about Compliance Committee meetings and that people

Page 28

from SGRMC --

MR. CALLOWAY: Am I talking loud enough? Can you guys hear me?

MR. GARRARD: Uh-huh.

Q. (By Mr. Calloway) You had mentioned Compliance Committee meetings. Do you know who the members for the Compliance meetings for SGRMC were during the time that you were employed there?

A. Oh. There was Bert Whitaker --

Q. Okay. The --

A. -- Ray Owings, the -- the CEO, the CFO, the -- Tim Chandler was the board member who was chairman. The director of nursing.

Q. Would that be the person from Camden?

A. No, the -- the SGRMC director of nursing.

Q. Okay.

A. I don't remember her name. The business office director. Let's see. Of course the hospital attorney. There were a few other people I can't remember.

Q. Okay. And what -- Let's just take these people one at a time. You said Bert Whitaker. He was the CEO?

A. Yes.

Q. Was Bert Whitaker already -- Strike that.

Page 29

Was Bert Whitaker already CEO of the hospital when you arrived there?

A. Yes.

Q. Okay. You also mentioned -- And do you know who -- how he came to -- to be the CEO of the hospital?

A. No, I don't.

Q. Okay. You also mentioned Ray Owings. Who is Mr. Owings?

A. He was the CFO.

Q. Okay. And was he at the hospital when you arrived there?

A. Yes.

Q. And by "the hospital," you mean SGRMC, correct?

A. Yes.

Q. Okay. And do you know what Quorum is?

A. They were a healthcare management company.

Q. Okay. And do you know if -- And how are you aware of that, that they were a healthcare management company?

A. I was aware of it when I became employed there. I didn't know them prior to that.

Q. Okay. And how did -- When did you become aware of -- I mean -- Strike that.

8 (Pages 26 to 29)

Whitten vs Triad                          Debra Kalister                                    6/19/2007

Page 30

Were you aware that Mr. Whitaker and Mr. Owings were actually employed by Quorum?

A.   Yes.

Q.   Okay.  And you mentioned Tim Chandler.  Who is Mr. Chandler?

A.   He was a board member.

Q.   And he was a board member for the Glynn Brunswick Memorial Hospital Authority?

A.   Yes.

Q.   Okay.  And did you -- You've met Mr. Chandler before, obviously?

A.   I --

Q.   Strike --

A.   I first met him when I became employed.

Q.   Right.  Bad question.  You -- You interacted with Mr. Chandler when you were employed at SGRMC?

A.   Yes.

Q.   Okay.  And who was the chair of the Compliance Committee?

A.   Tim Chandler.

Q.   Tim Chandler?  And you had mentioned the hospital's attorney.  That was Wallace Harrell?

A.   Yes.

Q.   And he was another member of the committee?

Page 31

A.   Yes.

Q.   Okay.  You men -- mentioned the director of nursing for SGRMC.  Do you remember her name?

A.   Was it Rosie O'Donnell?  No.  That's not it.  She's on TV.  It was Rosie something.

MR. GARRARD:  Rosie Mohn.

Q.   (By Mr. Calloway)  Rosie Mohn --

A.   Yes.

Q.   -- M-O-H-N?

A.   Yes.

Q.   And you mentioned the business office director.  Do you remember who that person was?

A.   Jim Anderson.

Q.   Okay.  Were there any other board members from the Glynn Brunswick Memorial Hospital Authority on the Compliance Committee?

A.   No.

Q.   Okay.  Just Mr. Chandler?

A.   Yes.

Q.   Okay.  And what -- what did the Compliance Committee do?

A.   Discuss Compliance issues, discuss the -- the operations of the Compliance Department.  I -- issues that we were currently working on.

Q.   Anything else?

Page 32

A.   That was the general framework.

Q.   Okay.  Do you know why Michelle Morris wasn't on the Compliance Committee?

A.   Oh, she was.

Q.   She was?

A.   I'm sorry.

Q.   Okay.

A.   All -- Ted, Michelle and I were always at the Compliance Committee meetings.

Q.   Do you know Donna Davis?

A.   Was she at the intermediary?

Q.   Well, I'm asking --

A.   I don't know, no.

Q.   If you don't recall, you don't recall.

A.   I don't remember.

Q.   Okay.  Do you know who Stephanie Sinopoli is?

A.   She worked in the business office.

Q.   Okay.  And do you know what she did in the business office?

A.   I know one of her duties was overseeing the preparation of the cost report.

Q.   Okay.  Do you know what title she held?

A.   No.

Q.   Okay.  Do you know who Alice Bess is?

Page 33

A.   I think she was the director of the Mental Health Unit, but I could be wrong.

Q.   Do you -- And you mentioned Jim Anderson previously.  He was the business office director?

A.   Yes.

Q.   Do you know what his role at SGRMC was --

A.   He --

Q.   -- what he did on a day-to-day basis?

A.   On a day-to-day basis, other than just overseeing the operations of the department.

Q.   Okay.  When we had talked before about the membership and Compliance Committee, we had mentioned Mr. Whitaker, Mr. Owings, Mr. Chandler, Rosie Mohn, Jim Anderson, Wallace Harrell and yourself, Tim Whitten and Michelle Morris.  Anybody else you can think of?

A.   There were others, but I can't remember.

Q.   Okay.  Have you seen a copy of the complaint in this lawsuit?

A.   Not -- I don't -- I saw an initial draft, but I don't -- I never saw the final.

Q.   Okay.  When you say you saw an initial draft, how did you come to see that initial draft?

A.   I met with Ted's attorneys.

Q.   Okay.  Mr. Blasingame -- You met with

9 (Pages 30 to 33)

Tiffany Alley & Associates
770-343-9696

Page 34

Mr. Blasingame and --

A. Yes.

Q. -- Mr. Garrard?

A. Yes.

Q. Okay. And when was that?

A. Probably sometime in 2001 or 2002 after I had left the hospital.

Q. And how did you come to meet with Mr. Blasingame and Mr. Garrard?

A. Ted asked me if I would meet with them.

Q. Okay. And when you said, "Ted asked me to," where were you living at the time?

A. In Brunswick.

Q. Okay. Did Mr. Whitten come to your house?

A. No.

Q. Or did he call you?

A. He called me.

Q. Okay. And what was -- You said Ted asked you to. What was the nature of that discussion? Did you talk about anything else?

A. No. He just said that he was meeting with some attorneys to consider action and would I mind meeting with them.

Q. Okay. Did he describe the nature of the action --

Page 35

A. No.

Q. -- that he was considering?

A. No.

Q. Okay. And what was your -- What did you -- How did you respond to his -- his request?

A. I said I would.

Q. Okay.

A. I wasn't working.

Q. Okay. And where did you meet with Mr. Blasingame and Mr. Garrard?

A. On St. Simmon's Island at his local attorney's office.

Q. Randy Jordan?

A. Yes.

Q. Was Mr. Whitten at that meeting?

A. No.

Q. Okay. Was Mr. Jordan at that meeting as well?

A. I think he was.

Q. Okay. Do you recall when -- I think you said that was sometime in 2001 after you resigned.

A. Yes.

Q. Okay. You drove there?

A. Yes.

Q. Okay. Did you drive there by yourself?

Page 36

A. Yes.

Q. Okay. When you arrived, what did you -- what did you discuss during that meeting?

A. I don't remember specifics. They asked a lot of questions about the Compliance office and just various issues, Medicare Bulletin 1834.

Q. Okay. Did they show you an initial draft of the complaint in this lawsuit at that time?

A. I don't think it was that -- I met with them two or three times, and I think maybe the second time they asked me to look at it.

Q. Okay. When you said -- Let's talk about that first meeting still before we move on to the second or third time. You had mentioned -- Well, can you repeat again for me like the items that they asked you about?

A. I really don't remember the specifics because I didn't take any notes.

Q. Okay. Just in general.

A. In general, it was Compliance issues, the -- the atmosphere or -- in the Compliance Department --

Q. Okay.

A. -- the work environment.

Q. Okay. And what did you -- What did you

Page 37

tell them about those things?

A. I think I just described, you know, what we -- how we worked on a day-to-day basis, some of the friction between the Compliance office and the administration.

Q. Okay. And when you said that -- the friction between the Compliance officer [sic] and the administration, what do you mean by that?

A. There was a lot of resistance to some of the -- the things the Compliance office was trying to do. And in general, I don't think we felt that we got the support from Administration that we needed to get the department directors on board.

Q. Uh-huh. Okay. And anything else you talked about during that initial meeting with Mr. Blasingame or Mr. Garrard?

A. I -- I can't remember.

Q. Okay. You mentioned that you might have met with them a second and third time. Let's talk about the second time. Do you recall that meeting?

A. I recall it. But, again, I just don't remember the specifics. They all run together in my mind.

Q. Okay. What about the third one?

A. Again, the same.

10 (Pages 34 to 37)

Whitten vs Triad                          Debra Kalister                                    6/19/2007

Page 38

Q. Okay. You mentioned earlier that you didn't take any notes with respect to the first meeting. Did you take any notes with respect to any subsequent meetings?

A. No.

Q. Okay. You had mentioned earlier that you were shown a -- an initial draft of the complaint in this lawsuit at some point during one of these meetings. Do you recall -- but it wasn't in the first meeting. Do you know if it was in the second or the third meeting?

A. I would say it was the second meeting.

Q. Okay. And were you asked anything about that draft?

A. I was asked to read it and to let them know if there were any mistakes, and -- and I did find a couple areas where -- For instance, there was one that referenced "Debra," and I think -- as if it were me, but it was another Debra at Camden, and I just pointed out there was an inconsistency there.

Q. Okay. And you said you pointed out that there was an inconsistency after they asked you to read it. You, in fact, did read that complaint?

A. Yes.

Q. Okay. Were there any attachments to the

Page 39

complaint?

A. I don't remember.

Q. Okay. Okay. Other than the -- Okay. And then you said that might have been -- you think that was during the second meeting. Did you ever review a -- an amended draft of that complaint at any other time?

A. No. I only saw one.

Q. Okay. Anything else that you can recall that occurred during that second meeting other than -- than what you've described already?

A. No. I just don't remember.

Q. Okay. And the third meeting, you don't recall?

A. No.

Q. Okay. Okay. After that initial discussion with Mr. Whitten when he asked you to meet with his attorneys, do you recall ever talking to Mr. Whitten again regarding the lawsuit?

A. I never talked to him again about the lawsuit. I called him once around Christmas just to see how he was, and he didn't seem interested in talking, so it was a short conversation, and I've never talked -- spoken to him since.

Q. Do you recall when -- You said you spoke to

Page 40

him about Christmas. Are you talking Christmas 2001?

A. I think so.

Q. And you said you haven't talken [sic] with him since. Do you have any -- How do you feel about that?

A. I'm not sure what you mean. I just -- I just -- It doesn't bother me that we haven't --

Q. Oh, okay.

A. -- had any contact.

Q. Okay. Would -- Let me ask the question. Would you have described your -- your -- Well, how would you have described your relationship with Mr. Whitten?

A. He was my -- my supervisor.

Q. Uh-huh.

A. We had a good working relationship.

Q. How would you have described your relationship with Michelle Morris?

A. A good working relationship.

Q. You had stated earlier that you had left the hospital -- Well, strike that.

    What year did you -- What -- When did you leave the hospital -- leave SGRMC?

A. March of 2001.

Page 41

Q. Okay. And do you -- Why did you leave?

A. I just -- I always worked because I wanted to, not because I had to financially, and I just didn't want to work anymore.

Q. Any other reasons?

A. No. Well, the Compliance office was just -- It really -- It didn't exist any longer, and I -- I just couldn't see the point in continuing to work there.

Q. What do you mean by, "it didn't exist any longer"?

A. You know we had a part-time compliance officer. They had taken -- We had brought in a billing auditor, and they fired her. She -- She got laid off in the big layoff of -- in January, so we didn't have a billing auditor. They moved Michelle to the business office, so we didn't have her expertise anymore. It was -- It was myself and a woman we had hired to do the education program presentation. It just -- They just pretty much gutted it.

Q. Okay. And when you said -- And what -- what -- When did that occur?

A. From December of 2000 through January of -- of 2001.

11 (Pages 38 to 41)