Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

UNITED STATES OF AMERICA )
ex rel. TED WHITTEN, )
      Plaintiff, )
 )
VS. ) CIVIL ACTION NO.
 ) CV202-189
TRIAD HOSPITALS, INC. as )
Successor to QUORUM HEALTH )
GROUP, INC., QUORUM HEALTH )
RESOURCES, INC. and QUORUM )
HEALTH RESOURCES, LLC, )
      Defendant. )


THE ORAL DEPOSITION OF
DEBRA KALISTER
JUNE 19, 2007


THE ORAL DEPOSITION OF DEBRA KALISTER, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on the 19th day of June, 2007 from 9:58 a.m. to 5:15 p.m., before JULIE VERASTEGUI, CSR in and for the State of Texas, reported by stenographic and computer-aided transcription at Inn of the Hills Resort & Conference Center, 1001 Junction Highway, Kerrville, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Whitten vs Triad                                          Debra Kalister                                                    6/19/2007

Page 174

C-A-S-T-R-I-N-A, Hanula, H-A-N-U-L-A -- That's Castrina-Hanula -- with Quorum Health Resources, LLC, dated October '99.

And my first question is: Did you participate in any way in the Pre-JCAHO consultation?

A. No.

Q. This document -- And it bears Quorum numbers QHRLLC-044778 and QHRLLC-04814.

MR. GARRARD: You want to see it?

MR. CALLOWAY: Yes. Thank you.

Q. (By Mr. Garrard) And if you look at the second page of that document, you see where it -- the Quorum representatives did the Pre-JCAHO and stated that Mental Health was out of compliance?

A. Yes.

Q. Okay. Now, I want to show you maybe one more exhibit. And this is Exhibit 48. And I'll show it to Counsel.

And if you would, Ms. Kalister, take just a moment and read that. That was an e-mail memo created by -- I lost my train of thought -- Michelle Morris.

A. Okay.

Q. Let me see it just a second, please, ma'am.

Page 175

Do you remember receiving that e-mail memo?

A. Yes.

Q. In that, on page -- the second page of it, it talks of current compliance issues. And on the Mental Health, it says, "MHU. The question of disclosure to the FI has not been resolved for prior cost reporting periods. In addition, there is some question as to how far back this goes. The unit may have been without a qualified department director in addition to an MSW as far back as 1994."

Would I be correct in understanding from this that there was still an issue as of 8/1/2000 concerning the Mental Health and prior billings?

A. Yes. And I don't recall it being resolved.

Q. Okay. When you got this memo from Ms. Morris, which is Exhibit 48, did you disagree with the issues or areas of concern which she outlined in there?

A. No. And I think I indicated that I -- I added some of those. It was -- We worked on it together, as I recall.

Q. So that would have been a joint expression of concerns?

A. Yes.

Page 176

Q. For both of you?

A. Yes.

Q. Okay.

MR. CALLOWAY: Could I see that for a second?

MR. GARRARD: Sure.

Q. (By Mr. Garrard) You remember the events surrounding the Tony Capullo PPS audit, correct?

A. Yes.

Q. What was the reaction of Mr. Whitaker when that -- I guess it was, the draft of that audit was disclosed?

A. I remember Tony said he asked the -- he asked Tony to change several sections and felt it was -- that it was a setup, that it was predetermined that he was going to make Compliance look good and the administration look bad.

Q. Did you take issue with the conclusions that Mr. Capullo came to?

A. I -- I don't remember taking issue with any of them. I believe we agreed with all of them.

Q. Okay. At least insofar as you and Compliance were concerned?

A. Correct.

Q. Did you believe that to have been a fair

Page 177

and correct audit?

A. Yes.

Q. Okay. Would it be fair to say that Mr. Whitaker was unhappy with the results of that audit?

A. Yes, he was.

Q. Okay.

MR. GARRARD: Thank you for your patience.

THE WITNESS: Okay.

MR. CALLOWAY: Brief follow-up.

MS. PARKER: Would you like me to move?

MR. CALLOWAY: No. I don't think that will be an issue.

That number -- Were you on 51?

MR. GARRARD: 51 will be the next number.

MR. CALLOWAY: Let's mark this as 51. This is going to be the original complaint.

MR. GARRARD: Okay.

(Deposition Exhibit No. 51 was marked.)

(4:58 p.m.)

EXAMINATION

45 (Pages 174 to 177)

Page 178

BY MR. CALLOWAY:

Q. Ms. Kalister, you've just been handed what's been marked as Exhibit 51. Do you see "51" at the bottom?

A. Yes.

Q. Okay. And do you see there's a stamp that runs vertically on that material?

A. Yes.

Q. Okay. What does that stamp say?

A. "Filed U.S. District Court Brunswick Division."

Q. And is there a date there?

A. November 21st, 2002.

Q. Okay. Can you -- That is a -- I'll represent to you that's a copy of the complaint that's originally filed with the Southern District of Georgia in this matter. Can you look at that complaint, look through the pages for a second and tell me if anywhere you see the name "Debra"?

A. No, I don't.

Q. Okay. You had mentioned earlier, during this morning session, that you -- when you had reviewed a copy of the draft of -- of the complaint that was submitted to you by Mr. Whitten's counsel that you believed there was some confusion in that

Page 179

complaint -- And I'm generalizing here, so correct me if I'm misstating what I'm saying -- between you and a Debra.

A. Yes.

Q. Okay. Did -- Did -- That complaint that I just handed you that's been marked as Exhibit 51 doesn't contain a reference to "Debra," does it?

A. No.

Q. Okay. That is not the material that you reviewed, is it?

A. No. And I'm not sure now that what I reviewed was a draft or -- I'm not sure what I looked at.

Q. Okay.

A. Looking back seven years, I might have been -- been mistaken.

Q. Well, when you say you might have been mistaken, mistaken as to what?

A. As to what it was they asked me to review.

Q. What -- I mean, now -- now that you're saying you're mistaken, what do you believe it was?

A. You know, I can't remember. It was -- It's -- It talked about issues in here, Mental Health, but I don't know whether it was just a review of the overall case or their position or what

Page 180

it was, but I thought it was a draft of the -- of the complaint, but I may be mistaken.

Q. Okay. When you say it talked about the issues in here, you said Mental Health. Did it talk about Cardiac Rehab?

A. In this?

Q. The material that you looked at.

A. I don't remember.

Q. Okay. Do you remember if it talked about Tricare and Champus?

A. I don't remember.

Q. Okay. But it concerned the same general matters?

A. I believe so.

Q. Okay. You had mentioned earlier -- And, again, I'm generalizing here regarding your testimony -- in response to a question from Mr. Garrard regarding responsibility for the finance -- finances of the hospital. Do you remember that?

A. Yes.

Q. Okay. And I think you had said that responsibility for the finance of the hospital rests with the Administration. Do you recall that?

A. Yes.

Page 181

Q. Do you know what the function of -- of a hospital board is, of directors?

A. To -- To oversee the administration of the hospital --

Q. Okay.

A. -- for oversight.

Q. Okay. Do you -- When you say oversight and you stated "to oversee the administration," where would you -- where would you rank the board of the hospital in relation to the hierarchy -- Strike that.

In terms of hierarchy, where would you rank the board with respect to the administration of the hospital?

A. They're not responsible for the day-to-day operations, but they're responsible to ensure that the -- those people who are the administrators are doing their job properly and benefitting the community.

Q. Okay. With respect to Exhibit 48 -- You can go ahead and take a look at that and refamiliarize with that.

A. Okay.

Q. I wanted to ask additional questions. You had made mention earlier that -- I think, that

46 (Pages 178 to 181)

Page 182

Professional Providers Services was engaged by -- by Tim Chandler.

A.   Well, the board --

Q.   Okay.

A.   -- at Tim Chandler's recommendation.

Q.   Do you know if Mr. Whitten knew Tony Capullo before Professional Provider Services was engaged?

A.   He knew who he was, based on some incident. Tony had parked in the Mental -- in the maternity center parking lot, and he was walking in the door, and Ted asked him why -- why did he park there, and he said, "It's okay. Ted Whitten said I could." He had never met Ted Whitten.

And I guess Ted didn't say anything. Then when Tony walked in to do the audit, Ted brought it up. But I don't know what Tony was doing at the hospital. Tony used to work at First American. That's how Tony knew Tim Chandler. They both had worked at First American. So at some point Tony was in Brunswick -- he lived in Brunswick at some point.

Q.   Okay. When you said -- I thought I made --

A.   It's one of those you meet somebody and you don't realize you met them --

Page 183

Q.   I see.

A.   -- until years later.

Q.   Okay. So Mr. Capullo told Mr. Whitten that, "Mr. Whitten said I could park here"?

A.   Yes.

Q.   Okay. Can I see Exhibit 45 -- 44 and 45? Okay. Let me hand this Exhibit 44 to you. And if you turn to the third page, what are the last three numbers of the third page?

A.   07SEG0055338.

Q.   Okay. And that's an e-mail from Mr. Owings, isn't it?

A.   Yes.

Q.   Okay. And Mr. Owings is commenting on the work that -- the draft that you had put together?

A.   Yes.

Q.   Okay. Do you -- I mean, looking at the draft and -- and recalling your experience in regards to this, do you feel that he was trying to encourage you with respect to what you had put together?

A.   Yes. He was supportive of it.

Q.   Okay. You've never been employed by Quorum or Triad, have you?

A.   No.

Page 184

Q.   Okay. And the date of your resignation -- Do you recall the date you -- you actually left the employment of the hospital?

A.   I think it was March 21st. It was -- The e-mail to Leigh Elrod indicated March 20th -- or March 30th, but, I mean, at some point I just went over to her office and said, "I've got to go." I was sitting there doing nothing. And I think it was the 20th or the 21st.

Q.   Okay. And I think you testified earlier -- Strike that.

Did you have any conversations regarding billing issues with anybody at the hospitals after you left other than what you've testified in regard to earlier this morning concerning your contacts with Mr. Whitten's counsel?

A.   No.

Q.   Okay. Is it fair to say that with respect to any activities that occurred after you left the employment of the hospital, that you had no knowledge of what occurred after you left?

A.   No knowledge of what occurred at the hospital?

Q.   Yes.

A.   That's correct.

Page 185

Q.   Okay. Okay. You had made mention of Mr. Whitaker's reaction to the PPS audit. Do you recall that?

A.   Yes.

Q.   Okay. And you had said that Mr. Whitaker -- I think you said something to the effect that he'd asked Tony to make changes to several sections.

A.   Yes.

Q.   Did Mr. Whitaker tell you exactly what changes he wanted to make?

A.   No. Tony told us.

Q.   Okay.

A.   But I don't remember which sections that he said he wanted changed.

Q.   Okay. You had said that you and Michelle Morris had called Kit Duncan at Blue Cross Blue Shield regarding the conditions of participation.

A.   Yes.

Q.   And do you recall the date of that?

A.   No. It would be sometime around the Mental Health memos.

Q.   Okay. Okay. Do you recall what -- how -- Well, let me see if we have Exhibit 44.

47 (Pages 182 to 185)